GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Charles H. Linehan (#307439)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

JOHNSON & WEAVER LLP
Frank J. Johnson (#174882)
Shawn Fields (#255267)
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: frankj@johnsonandweaver.com
shawnf@johnsonandweaver.com

*Co-Lead Counsel for Lead Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LIKAR ROK, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>IDENTIV, INC., JASON HART, and BRIAN NELSON,<br><br>Defendants. | Case No. 3:15-cv-05775-CRB<br><br>**CLASS ACTION**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 7

IV. SUBSTANTIVE ALLEGATIONS .......... 9

A. Identiv's Business .......... 9

B. Identiv Reported a Material Weakness in Its Internal Controls for Fiscal Years 2012 – 2014 Relating to the Financial Statement Close Process .......... 9

C. The Company Declared That It Had Remedied the Material Weakness in Its Internal Controls on March 23, 2015, in Its Fiscal Year 2014 Annual Report .......... 12

D. Defendants Knew the Company's Internal Controls Contained Material Weaknesses Not Reported by the Company During Fiscal Years 2013 and 2014 Because Hart Was Improperly Charging Personal Expenses to the Company, and Nelson Was Aware of It .......... 13

E. The Company Formed a "Special Committee" to Investigate Hart's Improprieties, but Continued to Conceal Deficiencies in the Company's Internal Controls, and Published Misleading Financial Reports .......... 18

F. The Company Finally Disclosed Weaknesses in Its Internal Controls on November 30, 2015, When BDO Refused to Be "Associated With" Any of the Company's 2015 Financial Statements .......... 20

V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS .......... 22

A. Defendants' Materially False and/or Misleading Executive Compensation Figures .......... 24

B. Defendants' Materially False and/or Misleading Internal Controls Statements .......... 25

C. Defendants' Materially False and/or Misleading Internal Controls Omissions During Fiscal Year 2015 .......... 31

VI. LOSS CAUSATION ........ 34

VII. PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 41

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........ 43

IX. CLASS ACTION ALLEGATIONS ........ 43

X. CLAIMS FOR RELIEF ........ 45

XI. PRAYER FOR RELIEF ........ 47

XII. JURY DEMAND ........ 48

1. Lead Plaintiff Thomas Cunningham ("Lead Plaintiff"), by and through his undersigned attorneys, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of himself and all other similarly situated purchasers of the securities of Identiv, Inc. ("Identiv" or the "Company") from November 13, 2013, through November 30, 2015, inclusive (the "Class Period").

2. Lead Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP and Johnson & Weaver LLP. This investigation included, among other things, a review and analysis of: (i) Identiv's public filings with the SEC; (ii) public reports and news articles; (iii) economic analyses of securities movement and pricing data; (iv) transcripts of Identiv's investor calls; (v) interviews with former employees and other potential witnesses with relevant information; and (vi) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody or control. Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

3. Identiv is a global security technology company that purportedly provides solutions to organizations in government, education, retail, transportation, healthcare, and other markets to reduce risk, achieve compliance, and protect brand identity.

4. During the Class Period, Defendants Identiv, its Chief Executive Officer ("CEO") Jason Hart ("Hart"), and its Chief Financial Officer ("CFO") Brian Nelson ("Nelson") (collectively, "Defendants") made numerous materially false and/or misleading statements and omissions regarding weaknesses in the Company's internal controls and Hart's

practice of improperly charging personal expenses to Identiv.

5. Investors and the market generally monitor the quality of a Company's internal controls because strong controls reassure investors that a Company's financial data is accurate. Weak internal controls, on the other hand, make a company vulnerable to instances of inaccurate financial reporting, causing the Company's public statements regarding the Company's operations and prospects to be less reliable.

6. The Company consistently informed investors of a material weakness related to the Company's "financial statement close process" throughout fiscal years 2013 and 2014.[1] For example, on March 19, 2013, in the Company's Annual Report filed with the SEC, the Company disclosed the existence of the material weakness, and specifically stated that the material weakness arises from "insufficient review and oversight of the recording of complex and non-routine transactions." The Company warned that the material weakness created a situation where a reasonable possibility existed that a material error related to complex and non-routine transactions could occur in the Company's financial statements and not be prevented or detected in a timely manner. The Company continued to disclose the existence of the material weakness related to the financial statements close process in quarterly and annual SEC filings throughout fiscal years 2013 and 2014, adding in its Annual Report filed on March 31, 2014, that the material weakness was also due in part to "an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP."[2] The Company also routinely reassured investors that it was in the process of remedying the weakness.

7. The Company declared that the material weakness had been fully remedied in its fiscal year 2014 Annual Report filed with the SEC on March 23, 2015. Specifically, the Company stated that it "added personnel with experience and training in U.S. GAAP." The

[1] The Company's fiscal year runs from January 1st to December 31st

[2] Generally Accepted Accounting Principles (or "GAAP") are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

Company also stated that it "streamlined [its] reporting processes and simplified [its] operational structure to create additional efficiencies" and that, as a result, "the previously disclosed material weakness has been remediated as of December 31, 2014." Defendants Hart and Nelson signed certifications that accompanied the Annual Report, reassuring investors that they had designed effective internal controls over financial reporting, disclosed known deficiencies or material weaknesses in internal controls, and had disclosed any know fraud.

8. However, during fiscal years 2013 and 2014, Hart was charging personal expenses to the Company, and failing to report this information to investors. Moreover, Nelson was aware Hart was doing it, but helped cover for Hart, and did not report him. As later admitted by the Company (on December 18, 2015), Identiv reimbursed expenses of $97,868 in 2014 and $13,147 in 2013 to Hart which the Company subsequently determined should not have been reimbursed either because the expenses were not consistent with the Company's expense guidelines and policies, or because insufficient documentation was provided to support such expense reimbursements. Because the Company was improperly reimbursing Hart for personal expenses, Hart's reported 2013 and 2014 compensation figures were deflated—since they did not include the value of personal expenses that Identiv was covering. Therefore, contrary to Defendants' representations, the Company's internal controls contained a weakness that Defendants were actively exploiting. Hart, with Nelson's cooperation, was disregarding the Company's internal controls to effectively steal from the Company, and failed to report the information to investors.

9. The public began to learn of Hart's misconduct on May 1, 2015. On that day, the Company announced that it had been served with a civil complaint by a former employee "alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company." The complaint identified many personal expenses that Hart charged to the Company. Identiv also announced that in response to the complaint, the Company's Board of Directors formed a special committee (the "Special Committee") to investigate the allegations, and that the Company intended to file an

amendment to its fiscal year 2014 10-K "to complete the information called for by Item III of Form 10-K, including the executive compensation information." On this news, Identiv common stock fell $0.13 per share, to close at $9.28 per share on May 4, 2015, the very next trading day following the disclosure.

10. The Company continued to publish financial statements during fiscal year 2015 despite the Company's inability to file official Quarterly Reports due to the ongoing Special Committee investigation. On May 18, 2015, the Company notified investors that it would not be filing its Quarterly Report for the first quarter of 2015 on time because of the ongoing investigation by the Special Committee. This disclosure re-emphasized to investors the magnitude of Defendants' fraud. On this news, Identiv common stock fell $0.24 per share, to close at $6.63 per share on May 19, 2015. However, despite the Company's inability to file its Quarterly Report for the first quarter of 2015, on May 15, 2015, the Company released first quarter 2015 financial statements to investors that, in the words of the Company "would typically be included in a Quarterly Report on Form 10-Q." Again, on August 14, 2015, the Company notified investors that it would not be filing its Quarterly Report for the second quarter of 2015 on time because of the ongoing investigation by the Special Committee. However, the Company still released second quarter financial statements to investors on August 13, 2015. Finally, on November 12, 2015, the Company released its third quarter 2015 financial statements to investors even though it did not file its third quarter Form 10-Q at that time.

11. The Company failed to disclose, however, that the financial statements associated with first, second, and third quarter of 2015 were the product of a financial reporting system that, at the time, contained a material weakness in its internal controls relating to the financial statement close process—the very same weaknesses that the Company claimed it had remedied in March of 2015. As a result, the Company failed to warn investors that the financial statements lacked the assurance of accuracy afforded by effective internal controls. As the Company later disclosed when it finally filed its Quarterly Reports associated

with those periods on Form 10-Qs with the SEC on March 29, 2016, "the Company's internal control over financial reporting was not effective as of [March 31, June 30, and September 30, 2015]" due to "insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP."

12. On November 30, 2015, after the market closed, the Company shocked the market when it revealed that the BDO USA, LLP ("BDO"), the Company's independent registered public accounting firm, had resigned. The Company also announced that BDO was unwilling to be associated with the Company's financial statements for any fiscal period in 2015; that BDO would not complete its review of financial information for the quarters ended March 31, 2015, June 30, 2015, and September 30, 2015; and that BDO would not audit the Company's financial statements for the year ended December 31, 2015 because "BDO disagrees with the scope and the remediation of the special investigation that was undertaken by the Special Committee of the Board."

13. The Company also announced that BDO informed the Board of two material weaknesses in the Company's internal control over financial reporting. The first weakness related to the Company's entity level controls. Specifically, BDO pointed out that "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued." This disclosure, and BDO's refusal to be associated with the Company's financial statements revealed to the market the egregious nature of Hart's misconduct and Defendants' unwillingness to properly address the issue.

14. The second material weakness identified by BDO related to the Company's ability to properly record and report financial data. Specifically the Company reported that BDO stated "the Company has not designed and implemented appropriate controls to provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to

prevent or timely detect and correct misstatements." In particular, BDO revealed the existence of two significant errors related to revenue transactions in the second quarter of 2015 that Identiv's internal controls failed to catch and correct. The disclosure of this weakness revealed to investors that the Company's earlier claims that it had remedied the financial statement close process weakness were false, and that the Company's published 2015 financial statements were the product of a system that contained significant internal control deficiencies.

15. On this news, Identiv common stock fell $0.46 per share, or 15.5%, to close at $2.49 per share on December 1, 2015 on unusually heavy trading volume. The stock price continued to decline, falling a total of $1.31 per share, or 44.4%, over five trading days, to close at $1.64 per share on December 7, 2015, on unusually heavy trading volume.

16. During the Class Period, Defendants issued false and/or misleading internal controls statements, and failed to inform investors that Hart was essentially stealing from the Company. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

18. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Identiv's principal executive offices are located within this Judicial District.

20. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

21. Lead Plaintiff Thomas Cunningham, as set forth in a previously-filed certification (Dkt. No. 12-3), incorporated by reference herein, purchased Identiv common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22. Defendant Identiv, Inc. is a Delaware corporation with its principal executive offices located at 2201 Walnut Avenue, Suite 310, Fremont, California 94538. The Company changed its name from "Identive Group, Inc." to "Identiv, Inc." on May 22, 2014. During the Class Period, Identiv, through its officers and directors, periodically filed financial and other information with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock. Throughout the Class Period, Identiv's common stock was actively traded on the NASDAQ Capital Market ("NASDAQ") under the symbol "INVE."

23. Defendant Jason Hart ("Hart") was, at all relevant times, CEO of Identiv from September 3, 2013 until September 9, 2015 when, after reviewing the findings of the Special Committee, Identiv's Board of Directors replaced him with Steven Humphreys. Hart also served as a Director of Identiv from September 3, 2013 until his resignation effective February 2, 2016. Hart joined Identiv in 2011 when Identiv acquired idOnDemand, a company Hart co-founded. Hart is a 25-year veteran of the technology industry, and his experience includes more than 20 years leading security companies. Hart was previously the CEO of idOnDemand, Inc., ActivIdentity, a provider of identity assurance and strong authentication solutions, and Protocom Development Systems Inc., an identity management software security business. During the Class Period, Hart made materially false and misleading statements.

24. Defendant Brian Nelson ("Nelson") was, at all relevant times, the CFO of Identiv from December 20, 2013 until November 18, 2015. Nelson has served as the Company's Vice President of Business Strategy since November 18, 2015. Nelson has more than 20 years of practical experience in accounting and finance, ranging from executive finance positions with both emerging and established technology companies in Silicon Valley to providing audit assurance and transaction-related services to public and private companies. Nelson served as CFO of Identiv's idOnDemand subsidiary both prior to and following its acquisition by the Company in May 2011. Before that, from 2005 to 2010, he served as Vice President of Finance and CFO of Kleer Corporation, a wireless audio company. Nelson was also previously an Audit Manager with KPMG LLP in Silicon Valley. Since 2008, Nelson has served as a Professor of Practice in the MBA program in the Leavey School of Business at Santa Clara University in Santa Clara, California. Nelson holds a Certified Public Accountant ("CPA") license in the State of California. During the Class Period, Nelson made materially false and misleading statements.

25. Defendants Hart and Nelson are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Identiv's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Identiv's Business

26. Identiv is a global security technology company. The Company purportedly provides solutions to organizations in government, education, retail, transportation, healthcare, and other markets to reduce risk, achieve compliance, and protect brand identity. There are four Identiv business segments: Premises, Identity, Credentials, and All Other:

27. **Premises**: The foundation of the Company's premises business is the Hirsch line of controllers. The Hirsch Velocity software platform enables centralized management of access and security operations across an organization, including control of doors, gates, turnstiles, elevators and other building equipment, monitoring users as they move around a facility, preventing unwanted access, maintaining compliance and providing a robust audit trail.

28. **Identity**: The Company's Identity products include smart card readers that are utilized to enable logical access, security, and identification applications.

29. **Credentials**: The Company's Credentials products include near field communication ("NFC") and radio frequency identification (" RFID") products—including inlays and inlay-based cards—labels, tags, and stickers. These products are used in a diverse range of physical applications, including electronic entertainment, games, loyalty cards, mobile payment systems, transit and event ticketing, and brand authenticity.

30. **All Other**: As the name implies, this business segment covers all security-related products and services offered by the Company which don't fit within the above-three categories.

### B. Identiv Reported a Material Weakness in Its Internal Controls for Fiscal Years 2012 – 2014 Relating to the Financial Statement Close Process

31. In the wake of the Enron and WorldCom accounting fraud scandals, the Sarbanes-Oxley Act of 2002 ("SOX") was enacted to "protect investors by improving the accuracy and reliability of corporate disclosures." Pursuant to SOX and the Exchange Act, a registrant's CEO and CFO are required to sign and certify, in each annual or quarterly report,

that the report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. The officers must also sign and certify that they have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report, and have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date. Finally, the officers must certify that they have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function), all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data, and have identified for the issuer's auditors any material weaknesses in internal controls, and any fraud that involves management or other employees who have a significant role in the issuer's internal controls. *See* SOX, Section 302 (15 U.S.C. § 7241).

32. Pursuant to SOX, the Company disclosed the existence of a material weakness in the Company's internal controls over financial reporting related to "the financial statement close process" in Identiv's Annual Report filed March 19, 2013 with the SEC on Form 10-K for the 2012 fiscal year (the "FY 2012 10-K"). Specifically, the Company, in the FY 2012 10-K, stated:[3]

> *Inadequate design of controls related to financial statement close process* — Management determined that the Company's design and operating effectiveness of controls over the financial statement close process related to the application of the Company's accounting policies and the presentation of disclosures in the notes to the financial statements was inadequate. Specifically, ***this material weakness arises from insufficient review and oversight of the recording of complex and non-routine transactions.*** This material weakness created a situation where a reasonable possibility exists that a material error related to complex and non-routine transactions could occur in our financial statements and not be prevented or detected in a timely manner.

33. The Company's fiscal year 2013 Quarterly Reports affirmed the continued existence of the material weakness identified in the FY 2012 10-K. The respective Quarterly

[3] All quoted text in this complaint that is both bolded and italicized is added emphasis, unless otherwise stated.

reports were filed on May 10, 2013, August 14, 2013, and November 13, 2013. In each one, the Company stated:

> Based on that evaluation, our principal executive officer and principal financial officer concluded that, due to the material weakness[] in our control over financial reporting [] disclosed in our Annual Report on Form 10-K for the year ended December 31, 2012, our internal disclosure controls and procedures were not effective as of the end of the period covered by this report.

34. The Company again affirmed the existence of the material weakness in its fiscal year 2013 Annual Report filed with the SEC on Form 10-K on March 31, 2014 (the "FY 2013 10-K"), but added that the material weakness was due in part to "an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP." Therein, the Company, in relevant part, stated:

> *Inadequate design of controls related to financial statement close process* - Management determined that the Company's design and operating effectiveness of controls over the financial statement close process related to the application of the Company's accounting policies and the presentation of disclosures in the notes to the financial statements was inadequate. Specifically, ***this material weakness arises from insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP***. This material weakness creates a situation where a reasonable possibility exists that a material error related to complex and non-routine transactions could occur in our financial statements and not be prevented or detected in a timely manner. This material weakness was previously identified and disclosed in our Annual Report on Form 10-K for the year ended December 2012 and a remediation plan was implemented; however, recent changes in the Company's operational structure have delayed full remediation of the material weakness, as discussed below.

35. The Company's fiscal year 2014 Quarterly Reports affirmed the continued existence of the material weakness originally identified in the FY 2012 10-K, and expanded on in the FY 2013 10-K. The respective Quarterly reports were filed on May 15, 2014, August 14, 2014, and November 14, 2014. In each one, the Company stated:

> As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2013, our management identified a material weakness in our internal control over financial reporting as of December 31, 2013, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP.

36. However, in each of the fiscal year 2014 quarterly reports, the Company stated that it was in the process of remedying the material weakness, but reassured investors that "the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively, which we expect to occur within the current fiscal year."

**C. The Company Declared That It Had Remedied the Material Weakness in Its Internal Controls on March 23, 2015, in Its Fiscal Year 2014 Annual Report**

37. The Company disclosed that it had remedied the material weakness related to the financial statement close process in its Annual Report filed March 23, 2015 with the SEC on Form 10-K for the 2014 fiscal year (the "FY 2014 10-K"). Therein, the Company, in relevant part, stated:

> During 2014, we completed the transition of our accounting and finance function to California and added personnel with experience and training in U.S. GAAP. Additionally, as part of our reorganizational changes, we streamlined our reporting processes and simplified our operational structure to create additional efficiencies.
>
> The Company has completed the implementation of remediation measures to address the material weakness described above and, as of December 31, 2014, has concluded that the remediation activities implemented are sufficient to allow us to conclude that the previously disclosed material weakness has been remediated as of December 31, 2014.

38. In addition to the declaration by the Company that the material weakness had been remedied, and the non-disclosure of any additional weaknesses, Defendants Hart and Nelson signed certifications reassuring investors regarding the Company's internal controls, which were filed with the FY 2014 10-K. Therein, Hart and Nelson stated:

> The registrant's other certifying officer and I . . . have . . . Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles . . .

*   *   *

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

39. BDO, the Company's independent registered public accounting firm, audited the statements of operations, comprehensive loss, stockholders' equity, and cash flows for the year ended December 31, 2014, that were provided in the Company's FY 2014 10-K, and expressed the opinion that the statements fairly represented Identiv's financial position. However, with respect to the Company's internal controls, BDO stated that it did not perform an audit of the Company's internal controls, and that it was not expressing an opinion on the effectiveness of the Company's internal controls.

**D. Defendants Knew the Company's Internal Controls Contained Material Weaknesses Not Reported by the Company During Fiscal Years 2013 and 2014 Because Hart Was Improperly Charging Personal Expenses to the Company, and Nelson Was Aware of It**

40. Despite the Company's claim in the FY 2014 10-K that the material weakness had been remedied and Defendants' reassurances in the SOX certifications that there were no other material weaknesses, the material weakness relating to the financial statement close process continued to exist well into fiscal year 2015 (as explained in subsection "F", below). Additionally, contrary to Defendants' representations that the Company's internal controls issues had been remedied, Defendants knew that the Company's internal controls contained a material weakness that the Company was not reporting in fiscal years 2013 and 2014.

41. On April 2, 2015, a civil complaint was filed in the California Superior Court for the County of Alameda (*Ruggiero v. Identiv, Inc. et al.*, Case No. HG15764795) (the "Complaint") by Hart's former executive assistant (the "Assistant"), against Identiv and Hart for age discrimination, disability discrimination, retaliation, and harassment. The Complaint

detailed Hart's practice of inappropriately charging the Company for personal expenses, and revealed a pattern of disregard for the adequacy of internal controls and accurate reporting of financial data by both Hart and Nelson.

42. As alleged in the Complaint, shortly after Hart became CEO of Identiv in September 2013, he began charging Identiv for his own personal expenses. This fact was eventually confirmed by the Company in its amendment to the FY 2014 10-K filed on December 18, 2015 (the "FY 2014 10-K/A"). Therein, the Company disclosed that Hart charged to the Company "$13,147 in 2013," which the Company "subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."

43. As explained in further detail in the Complaint, Hart routinely charged the Company for personal expenses. For example, Hart submitted his personal American Express bill that included PayPal purchases, Amazon.com purchases, restaurant charges, and other personal expenses to the Company for reimbursement. The Complaint also alleges that Hart purchased servers through eBay in 2013 at a price of approximately $18,000 each—which were on Hart's American Express bill and were submitted to the Company for reimbursement—and which Hart kept at his home for personal, not Identiv's, use.

44. Hart was aware that charging such items to the Company was improper because, as laid out in the Complaint, as early as 2013, his Assistant would ask him to provide backup documents and names of participants to clarify that the requested expenses were Identiv expenses. However, Hart would ignore her emails and calls, or he would pick an expense category and tell her to "figure it out."

45. Defendant Nelson was also aware that Hart was improperly charging the Company for his personal expenses in 2013. Hart's Assistant regularly discussed the issue with Nelson, and Nelson often returned Hart's expense reports to the Assistant, asking for the same supporting information that Hart originally failed to provide to the Assistant. There were

also discussions of the issue between the Assistant, Hart, and Nelson because the issue had to be resolved in order to complete the expense reports.

46. Hart continued to improperly charge the Company for personal expenses during fiscal year 2014. As admitted by the Company in its FY 2014 10-K/A, Hart charged the Company "$97,868 in 2014" which the Company "subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."

47. As explained in further detail in the Complaint, Hart routinely charged the Company for personal expenses in 2014. In April 2014, Identiv purchased a drone for approximately $5,000, which Hart kept at his home for personal use. In June 2014, Hart submitted approximately $3,000 in American Express gift cards to Identiv for reimbursement; however, the gift cards were used to pay the groundskeeper for a different company's property (with which Hart was associated).

48. Around July 4, 2014, Hart went to Las Vegas, Nevada with a contact in the U.S. government, Gary Kremen, an Identiv Board member, Defendant Nelson, Hart's girlfriend, Hart's girlfriend's sister, and the sister's boyfriend. Another recently hired female employee (and roommate of Hart's girlfriend) met the group in Las Vegas. Everyone stayed at the Cosmopolitan hotel under Hart's name. Hart payed the group's charges, which also included "champagne showers" at the MGM club "Wet Republic." Champagne showers involve spraying champagne on oneself, simulating the activity athletes perform after winning a championship. Hart also racked up bills of approximately $5,000 for top shelf vodka, $5,000 at the XS-Encore restaurant, $1,900 in massages for Kremen, and thousands more for various other items. All these charges, totaling $17,585, were submitted to Identiv for reimbursement.

49. Hart also converted his personal car—a Porsche Cayenne Turbo—into a Company vehicle so that the Company would bear more of the costs associated with the car.

50. Additionally, about the time of the Company's public offering of 2 million shares that took place on or around September 11, 2014, Hart again racked up a large bill—totaling $28,959.19—on a trip to Las Vegas that included Hart's friend, his girlfriend, and a roommate of Hart's girlfriend (who was also an Identiv employee). Nelson also accompanied Hart on the trip, along with Kremen, Identiv Board Chairman Steve Humphries, and a DLA Piper attorney. Hart submitted the bill to Identiv for reimbursement.

51. Defendant Hart knew that the identified (and many more) expenses he charged to the Company in 2014 were improper. There was at least one instance when Hart instructed the Assistant to misrepresent the expense in order to conceal an improper expense: with respect to the 4th of July Las Vegas expenses, Hart told the Assistant to label the expense "customer event – senior exec and board plus customers including us marshal." Moreover, at or around the time of the July 4th weekend, the Assistant became very vocal about Hart's improper expenses, which would have ensured that Hart was aware that he was improperly charging the Company for personal expenses. Finally, on or around October 3, 2014, Hart sent his Assistant an email berating her, out of frustration, that she continued to complain about Hart's improper expenses.

52. Defendant Nelson was also aware of Hart's improper expenses during 2014. Around July 4, 2014, the Assistant again brought Hart's expenses to the attention of Nelson—specifically noting the alcohol portion of the bill and telling Nelson the expenses were unethical. In response, Nelson reassured the Assistant that he would speak with Hart about the matter. Around this time, Hart's Assistant also explained to Nelson that she believed Hart was using the Company to finance his lifestyle because Hart was out of money. Additionally, Nelson accompanied Hart on the trip to Las Vegas after the offering, so he personally witnessed Hart racking up large personal expenses which Hart later submitted to Identiv for reimbursement. After the trip, Hart's Assistant communicated her frustrations to Nelson regarding Hart charging the post-offering Las Vegas trip to the Company. In response, Nelson confirmed with the Assistant that he understood and agreed with her concerns.

53. The testimony of a former employee and confidential witness ("CW1") confirms that Hart was improperly charging personal expenses to the Company and that Nelson was aware of it. CW1 was an employee of Identiv at all relevant times until July 2014. CW1 took direction directly from Defendant Nelson, and CW1 oversaw an employee (the "Sub-Employee") that processed an American Express credit card that was used by Hart. CW1 stated that there had been a lot of time spent writing SOX processes before Hart and Nelson became CEO and CFO, but that when Hart and Nelson arrived, the processes "went out the door." According to CW1, it was a daily fight for the Sub-Employee to obtain the expense reports and receipts from Hart or Hart's Assistant to support the charges to the Company. For charges that did not have an accompanying receipt, CW1 stated that Nelson instructed CW1 to pay the expenses and would comment "we will figure it out later." When CW1 would push back regarding the improper expenses, Nelson would tell CW1, "you have to do it." CW1 stated that it was a common joke around the office that you had to do what Jason (Hart) wanted or you would be fired.

54. Hart and Nelson's activity clearly violated the Company's "Code of Conduct and Ethics."[4] The code states that "Identiv's Directors, Chief Executive Officer and Chief Financial Officer are responsible for ensuring that Identiv's public disclosures meet these requirements and guidelines, and that adequate financial and disclosure controls exist for this purpose." The code also requires that "Identiv's Directors and employees must promote the accurate and reliable preparation and maintenance of Identiv's financial and other records and must ensure that any information or data they report to management is accurate and honest[,]" that "Identiv employees must record and report all information accurately and honestly[,]" and that employees "[n]ever make misrepresentations or dishonest statements to any person or organization." Finally, in the event an employee has knowledge of a violation of the code, "it is [his] responsibility to report this to Identiv management in person or through the

[4] Available at: http://www.identiv.com/images/pdfs/_Code_of_Conduct_and_Ethics.pdf (last accessed May 2, 2016).

Confidential Employee Hotline." Hart flagrantly violated this code, while Nelson permitted him to do so.

**E. The Company Formed a "Special Committee" to Investigate Hart's Improprieties, but Continued to Conceal Deficiencies in the Company's Internal Controls, and Published Misleading Financial Reports**

55. In response to the Complaint, on May 1, 2015, Identiv announced its intent to file an amendment to its FY 2014 10-K on Form 10-K/A "to complete the information called for by Item III of Form 10-K, including the executive compensation information" which the Company did not include in its FY 2014 10-K. The Company also disclosed the existence of the Complaint to investors, characterizing it as "a complaint . . . from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company." The Company informed investors that it had formed the Special Committee to investigate the allegations contained in the Complaint.

56. On May 18, 2015, the Company filed a Notice of Late Filing of Form 12b-25 informing investors that the Company would not be filing its Form 10-Q for the quarterly period ended March 31, 2015 ("Q1 2015") because the Company was not able to complete the executive compensation portion of the 10-Q due to the ongoing investigation by the Special Committee.

57. However, despite the Company's inability to file its 10-Q, the Company released condensed and consolidated financial statements "that would typically be included in a Quarterly Report on Form 10-Q" (as described by the Company) for Q1 2015 on May 15, 2015. Highlights from the financial statements included net revenue of $14.9 million, cost of revenue of $8.8 million, total operating expenses of $10.2 million, and a loss from operations of $4.1 million.

58. On August 14, 2015, the Company again filed a Notice of Late Filing of Form 12b-25 informing investors that the Company would not be filing its Form 10-Q for the quarterly period ended June 30, 2015 ("Q2 2015") because the Company was not able to

complete the executive compensation portion of the 10-Q due to the ongoing investigation by the Special Committee.

59. However, despite the Company's inability to file its 10-Q, the Company released financial statements in its quarterly results press release for Q2 2015 on August 13, 2015. Highlights from the financial statements included net revenue of approximately $15.6 million, cost of revenue of $8.9 million, total operating expenses of $13.9 million, and a loss from operations of $7.3 million.

60. The Company did not file its 10-Q for the third quarter of 2015 ("Q3 2015") in November, when it is typically filed; however, the Company released financial statements in its quarterly results press release for Q3 2015 on November 12, 2015. Highlights from the financial statements included net revenue of $17.2 million, cost of revenue of $9.5 million, total operating expenses of $13.2 million, and a loss from operations of $5.6 million.

61. The Company failed to disclose, however, that the financial statements associated with Q1 2015, Q2 2015, and Q3 2015 were the product of a financial reporting system that, at the time, contained a material weakness in its internal controls relating to the financial statement close process—the very same weaknesses that the Company claimed it had remedied in March of 2015. As a result, the Company failed to warn investors that the financial statements lacked the assurance of accuracy afforded by effective internal controls. As the Company later disclosed when it finally filed its Q1 2015 10-Q, Q2 2015 10-Q, and Q3 2015 10-Q on March 29, 2016, "the Company's internal control over financial reporting was not effective as of [March 31, June 30, and September 30, 2015]" due to "insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP."

62. The Company's failure to disclose the material weakness upon the release of the Q2 2015 and Q3 2015 financial statements was especially egregious given that the weakness was clear to Defendants when the statements were released to the public since the

financial statements reflected two major adjustments that were spotted by BDO when preparing the statements for publication. As disclosed by the Company in a Current Report filed with the SEC on November 30, 2015:

> BDO determined that the Company has not designed and implemented appropriate controls to provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to prevent or timely detect and correct misstatements. Specifically, during the course of conducting review procedures on the Company's interim financial information for the quarter ended June 30, 2015, BDO identified significant adjustments with respect to revenue transactions which resulted in the deferral of revenue; which errors were not identified by the Company's internal control over financial reporting.

The Company identified two problematic transactions:

> The first of these transactions related to a significant long-standing reseller, with which the Company was in discussions regarding delivery and payment schedules. The $3.2 million shipment was made and accepted in June 2015, and the Company provided 90 day "extended payment terms" specified by the customer during the quarter ended June 30, 2015. The Company originally recorded revenue during the quarter ended June 30, 2015 whereas the fact pattern indicated that the terms were not "fixed or determinable" at the time and revenue should have been recorded when the amount became due and payable by the customer. The account was fully paid in September 2015, and the revenue recognized upon payment during the quarter ended September 30, 2015.
>
> The second transaction related to an agreement that BDO was made aware of during the quarter. The Company considered revenue recognition with respect to this transaction and prepared a memorandum that was provided to BDO. While the customer accepted delivery of the non-recurring engineering work in June 2015, BDO advised, and the Company agreed, that the Company, in its memorandum, had failed to conclude that there were undelivered software elements in the arrangement for which vendor specific objective evidence of fair value had not been established and accordingly, the Company recorded an adjustment in June 2015 to defer this revenue. The Company will recognize such revenue in the current quarter now that it is actively selling the solution it developed.
>
> The quarterly results included in the Company's Current Report on Form 8-K filed August 13, 2015 reflected the adjustments described above.

### F. The Company Finally Disclosed Weaknesses in Its Internal Controls on November 30, 2015, When BDO Refused to Be "Associated With" Any of the Company's 2015 Financial Statements

63. The true nature of the Company's material control weaknesses was revealed on November 30, 2015, when the Company filed a Current Report on Form 8-K with the SEC disclosing that BDO "is unwilling to be associated with the consolidated financial statements

prepared by management for any of the fiscal periods within 2015 and will not complete its reviews of the interim financial information as of or for the periods ended March 31, 2015, June 30, 2015 or September 30, 2015, and additionally will not audit the Company's consolidated financial statements as of and for the year ending December 31, 2015" because BDO "disagrees with the scope and the remediation of the special investigation that was undertaken by the Special Committee of the Board."

64. The Company also reported that BDO informed the Board of "two material weaknesses in the Company's internal control over financial reporting." The first weakness related to the Company's entity level controls, including a determination by BDO that "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued." The second weakness identified by BDO "related to revenue recognition." BDO determined that the Company failed to designate and implement controls to "provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to prevent or timely detect and correct misstatements." BDO noted that during the course of conducting review procedures on the Company's interim financial information for the quarter ended June 30, 2015, it "identified significant adjustments with respect to revenue transactions which resulted in the deferral of revenue; which errors were not identified by the Company's internal control over financial reporting."

65. On news of the material weaknesses and implicit confirmation by BDO's statements that Identiv management did not foster an environment where internal controls and accurate financial reporting are valued (which allowed Hart to use the Company as his own personal checking account), the Company's stock price fell, thereby injuring investors.

66. The Company later admitted on December 18, 2015, that Identiv had improperly reimbursed Hart for personal expenses. In an amendment to the Company's FY 2015 10-K filed on Form 10-K/A on December 18, 2015, the Company stated that it

"reimbursed expenses of $97,868 in 2014 and $13,147 in 2013" to Hart "which the Company subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements." The Company also corrected previously issued compensation information, increasing Hart's reported compensation, to account for the improper reimbursements.

67. Finally, the Company admitted and confirmed on March 29, 2016, that its internal controls over financial reporting were materially weak during the first, second, and third quarters of 2015. The Company finally filed its 2015 Quarterly Reports on Form 10-Qs on March 29, 2016. Therein, the Company admitted that for those periods, "the Company's internal control over financial reporting [were] not effective" because of a weakness relating to the financial statement close process due to "insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP."

## V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS

68. During the Class Period, Identiv filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial statements. The Company's 10-Qs and 10-Ks contained false information regarding the Company's internal controls. The following chart identifies the date, signatories, and period covered by each relevant report filed with the SEC during the Class Period:

| Form | Period | Date Filed | Defendant Signatories | Referred to Below As |
|---|---|---|---|---|
| 10-Q | 2013 Fiscal Third Quarter | 11/13/2013 | Hart | Q3 2013 10-Q |
| 10-K | 2013 Fiscal Year | 3/31/2014 | Hart | FY 2013 10-K |
| 10-Q | 2014 Fiscal First Quarter | 5/15/2014 | Hart & Nelson | Q1 2014 10-Q |
| 10-Q | 2014 Fiscal Second Quarter | 8/14/2014 | Hart & Nelson | Q2 2014 10-Q |
| 10-Q | 2014 Fiscal Third Quarter | 11/14/2014 | Hart & Nelson | Q3 2014 10-Q |
| 10-K | 2014 Fiscal Year | 3/23/2015 | Hart | FY 2014 10-K |

69. The Company attached CEO and CFO signed certifications regarding the Company's internal controls to the filed Form 10-Qs and 10-Ks as required by SOX. The certifications contained false statements regarding the Company's internal controls. The chart below identifies the certification signatories associated with each relevant Form 10-Q and 10-K.

| Form | Cert. Signatories |
|---|---|
| Q3 2013 10-Q | Hart & David Wear |
| FY 2013 10-K | Hart & Nelson |
| Q1 2014 10-Q | Hart & Nelson |
| Q2 2014 10-Q | Hart & Nelson |
| Q3 2014 10-Q | Hart & Nelson |
| FY 2014 10-K | Hart & Nelson |

70. The Company's FY 2013 10-K and FY 2014 10-K pointed investors' attention to the Company's Proxy Statements for information related to executive compensation. The Preliminary Proxy Statement and Definitive Proxy Statements referenced by the FY 2013 10-K were filed on April 18, and April 28, 2014, respectively (the "2013 Proxy Statements"). The Preliminary Proxy Statement referenced by the FY 2014 10-K was filed on April 17, 2015 (the "2014 Proxy Statement"). The Proxy Statements contained false information regarding Hart's compensation.

71. Though the Company did not file Quarterly Reports on form 10-Q for the first, second, and third quarters of 2015, the Company still published financial statements, filed with the SEC on Form 8-K (attached as exhibit 99.1), similar to those that would be included in a Form 10-Q. Defendants failed to inform investors of material weaknesses in the Company's internal controls that existed at the time the statements were compiled, which could have affected the accuracy and did affect the reliability of the financial statements. The relevant 8-Ks are identified in the chart below.

| Period | Date Filed | Referred to Below As |
|---|---|---|
| 2015 Fiscal First Quarter | 5/15/2015 | Q1 2015 8-K |
| 2015 Fiscal Second Quarter | 8/13/2015 | Q2 2015 8-K |
| 2015 Fiscal Third Quarter | 11/12/2015 | Q3 2015 8-K |

### A. Defendants' Materially False and/or Misleading Executive Compensation Figures

72. The Company's 2013 Proxy Statements reported "Total" compensation for Hart for the year 2013 as "$250,056." The Company also reported "All Other Compensation"—which is a subcategory of total compensation—for Hart for the year 2013 as "$56" which the Company attributed to "payments made on behalf of Mr. Hart in 2013 for life insurance."

73. The reported total compensation and All Other Compensation figures identified in the paragraph above were materially false when made because, as admitted by the Company in its FY 2014 10-K/A filed with the SEC on December 18, 2015, Hart's total compensation for 2013 was "$263,203," and Hart's All Other Compensation for 2013 was "$13,203" which included "$13,147 in 2013 as to which the Company subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."

74. The Company's 2014 Proxy Statement reported "Total" compensation for Hart for the year 2014 as "$3,515,504." The Company also reported "All Other Compensation"—which is a subcategory of total compensation—for Hart for the year 2014 as "$17,004." The Company's 2014 Proxy Statement also reported, and reiterated, "Total" compensation for Hart for the year 2013 as "$250,056" and "All Other Compensation" for Hart for the year 2013 as "$56" which the Company attributed to "payments made on behalf of Mr. Hart in 2013 for life insurance."

75. The reported total compensation and All Other Compensation figures identified in the paragraph above were materially false when made because, as admitted by the Company in the FY 2014 10-K/A, Hart's total compensation for 2014 and 2013 were "$3,763,372" and "$263,203," respectively, and Hart's All Other Compensation for 2014 and 2013 were

"$114,872" and "$13,203," respectively, which included "payments to Mr. Hart of previously reimbursed expenses of $97,868 in 2014 and $13,147 in 2013 as to which the Company subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."

76. Theses false statements with regard to compensation reporting were made with scienter because Hart and Nelson were aware that Hart was improperly charging the Company for personal expenses as detailed in ¶¶44-45, 51-53.

### B. Defendants' Materially False and/or Misleading Internal Controls Statements

77. In the Q3 2013 10-Q, under Item 4, "Controls and Procedures," the Company stated:

> As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2012, our management identified a material weakness in our internal control over financial reporting as of December 31, 2012, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions. We continue to improve our policies and procedures relating to internal controls over financial reporting, including putting in place an increased level of accounting and reporting oversight and controls at the corporate level. We expect to complete the implementation of remediation measures, and as a result remediate the existing material weakness described above, by the end of 2013.

78. Hart, through his Sarbanes-Oxley certification which was attached to the Q3 2013 10-Q as an exhibit, stated:

> 1. I have reviewed this quarterly report on Form 10-Q of Identive Group, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and ***I*** are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal

> control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and ***have***:
>
> a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***
>
> b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;
>
> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***
>
> a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***
>
> b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

79. In the FY 2013 10-K, under Item 9A, "Controls and Procedures," the Company stated:

> Based on management's assessment, including consideration of the control deficiencies discussed below, management has concluded that the Company's internal control over financial reporting was not effective as of December 31, 2013, due to the following material weakness.

> *Inadequate design of controls related to financial statement close process* - ***Management determined that the Company's design and operating effectiveness of controls over the financial statement close process related to the application of the Company's accounting policies and the presentation of disclosures in the notes to the financial statements was inadequate. Specifically, this material weakness arises from insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP. This material weakness creates a situation where a reasonable possibility exists that a material error related to complex and non-routine transactions could occur in our financial statements and not be prevented or detected in a timely manner***. This material weakness was previously identified and disclosed in our Annual Report on Form 10-K for the year ended December 2012 and a remediation plan was implemented; however, recent changes in the Company's operational structure have delayed full remediation of the material weakness, as discussed below.

80. Hart and Nelson signed SOX certifications that were submitted with the FY 2013 10-K. The content of the certifications was substantively identical to the certification described in ¶78.

81. In the Q1 2014 10-Q, under Item 4, "Controls and Procedures," the Company stated:

> As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2013, our ***management identified a material weakness in our internal control over financial reporting as of December 31, 2013, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP***.
>
> * * *
>
> Management has developed a timetable for the implementation of the foregoing remediation efforts and will monitor the implementation. In addition, under the direction of the Audit Committee, ***management will continue to review and make necessary changes to the overall design of the Company's internal control environment, as well as to policies and procedures to improve the overall effectiveness of internal control over financial reporting. Management believes the foregoing efforts will effectively remediate the material weakness***. However, the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively, which we expect to occur within the current fiscal year.

82. Hart and Nelson signed SOX certifications that were submitted with the Q1 2014 10-Q. The content of the certifications was substantively identical to the certification described in ¶78.

83. In the Q2 2014 10-Q, under Item 4, "Controls and Procedures," the Company stated:

> As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2013, our ***management identified a material weakness in our internal control over financial reporting as of December 31, 2013, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP***.
>
> * * *
>
> Management has developed a timetable for the implementation of the foregoing remediation efforts and will monitor the implementation. In addition, under the direction of the Audit Committee, ***management will continue to review and make necessary changes to the overall design of the Company's internal control environment, as well as to policies and procedures to improve the overall effectiveness of internal control over financial reporting. Management believes the foregoing efforts will effectively remediate the material weakness***. However, the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively, which we expect to occur within the current fiscal year.

84. Hart and Nelson signed SOX certifications that were submitted with the Q2 2014 10-Q. The content of the certifications was substantively identical to the certification described in ¶78.

85. In the Q3 2014 10-Q, under Item 4, "Controls and Procedures," the Company stated:

> As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2013, our ***management identified a material weakness in our internal control over financial reporting as of December 31, 2013, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP***.
>
> * * *

> Management has developed a timetable for the implementation of the foregoing remediation efforts and will monitor the implementation. In addition, under the direction of the Audit Committee, ***management will continue to review and make necessary changes to the overall design of the Company's internal control environment, as well as to policies and procedures to improve the overall effectiveness of internal control over financial reporting. Management believes the foregoing efforts will effectively remediate the material weakness***. However, the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively, which we expect to occur within the current fiscal year.

86. Hart and Nelson signed SOX certifications that were submitted with the Q3 2014 10-Q. The content of the certifications was substantively identical to the certification described in ¶78.

87. The statements identified in ¶¶77-86 above were materially false and/or misleading because Defendants failed to disclose the existence of an additional material weakness in the Company's internal controls—namely, the weakness relating to the Company's "entity level controls" identified by BDO which allowed Hart to improperly expense personal items to the Company as described in more detail in ¶¶41-53.

88. These false statements were made with scienter because Hart and Nelson were aware that Hart was actively disregarding the Company's "entity level" internal controls by improperly charging the Company for personal expenses as detailed in ¶¶41-53, and that the Company was not reporting these expenses as part of Hart's compensation.

89. In the FY 2014 10-K, under Item 4, "Controls and Procedures," the Company stated:

> As previously reported in Part II, Item 9A. "Controls and Procedures" of our Annual Reports on Form 10-K for the years ended December 31, 2013 and 2012, ***we identified a material weakness in our internal control over financial reporting as of December 31, 2013 and 2012, which arose due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP. Specifically, this material weakness resulted from insufficient review and oversight involving the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP***. This material weakness created a situation where a reasonable possibility that a material error related to complex and non-routine transactions could occur in our financial statements and not be prevented or detected in a timely manner.

> In response to this material weakness, we developed remediation plans to address the material weakness. However, because of the reorganization of and changes to our management team initiated at the end of 2013, the move of our executive headquarters to Fremont, California and the timing of the transition of our accounting and finance function from Ismaning, Germany to Santa Ana, California, mentioned elsewhere in this Form 10-K, certain remedial actions were delayed and the prior material weakness had not been fully remediated. During 2014, we completed the transition of our accounting and finance function to California and added personnel with experience and training in U.S. GAAP. Additionally, as part of our reorganizational changes, we streamlined our reporting processes and simplified our operational structure to create additional efficiencies.
>
> ***The Company has completed the implementation of remediation measures to address the material weakness described above and, as of December 31, 2014, has concluded that the remediation activities implemented are sufficient to allow us to conclude that the previously disclosed material weakness has been remediated as of December 31, 2014***.
>
> In addition, under the direction of the Audit Committee of the Board, our management will continue to review the overall design of our internal control environment, and make changes to policies and procedures to improve the overall effectiveness of internal control over financial reporting.

90. Hart and Nelson signed SOX certifications that were submitted with the Company's FY 2014 10-K. The content of the certifications was substantively identical to the certification described in ¶78.

91. The statements identified in ¶¶89-90 above were materially false and/or misleading because Defendants failed to disclose the existence of an additional material weakness in the Company's internal controls—namely, the weakness relating to the Company's "entity level controls" identified by BDO which allowed Hart to improperly expense personal items to the Company. The statements were also false because the previously disclosed material weakness relating to the financial statement close process had not, in fact, been remediated. As pointed out by BDO in the November 30, 2015 Form 8-K filed with the SEC, "the Company [did] not design[] and implement[] appropriate controls to provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to prevent or timely detect and correct misstatements." The Company also admitted in its Q1, Q2, and Q3 2015 Form 10-Qs that the material weakness still existed into fiscal year 2015, as detailed in ¶67.

92. The false statements relating to the existence of a material weakness in the Company's internal controls were made with scienter because Hart and Nelson were aware that Hart was actively disregarding the Company's "entity level" internal controls by improperly charging the Company for personal expenses as detailed in ¶¶44-45, 51-53, and that the Company was not reporting these expenses as part of Hart's compensation. The false statements relating to the remediation of the previously identified weakness in the Company's internal controls were made with scienter because (1) correcting the internal control issue was a primary focus of Defendants, (2) the Company stated that "the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively," (3) the control deficiency was of such an extreme nature that BDO was unwilling to be associated with the Company's 2015 financial statements, and (4) Defendants demonstrated a complete and willing lack of care for blatant internal control deficiencies throughout the class period as detailed in ¶¶36, 41-54, 63-64.

### C. Defendants' Materially False and/or Misleading Internal Controls Omissions During Fiscal Year 2015

93. Identiv published financial statements for the first quarter of 2015 in its Q1 2015 8-K. The financial statements included the balance sheet, statement of operations, statement of comprehensive loss, statement of equity, and statement of cash flows.

94. However, Defendants failed to report material information to investors by failing to disclose that the financial statements were prepared in an environment of inadequate internal controls over financial reporting. As admitted by the Company in its Q1 2015 10-Q filed on March 29, 2015, and contrary to Defendants representations in the FY 2014 10-K, "the Company's internal control over financial reporting was not effective as of March 31, 2015" due to "insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP." As such, the Company failed to warn investors that the financial statements lacked the assurance of accuracy afforded by effective

internal controls.

95. Defendants failed to inform investors of the material weaknesses with scienter because (1) correcting the internal control issue was a primary focus of Defendants, (2) the Company stated that "the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively," (3) the control deficiency was of such an extreme nature that BDO was unwilling to be associated with the Company's 2015 financial statements, and (4) Defendants demonstrated a complete and willing lack of care for blatant internal control deficiencies throughout the class period as detailed in ¶¶36, 41-54, 63-64.

96. Identiv published financial statements for the second quarter of 2015 in its Q2 2015 8-K. The financial statements included the balance sheet, and statement of operations.

97. However, Defendants failed to report material information to investors by failing to disclose that the financial statements were prepared in an environment of inadequate internal controls over financial reporting. As admitted by the Company in its Q2 2015 10-Q filed on March 29, 2015, and contrary to Defendants representations in the FY 2014 10-K, "the Company's internal control over financial reporting was not effective as of June 30, 2015" due to "insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP." As such, the Company failed to warn investors that the financial statements lacked the assurance of accuracy afforded by effective internal controls.

98. Defendants failed to inform investors of the material weaknesses with scienter because (1) correcting the internal control issue was a primary focus of Defendants, (2) the Company stated that "the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively," (3) the control

deficiency was of such an extreme nature that BDO was unwilling to be associated with the Company's 2015 financial statements, and (4) Defendants demonstrated a complete and willing lack of care for blatant internal control deficiencies throughout the class period as detailed in ¶¶36, 41-54, 63-64. Moreover, Defendants were aware that BDO had made two significant adjustments to the Company's Q2 2015 8-K financial statements that were not caught by the Company's internal controls as detailed in ¶¶64, 112.

99. Identiv published financial statements for the third quarter of 2015 in its Q3 2015 8-K. The financial statements included the balance sheet, and statement of operations.

100. However, Defendants failed to report material information to investors by failing to disclose that the financial statements were prepared in an environment of inadequate internal controls over financial reporting. As admitted by the Company in its Q3 2015 10-Q filed on March 29, 2015, and contrary to Defendants representations in the FY 2014 10-K, "the Company's internal control over financial reporting was not effective as of September 30, 2015" due to "insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP." As such, the Company failed to warn investors that the financial statements lacked the assurance of accuracy afforded by effective internal controls.

101. Defendants failed to inform investors of the material weaknesses with scienter because (1) correcting the internal control issue was a primary focus of Defendants, (2) the Company stated that "the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively," (3) the control deficiency was of such an extreme nature that BDO was unwilling to be associated with the Company's 2015 financial statements, and (4) Defendants demonstrated a complete and willing lack of care for blatant internal control deficiencies throughout the class period as detailed in ¶¶36, 41-54, 63-64. Moreover, Defendants were aware that BDO had made two

significant adjustments to the Company's Q2 2015 8-K financial statements that were not caught by the Company's internal controls as detailed in ¶64, 112.

## VI. LOSS CAUSATION

102. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and other Class members. During the Class Period, Lead Plaintiff and other Class members purchased or acquired Identiv securities at artificially inflated prices in reliance on Defendants' material misrepresentations and omissions. The price of those securities declined significantly when information disclosed to the market for the first time corrected those material misrepresentations and omissions.

103. The truth regarding Identiv's internal controls and CEO misconduct was partially revealed, and/or the concealed risks materialized, on or about: May 1, 2015; May 4, 2015; May 18, 2015; August 14, 2015; November 30, 2015; December 18, 2015; and March 29, 2016. As a direct result of certain of these partial disclosures, the price of Identiv's stock declined precipitously.

104. The damage suffered by Lead Plaintiff and other members of the Class was a direct result of Defendants' practice of issuing false information and withholding material information from Identiv investors, and the subsequent significant decline in the value of Identiv securities when the truth was revealed. During the Class Period, investors were focused on the integrity of Identiv's internal controls and financial reporting.

105. On May 1, 2015, a Friday, after the market closed, the Company filed a Notice of Late Filing with the SEC on Form 12b-25. Therein, the Company disclosed that it had been served with a Complaint by a former employee alleging "certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company" and that the Board of Directors of the Company had formed a special committee to investigate the allegations contained in the Complaint. The Company also disclosed that it would not be able to timely file its Annual Report on form 10-K for the fiscal year ended December 31, 2014, because the Company required additional time to complete the information called for by Item

III of the 10-K, including executive compensation information. In greater detail and in relevant part, the Company stated:

> Identiv, Inc. (the "Company") is filing this Form 12b-25 with respect to its annual report on Form 10-K for the period ended December 31, 2014 (the "Annual Report"). The Company needs additional time to complete the information called for by Item III of Form 10-K, including the executive compensation information (the "Part III Information") which the Company was not able to complete by April 30, 2015 (the prescribed due date for the inclusion of the Part III Information in the Company's Annual Report filing) without unreasonable effort or expense due to the circumstances described below.
>
> The Company has been served with a complaint (the "Complaint") from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company. The Board of Directors of the Company has formed a special committee (the "Committee") to investigate the allegations contained in the Complaint and related matters with the assistance of independent counsel.
>
> The Company is currently unable to predict when it will be in a position to file an amendment to its Annual Report on Form 10-K/A to include the required Part III Information as well as to file a definitive proxy statement in connection with the 2015 annual meeting.

106. On May 4, 2015, the following Monday, the Company filed a Current Report on Form 8-K with the SEC reiterating, and re-emphasizing, certain of its prior disclosures. In relevant part, the Company stated:

> On May 1, 2015 Identiv, Inc. (the "Company") filed a Form 12b-25 with the Securities and Exchange Commission with respect to its annual report on Form 10-K for the period ended December 31, 2014 (the "Annual Report"). The Company needs additional time to complete the information called for by Item III of Form 10-K, including the executive compensation information (the "Part III Information") which the Company was not able to complete by April 30, 2015 (the prescribed due date for the inclusion of the Part III Information in the Company's Annual Report filing) without unreasonable effort or expense due to the circumstances described below.
>
> The Company has been served with a complaint (the "Complaint") from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company. The Board of Directors of the Company has formed a special committee (the "Committee") to investigate the allegations contained in the Complaint and related matters with the assistance of independent counsel.
>
> The Company is currently unable to predict when it will be in a position to file an amendment to its Annual Report on Form 10-K/A to include the required Part III Information as well as to file a definitive proxy statement in connection with the 2015 annual meeting. The Company expects to provide an update on its earnings call with respect to the quarter ended March 31, 2015.

107. On this news, Identiv common stock fell $0.13 per share, to close at $9.28 per share on May 4, 2015, the very next trading day following the disclosure.

108. The May 1, and May 4, 2015 revelations partially disclosed to the market that Identiv improperly reported executive compensation—particularly with respect to expense reimbursement—in previous financial filings and that the Company lacked adequate internal controls over financial reporting, but did not reveal the full extent of the Company's fraud.

109. On May 18, 2015, after the market closed, the Company filed another Notice of Late Filing with the SEC on Form 12b-25. Therein, in addition to previously disclosed information, the Company disclosed that the Special Committee's investigation was still ongoing and that "the Company does not plan to file an amendment to its Annual Report on Form 10-K to include the required Part III information or file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 until it has additional information from such investigation." The Company also disclosed that it would not be able to timely file its Quarterly Report on form 10-Q for the fiscal quarter ended March 31, 2015, because the Company required additional time to complete the information called for by Item III of the 10-K, including executive compensation information. The Company also stated that it "is currently unable to predict when it will be in a position to file its Annual Report on Form 10-K/A to include the Part III Information or to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015." In greater detail and in relevant part, the Company stated:

> Identiv, Inc. (the "Company") is filing this Form 12b-25 with respect to its quarterly report on Form 10-Q for the period ended March 31, 2015 (the "Quarterly Report"). As reported on Form 12b-25 filed on May 1, 2015, the Company needs additional time to complete the information called for by Item III of its Annual Report on Form 10-K, including the executive compensation information (the "Part III Information") which the Company was not able to complete by the prescribed due date for the inclusion of the Part III information in such report without unreasonable effort or expense due to the circumstances described below.
>
> The Company has been served with a complaint (the "Complaint") from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company. The Board of Directors of the Company has formed a special committee (the "Committee") to investigate the allegations contained in the Complaint and related matters with the assistance of independent counsel. The

> investigation is ongoing and the Company does not plan to file an amendment to its Annual Report on Form 10-K to include the required Part III information or file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 until it has additional information from such investigation. On May 15, 2015, the Company did file a Report on Form 8-K furnishing certain of the financial information that typically would be included in a Quarterly Report on Form 10-Q.
>
> The Company is currently unable to predict when it will be in a position to file its Annual Report on Form 10-K/A to include the Part III Information or to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015.

110. On this news, Identiv common stock fell $0.24 per share, to close at $6.63 per share on May 19, 2015.

111. The May 18, 2015 revelation partially disclosed, and re-emphasized, to the market that Identiv improperly reported executive compensation—particularly with respect to expense reimbursement—in previous financial filings and that the Company lacked adequate internal controls over financial reporting, but did not reveal the full extent of the Company's fraud.

112. On November 30, 2015, after the market closed, the Company filed a Current Report on with the SEC on Form 8-K, disclosing that on November 23, 2015, BDO had resigned as the Company's independent registered public accounting firm. The Company disclosed that BDO was unwilling to be associated with the Company's financial statements for any fiscal period in 2015, would not complete its review of financial information for the quarters ended March 31, 2015, June 30, 2015, and September 30, 2015, and would not audit the Company's financial statements for the year ended December 31, 2015 because "BDO disagrees with the scope and the remediation of the special investigation that was undertaken by the Special Committee of the Board." The Company also announced that BDO informed the Board of two material weaknesses in the Company's internal control over financial reporting. The first was related to entity level controls, specifically, '"with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an

environment where accountability is valued.'" The second material weakness related to the Company's ability to properly report revenue; specifically the Company reported that BDO stated that the "Company has not designed and implemented appropriate controls to provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to prevent or timely detect and correct misstatements." In greater detail, and in relevant part, the Company stated:

> On November 23, 2015, Identiv, Inc. (the "Company") received notice from BDO USA, LLP ("BDO") that BDO had resigned, effective immediately, as the Company's independent registered public accounting firm.
>
> The reports of BDO and of Ernst & Young GmbH Wirtschaftspruefungsgesellschaft ("EY") on the Company's consolidated financial statements for the year ended December 31, 2014 and 2013, respectively, did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles except EY's report with respect to the fiscal year ended December 31, 2013, which indicated that there was substantial doubt as to the Company's ability to continue as a going concern.
>
> BDO has advised the Board of Directors (the "Board") of the Company that BDO is unwilling to be associated with the consolidated financial statements prepared by management for any of the fiscal periods within 2015 and will not complete its reviews of the interim financial information as of or for the periods ended March 31, 2015, June 30, 2015 or September 30, 2015, and additionally will not audit the Company's consolidated financial statements as of and for the year ending December 31, 2015 because of the disagreement described below in this Current Report on Form 8-K.
>
> For the purposes of this Current Report on Form 8-K, the term "disagreement" is interpreted and used broadly, to include any difference of opinion concerning any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure which, if not resolved to the satisfaction of the independent registered public accountant, would have caused it to make reference to the subject matter of the disagreement in connection with its report.
>
> During fiscal year 2015, the Board formed a Special Committee to investigate the allegations contained in a complaint. BDO advised the Board that BDO disagrees with the scope and the remediation of the special investigation that was undertaken by the Special Committee of the Board. The subject matter of the special investigation was first disclosed by the Company in a Form NTN 10-K filed with the Securities and Exchange Commission (the "SEC") on May 1, 2015 and a Current Report on Form 8-K filed with the SEC on May 4, 2015. The Board determined that the scope and the remediation of the special investigation were appropriate.
>
> In addition, BDO has informed the Board of two material weaknesses in the Company's internal control over financial reporting. The first material

weakness identified by BDO related to the Company's entity level controls, including a determination by BDO that "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued."

The second material weakness identified by BDO related to revenue recognition; BDO determined that the Company has not designed and implemented appropriate controls to provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to prevent or timely detect and correct misstatements. Specifically, during the course of conducting review procedures on the Company's interim financial information for the quarter ended June 30, 2015, BDO identified significant adjustments with respect to revenue transactions which resulted in the deferral of revenue; which errors were not identified by the Company's internal control over financial reporting. Those errors arose primarily as a result of the following matters:

- The Company did not appropriately consider the accounting for a revenue transaction totaling approximately $3.2 million, where the fact pattern suggested that the terms on the sales were not "fixed or determinable." This resulted in a correcting adjustment of revenue of $3.2 million.

- In a different revenue transaction, there were undelivered elements in the arrangement that were not adequately considered and assessed by the Company, resulting in a correcting adjustment of $0.6 million.

The first of these transactions related to a significant long-standing reseller, with which the Company was in discussions regarding delivery and payment schedules. The $3.2 million shipment was made and accepted in June 2015, and the Company provided 90 day "extended payment terms" specified by the customer during the quarter ended June 30, 2015. The Company originally recorded revenue during the quarter ended June 30, 2015 whereas the fact pattern indicated that the terms were not "fixed or determinable" at the time and revenue should have been recorded when the amount became due and payable by the customer. The account was fully paid in September 2015, and the revenue recognized upon payment during the quarter ended September 30, 2015.

The second transaction related to an agreement that BDO was made aware of during the quarter. The Company considered revenue recognition with respect to this transaction and prepared a memorandum that was provided to BDO. While the customer accepted delivery of the non-recurring engineering work in June 2015, BDO advised, and the Company agreed, that the Company, in its memorandum, had failed to conclude that there were undelivered software elements in the arrangement for which vendor specific objective evidence of fair value had not been established and accordingly, the Company recorded an adjustment in June 2015 to defer this revenue. The Company will recognize such revenue in the current quarter now that it is actively selling the solution it developed.

The quarterly results included in the Company's Current Report on Form 8-K filed August 13, 2015 reflected the adjustments described above.

> While the full Audit Committee of the Board and BDO have not discussed the subject matter of the disagreement with BDO, the Audit Committee through its Chairman has had discussions with BDO concerning the subject matter of the disagreement. The Company has authorized BDO to respond fully to the inquiries of the Company's successor accountant, Burr Pilger Mayer Inc., concerning the subject matter of this Current Report on Form 8-K (this "Report").
>
> The Company has provided a copy of the disclosures in this Report to BDO and requested that BDO furnish the Company with a letter addressed to the SEC stating whether or not BDO agrees with the statements made by the Company set forth above. A copy of BDO's letter, dated November 30, 2015, is filed as Exhibit 16.1 to this Current Report on Form 8-K.

113. In the same 8-K, the Company disclosed that the Company approved the appointment of Burr Pilger Mayer Inc. as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015:

> On November 25, 2015, the Audit Committee approved the appointment of Burr Pilger Mayer Inc. as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015, which appointment Burr Pilger Mayer Inc. accepted on November 25, 2015. During the Company's fiscal years ended December 31, 2014 and 2013 and in the subsequent interim period through November 25, 2015, neither the Company nor anyone acting on its behalf has consulted with Burr Pilger Mayer Inc. on any of the matters or events set forth in Item 304(a)(2) of Regulation S-K.

114. On this news, Identiv common stock fell $0.46 per share, or 15.5% to close at $2.49 per share on December 1, 2015 on unusually heavy trading volume. The stock price continued to decline, falling a total of $1.31 per share, or 44.4%, over five trading days, to close at $1.64 per share on December 7, 2015, on unusually heavy trading volume.

115. The November 30, 2015 revelation partially disclosed, and re-emphasized, to the market that Identiv improperly reported executive compensation—particularly with respect to expense reimbursement—in previous financial filings and that the Company lacked adequate internal controls over financial reporting, but did not reveal the full extent of the Company's fraud. The revelation also partially disclosed to investors that the Company, contrary to its earlier representations, continued to experience the material weakness related to the financial statement close process.

116. On December 18, 2015, after the market closed, the Company filed an amendment to its fiscal year 2014 Annual Report with the SEC on Form 10-K/A. Therein, the

Company restated Hart's compensation under the category "All Other Compensation"—which includes certain executive expense reimbursements—for the fiscal years ended December 31, 2013 and December 31, 2014:

| Hart's Reported "All Other Compensation" | | | |
|---|---|---|---|
| **Fiscal Year** | **Initial Report** | **As Restated** | **Percentage Increase** |
| 2013 | $56 | $13,203 | 23477% |
| 2014 | $17,004 | $114,872 | 576% |

As stated by the Company, the adjustments reflect "payments to Mr. Hart of previously reimbursed expenses of $97,868 in 2014 and $13,147 in 2013 as to which the Company subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."

117. On March 29, 2016, the Company filed its Q1, Q2, and Q3 2015 10-Qs that it failed to timely file during fiscal year 2015. Therein, the Company admitted that for those periods, "the Company's internal control over financial reporting [were] not effective" because of a weakness relating to the financial statement close process due to "insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP."

## VII. PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

118. The fraud-on-the-market presumption of reliance applies because the market for Identiv's securities was open, well-developed, and efficient at all relevant times for the following reasons, among others:

(a) Identiv's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regular issuer, Identiv filed periodic reports with the SEC and the NASDAQ;

(c) Identiv regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Identiv was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and distributed to those brokerage firms' sales forces and certain of their customers.

119. As a result of the foregoing, the market for Identiv stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in its stock price. Under these circumstances, Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relied upon the integrity of the market price of Identiv's securities, and market information relating to Identiv. All purchasers of Identiv securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices and the subsequent decline in the securities' price when the truth was revealed.

120. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

121. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements pleaded in this complaint. None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

122. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not identified as “forward-looking statements” when made and/or were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

123. To the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements were made, either the speaker knew that the statement was false or the statement was authorized or approved by an executive officer of Identiv who knew that the statement was false.

## IX. CLASS ACTION ALLEGATIONS

124. Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Identiv securities traded on the NASDAQ from November 13, 2013, through November 30, 2015, inclusive, and who were damaged thereby (the “Class”). Excluded from the Class are Defendants, the officers and directors of Identiv at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

125. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Identiv common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this

time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members. As of December 1, 2015, Identiv had 10,746,911 shares of common stock outstanding. Class members who purchased Identiv common stock may be identified from records maintained by the Company or its transfer agents, and such members may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

126. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

127. Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

128. Common questions of law and fact exist to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Identiv;

(c) whether Defendants acted with scienter; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

129. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them. There will be no difficulty in managing this

action as a class action.

## X. CLAIMS FOR RELIEF

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants**

130. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

131. This Count is asserted on behalf of all members of the Class against Defendants Identiv, Hart, and Nelson for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

132. During the Class Period, Defendants knowingly or recklessly made false statements of material fact and omitted to state material facts necessary to make their statements made, in the light of the circumstances under which they were made, not misleading. These misrepresentations and omissions: (i) deceived the investing public, including Lead Plaintiff and the Class, regarding, among other things, Identiv's internal controls and officer compensation; (ii) artificially inflated and/or maintained the market price of Identiv securities; and (iii) caused Lead Plaintiff and other members of the Class to purchase Identiv securities at artificially inflated prices and suffer losses when the true facts became publicly known.

133. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged in a course of conduct that operated as fraud on Lead Plaintiff and the Class. The facts alleged herein give rise to a strong inference that Identiv and each of the Individual Defendants made materially false and misleading statements and omissions with scienter. They knew or recklessly disregarded that the Class Period statements alleged herein contained material misrepresentations and omissions.

134. Identiv is liable for all materially false and misleading statements and omissions made during the Class Period.

135. Hart is liable for the materially false and misleading statements and omissions he made during the Class Period, including the false statements contained in the Proxy Statements regarding officer compensation, the false SOX certifications that he signed, the false statements regarding the Company's internal controls contained in the SEC filings, and the failure to inform investors of material weaknesses in the Company's internal controls in 2015.

136. Nelson is liable for the materially false and misleading statements and omissions he made during the Class Period, including the false statements contained in the Proxy Statements regarding officer compensation, the false SOX certifications that he signed, the false statements regarding the Company's internal controls contained in the SEC filings, and the failure to inform investors of material weaknesses in the Company's internal controls in 2015.

137. Lead Plaintiff and other Class members have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Identiv securities, and inflation was removed from the stock when the true facts became known. Lead Plaintiff and other Class members would not have purchased Identiv securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' material misrepresentations and omissions.

138. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other Class members suffered damages attributable to the fraud alleged herein in connection with their purchases or acquisitions of Identiv securities during the Class Period.

## <u>COUNT II</u>

### Violations of Section 20(a) of the Exchange Act Against Individual Defendants Hart and Nelson

139. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

140. This Count is asserted on behalf of all members of the Class against the

Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

141. During their tenures as officers and/or directors of Identiv, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Identiv, they had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. In their capacities as senior corporate officers of Identiv, the Individual Defendants had direct involvement in the daily operations of the Company; in reviewing and managing its regulatory and legal compliance; and in its accounting, reporting, and public disclosure functions. The Individual Defendants made the false and misleading statements alleged herein, and they were able to and did control, directly and indirectly, the content of the public statements made by Identiv during the Class Period, thereby causing the dissemination of the material misrepresentations and omissions alleged herein.

142. Identiv is a primary violator of Section 10(b) and SEC Rule 10b-5 by its acts and omissions alleged herein. By virtue of their positions as controlling persons of the Company and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a), jointly and severally with and to the same extent as the Company is liable under Section 10(b) and Rule 10b-5, to Lead Plaintiff and other Class members who purchased or otherwise acquired Identiv securities.

143. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of Identiv securities during the Class Period.

## XI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) a declaration that the action is a proper class action pursuant to Fed. R. Civ. P. 23;

(b) an award of compensatory damages in favor of Lead Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) an award to Lead Plaintiff and the Class for their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d) such other relief as the Court may deem just and proper.

## XII. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated: May 3, 2016

GLANCY PRONGAY & MURRAY LLP

By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

JOHNSON & WEAVER LLP
Frank J. Johnson
Shawn Fields
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: frankj@johnsonandweaver.com
shawnf@johnsonandweaver.com

*Co-Lead Counsel for Lead Plaintiff and the Class*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

I, the undersigned, say:

I am a citizen of the United States and am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On May 3, 2016, I served the following document:

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

By posting the document to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as listed on the attached Court's ECF Service List.

And on any non-ECF registered parties:

By U.S. Mail: By placing true and correct copies thereof in individual sealed envelope: with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence or mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 3, 2016, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 3:15-cv-05775-CRB Rok vs. Identiv

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Shawn Eric Fields**
  shawnf@johnsonandweaver.com,paralegal@johnsonandweaver.com,frankj@johnsonandweaver.com,michaelf@johnsonandweaver.com
- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com
- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,shawnf@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.com
- **Willem F. Jonckheer**
  wjonckheer@schubertlawfirm.com,kmessinger@schubertlawfirm.com,epawson@schubertlawfirm.com,paralegal@schubertlawfirm.com
- **James M Lindfelt**
  james.lindfelt@pillsburylaw.com,teresa.castro@pillsburylaw.com,cate.kealiinohomoku@pillsburylaw.com
- **Adam Christopher McCall**
  amccall@zlk.com
- **Christopher Harold McGrath**
  chrismcgrath@paulhastings.com,veronicacortez@paulhastings.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Lesley F Portnoy**
  lportnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Mark Punzalan**
  markp@punzalanlaw.com,office@punzalanlaw.com
- **Casey Edwards Sadler**
  csadler@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`