1    GLANCY PRONGAY & MURRAY LLP
     Lionel Z. Glancy (#134180)
2    Robert V. Prongay (#270796)
     Charles H. Linehan (#307439)
3    1925 Century Park East, Suite 2100
     Los Angeles, California 90067
4    Telephone: (310) 201-9150
     Facsimile: (310) 201-9160
5    Email: info@glancylaw.com

6    JOHNSON & WEAVER LLP
     Frank J. Johnson (#174882)
7    Phong L. Tran (#204961)
     600 West Broadway, Suite 1540
8    San Diego, CA 92101
     Telephone: (619) 230-0063
9    Facsimile: (619) 255-1856
     Email: frankj@johnsonandweaver.com
10           phongt@johnsonandweaver.com

11   *Co-Lead Counsel for Lead Plaintiff and the Class*

12              **UNITED STATES DISTRICT COURT**

13             **NORTHERN DISTRICT OF CALIFORNIA**

14   LIKAR ROK, Individually and On Behalf of     Case No. 3:15-cv-05775-CRB
     All Others Similarly Situated,
15                                                **CLASS ACTION**
                              Plaintiff,
16                                                **SECOND AMENDED CLASS ACTION
                       v.                         COMPLAINT FOR VIOLATIONS OF
17                                                THE FEDERAL SECURITIES LAWS**
     IDENTIV, INC., JASON HART, and
18   BRIAN NELSON,                                **JURY TRIAL DEMANDED**

19                            Defendants.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   JURISDICTION AND VENUE .................................................................. 5

III.  PARTIES ..................................................................................... 6

IV.   SUBSTANTIVE ALLEGATIONS .............................................................. 8

    A.   Identiv's Business Overview and Background to the Class Period .................... 8

    B.   During the Class Period, Defendants Had an Obligation to Report All Internal Control Weaknesses, Including the Entity Level Controls Weakness, But Failed to Do So. ........................................................... 13

    C.   Defendant Hart Exploited the Entity Level Controls Weakness and Misappropriated Corporate Funds With the Authorization of Defendant Nelson ....................................................................................... 19

    D.   The Company Formed a "Special Committee" to Investigate Hart's Improprieties, but Continued to Conceal Deficiencies in the Company's Internal Controls .......................................................................... 27

    E.   The Company Disclosed the Entity Level Controls Weakness on November 30, 2015, When BDO Refused to Be "Associated With" Any of the Company's 2015 Financial Statements ..................................... 28

V.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS ........................................................ 29

    A.   Defendants' Materially False and/or Misleading Executive Compensation Figures ............................................................... 31

    B.   Defendants' Materially False and/or Misleading Statements and Omissions Concerning the Entity Level Controls Weakness ..................... 32

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER ........................................ 38

VII.  LOSS CAUSATION ........................................................................ 41

VII.  PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 49

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ..................................................... 50

IX.   CLASS ACTION ALLEGATIONS ......................................................... 51

X.    CLAIMS FOR RELIEF ..................................................................... 52

COUNT I  Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants ................................................................. 52

COUNT II  Violations of Section 20(a) of the Exchange Act Against Individual Defendants Hart and Nelson ........................................................................................ 54

XI.        PRAYER FOR RELIEF............................................................................................. 55

XII.       JURY DEMAND ...................................................................................................... 56

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

1.     Lead Plaintiff Thomas Cunningham ("Lead Plaintiff"), by and through his undersigned attorneys, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of himself and all other similarly situated purchasers of the securities of Identiv, Inc. ("Identiv" or the "Company") from November 13, 2013, through November 30, 2015, inclusive (the "Class Period").

2.     Lead Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel Glancy Prongay & Murray LLP and Johnson & Weaver LLP.  This investigation included, among other things, a review and analysis of: (i) Identiv's public filings with the SEC; (ii) public reports and news articles; (iii) economic analyses of securities movement and pricing data; (iv) transcripts of Identiv's investor calls; (v) interviews with former employees and other potential witnesses with relevant information; and (vi) other publicly available material and data identified herein.  Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.     PRELIMINARY STATEMENT

3.     Investors base their investment decisions in part on the ethics and accountability of the senior management overseeing the public companies they invest in. Investors therefore have a right to know—and would consider it important—when the head of a publicly-owned company is misappropriating corporate funds by improperly claiming reimbursement for personal charges.

4.     Investors also generally monitor the quality of a company's internal controls because strong controls provide reassurance that the company's financial data is accurate, and that insider fraud will be prevented.  Weak internal controls, on the other hand, make a

1   company vulnerable to instances of inaccurate financial reporting and fraud, causing the
2   company's public statements regarding the company's operations and prospects to be less
3   reliable.

4          5.      Here, during the two-year Class Period, Defendants knew of but concealed
5   from investors: (i) Defendant Jason Hart's ("Hart") routine misappropriation of corporate
6   resources for personal gain; (ii) Identiv's deficient entity level controls that allowed this
7   misappropriation to occur and continue; and (iii) that Identiv's financial statements
8   accordingly contained false and misleading information concerning Hart's executive
9   compensation and the improper expenses claimed by him.

10         6.      As Chief Executive Officer ("CEO") of Identiv, Defendant Hart routinely
11  misappropriated corporate funds through improper claims for reimbursement of substantial
12  amounts of personal expenses.  Defendant Brian Nelson ("Nelson"), Identiv's Chief Financial
13  Officer ("CFO") and a highly trained accountant with over twenty years of accounting and
14  finance experience, knowingly approved Hart's claims for reimbursement even though the
15  claimed expenses were plainly for non-work-related personal expenses.

16         7.      Defendants Hart and Nelson believed their corporate misconduct would go
17  undetected due to a material weakness in Identiv's entity level controls (the "Entity Level
18  Controls Weakness") that plagued the Company throughout the Class Period, and which Hart
19  and Nelson had a hand in creating.  The Entity Level Controls Weakness involved Hart's
20  improper expensing of personal items to Identiv, Nelson's rubber-stamped approval of the
21  improper personal expenses, Hart and Nelson's overriding of Identiv's established expense
22  reimbursement policies, and a general lack of management accountability surrounding expense
23  reimbursement.  Hart—with Nelson's approval and authorization—repeatedly exploited the
24  Company's Entity Level Controls Weakness to expense a host of personal charges for non-
25  work items including extravagant trips to Las Vegas, gift cards, multiple computer servers for
26  home use, personal car expenses, and even a drone for Hart's own personal recreation.

27         8.      During the Class Period, investors were particularly wary of the integrity of
28  Identiv's internal control and financial reporting procedures, due to the existence of an internal

weakness related to its "financial statement close process," which the Company disclosed during fiscal years 2013 and 2014.[1]   During this period, the Company routinely reassured investors that it was in the process of remediating the financial statement close process weakness.

9.     The Company declared that the material weakness relating to the financial statement close process had been **fully remediated** in its fiscal year 2014 Annual Report filed with the SEC on March 23, 2015.   Defendants Hart and Nelson signed certifications accompanying the Annual Report that falsely reassured investors that they had designed effective internal controls over financial reporting, disclosed all known deficiencies or material weaknesses in internal controls, and disclosed any known fraud.

10.     Despite their assurances that the financial statement close process weakness had been completely remediated, and despite certifying that all other known internal control weaknesses had been disclosed,  Defendants Hart and Nelson failed to disclose the existence of an altogether separate weakness during the Class Period—the Entity Level Controls Weakness.   Hart, with Nelson's cooperation, maintained and concealed the Entity Level Controls Weakness in order to effectively steal from the Company.   Despite having direct knowledge of the Entity Level Controls Weakness, Defendants failed to report that material information to investors.

11.     Hart's repeated misappropriation of corporate funds, and Nelson's knowledge and complicity in the misappropriation, are thoroughly detailed in a civil complaint filed in the California Superior Court for the County of Alameda, entitled *Ruggiero v. Identiv, Inc. et al.*, Case No. HG15764795 (the "*Ruggiero* Complaint").[2]   The plaintiff in that case, Ana Ruggiero ("Ruggiero"), was Hart's executive assistant who handled Hart's reimbursement requests and had firsthand knowledge of Hart's routine misappropriation of corporate funds.   The *Ruggiero*

---

[1] The Company's fiscal year runs from January 1st to December 31st.

[2] The Court took judicial notice of the *Ruggiero* Complaint in its August 10, 2016 Order (Dkt. No. 52).

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

Complaint also describes how Nelson was repeatedly informed of Hart's theft, yet refused to take action, until Nelson eventually terminated Ruggiero.

12.     After Identiv disclosed to the public that it had been served with the *Ruggiero* Complaint, the Company sought to reassure investors by forming a special committee (the "Special Committee") of the Company's Board of Directors (the "Board") to investigate the allegations of the Complaint.

13.     Months later, investors were stunned when Identiv announced that BDO USA, LLP ("BDO"), the Company's independent registered public accounting firm (its auditor), had confirmed the lack of accountability on the part of Identiv's senior management and confirmed the existence of the Entity Level Controls Weakness.  The Company also made the shocking disclosure in its November 30, 2015 Current Report that BDO had abruptly resigned and refused to further associate itself with the Company's financial statements.    BDO's explanation for this drastic action, as reported in the Company's Current Report filed on Form 8-K with the SEC on November 30, 2015, was, in part, that BDO disagreed with the remediation of the special investigation, and that Identiv had an Entity Level Controls Weakness, including "with respect to *the results* of the special investigation undertaken by the Special Committee during 2015, *the Company's senior management leadership and operating style and the Board's oversight* did not result in an open flow of information and communication and *did not support an environment where accountability is valued*."[3]

14.     BDO's revelations, through Identiv's disclosure, in late November 2015 confirmed the allegations of corporate misconduct in the  *Ruggiero* Complaint and shattered investors' confidence in the ethics and accountability of Identiv's management.  Although Identiv had previously disclosed that it had been served with the *Ruggiero* Complaint and that it would form a Special Committee to investigate the lawsuit, the true nature of the Individual Defendants' corporate misconduct was revealed when BDO, a respected independent accounting firm, acknowledged that it was willing to give up a lucrative engagement contract with Identiv, due to Identiv's Entity Level Controls Weakness, and Identiv's failure to

[3] Emphasis added unless otherwise stated.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

1  appropriately investigate and remedy the weakness.  This disclosure added to and provided

2  independent confirmation of the allegations in the *Ruggiero* Complaint.

3      15.     On this news, Identiv's common stock price fell $0.46 per share, or 15.5% to

4  close at $2.49 per share on December 1, 2015 on unusually heavy trading volume.  The

5  Company's stock price continued to decline, falling a total of $1.31 per share, or 44.4%, over

6  five trading days, to close at $1.64 per share on December 7, 2015, on unusually heavy trading

7  volume, thereby injuring investors.

8      16.     In the midst of the Special Committee's investigation into the *Ruggiero*

9  Complaint allegations, Hart and Nelson lost their senior executive positions.  Hart was

10 replaced as CEO on September 9, 2015.  Nelson ceased being CFO effective

11 November 18, 2015, less than two weeks before BDO's resignation and condemnation of

12 Identiv's management became public.  Two months later, on February 2, 2016, Hart ceased

13 being a director of Identiv.

14     17.     During the Class Period, Defendants issued false and/or misleading internal

15 controls statements, and failed to inform investors that Hart was essentially stealing from the

16 Company.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline

17 in the market value of the Company's securities, Plaintiff and other Class members have

18 suffered significant losses and damages.

19 **II.     JURISDICTION AND VENUE**

20     18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a)

21 of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder,

22 17 C.F.R. § 240.10b-5.

23     19.     This Court has jurisdiction over the subject matter of this action pursuant to

24 Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

25     20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act,

26 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud

27 or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged

28 herein, including the preparation and dissemination of materially false and/or misleading

information, occurred in substantial part in this Judicial District.   Additionally, Identiv's principal executive offices are located within this Judicial District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

**III.   PARTIES**

22.     Lead Plaintiff, as set forth in a previously-filed certification (Dkt. No. 12-3), incorporated by reference herein, purchased Identiv common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.     Defendant Identiv, Inc., is a global security technology company and Delaware corporation with its principal executive offices located at 2201 Walnut Avenue, Suite 310, Fremont, California 94538.   The Company changed its name from "Identiv Group, Inc." to "Identiv, Inc." on May 22, 2014.   During the Class Period, Identiv, through its officers and directors, periodically filed financial and other information with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.   Throughout the Class Period, Identiv's common stock was actively traded on the NASDAQ Capital Market ("NASDAQ") under the symbol "INVE."

24.     Defendant Hart was CEO of Identiv from September 3, 2013 until September 9, 2015 when, after reviewing the findings of the Special Committee, Identiv's Board of Directors replaced him with Steven Humphreys.   Hart was President of Identiv from July 31, 2014 through February 2, 2016.   Hart also served as a Director of Identiv from September 3, 2013 until his "departure" effective February 2, 2016.   According to the Company's Form 8-K filed February 2, 2016 announcing Hart's departure, the Company was to pay Hart severance as set out in an agreement between Hart and the Company: 12 months of his base salary and benefits and 100% of bonuses or actual commissions paid in the prior 12 months.

25.     Hart joined Identiv in 2011 when Identiv acquired idOnDemand, a company which he co-founded.  Hart is a 25-year veteran of the technology industry, and his experience includes more than 20 years leading security companies.  Hart was previously the CEO of idOnDemand, a provider of service-based identity credential provisioning and management; ActivIdentity, a provider of identity assurance and strong authentication solutions; and Protocom Development Systems, an identity management software security business.  During the Class Period, Hart made materially false and misleading statements.

26.     Defendant Nelson was the CFO of Identiv from December 20, 2013 until November 18, 2015.  On November 18, 2015, Nelson became the Company's Vice President of Business Strategy.  Nelson has more than 20 years of practical experience in accounting and finance, ranging from executive finance positions with both emerging and established technology companies in Silicon Valley, to providing audit assurance and transaction-related services to public and private companies.  Nelson previously worked alongside Hart, serving as CFO of Identiv's idOnDemand subsidiary both prior to and following its acquisition by the Company in May 2011.  Before that, from 2005 to 2010, he served as Vice President of Finance and CFO of Kleer Corporation, a wireless audio company.  Nelson was also previously an Audit Manager with KPMG LLP in Silicon Valley.  Since 2008, Nelson has served as a Professor of Practice in the MBA program in the Leavey School of Business at Santa Clara University in Santa Clara, California.  Nelson holds a Certified Public Accountant ("CPA") license in the State of California.  During the Class Period, Nelson made materially false and misleading statements.

27.     Defendants Hart and Nelson are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Identiv's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

1   Because of their positions and access to material non-public information available to them,

2   each of these defendants knew that the adverse facts specified herein had not been disclosed to,

3   and were being concealed from, the public, and that the positive representations which were

4   being made were then materially false and/or misleading.  The Individual Defendants are liable

5   for the false statements pleaded herein, as those statements were each "group-published"

6   information, the result of the collective actions of the Individual Defendants.

7   **IV.   SUBSTANTIVE ALLEGATIONS**

8       **A.   Identiv's Business Overview and Background to the Class Period**

9       28.   Identiv is a global security technology company headquartered in Fremont,

10   California.  The Company provides security-based products and solutions to organizations in

11   government, education, retail, transportation, healthcare, and other markets, which it claims

12   reduce risk, achieve compliance, and protect brand identity.  Identiv operates four primary

13   business segments: Premises, Identity, Credentials, and All Other, as follows:

14       29.   **Premises**: The foundation of the Company's Premises business is the Hirsch

15   line of electronic controllers.  The Hirsch Velocity software platform enables centralized

16   management of access and security operations across an organization, including control of

17   doors, gates, turnstiles, elevators and other building equipment, monitoring users as they move

18   around a facility, preventing unwanted access, maintaining compliance and providing a robust

19   audit trail.

20       30.   **Identity**: The Company's Identity products include smart card readers that are

21   utilized to enable logical access, security, and identification applications.

22       31.   **Credentials**: The Company's Credentials products include near field

23   communication ("NFC") and radio frequency identification ("RFID") products—including

24   inlays and inlay-based cards—labels, tags, and stickers.  These products are used in physical

25   applications such as electronic entertainment, games, loyalty cards, mobile payment systems,

26   transit and event ticketing, and brand authenticity.

27       32.   **All Other**: Identiv's fourth business segment covers all other security-related

28   products and services offered by the Company that do not fit within the above three categories.

1    33.    In the quarters preceding the Class Period and continuing onward throughout

2 the Class Period, Identiv was facing a number of significant business concerns that threatened

3 to derail the Company's financial growth.  First, heading into the Class Period, Identiv was

4 experiencing significant operating losses and suffering from negative cash flow.  As set forth

5 in Identiv's Form 10-Q for the third quarter of fiscal year 2013 ("Q3 2013 10-Q"), filed on

6 November 13, 2013, the Company's cash flow problems called into question its ability to

7 continue operating as a going concern:

> **The Company has historically incurred operating losses** and has a total accumulated deficit of $318 million as of September 30, 2013. These factors, among others, including the recent effects of the U.S. Government sequester and related budget uncertainty on certain parts of our business, have raised significant doubt about the Company's ability to continue as a going concern . . . . **The ability to continue as a going concern is contingent upon the Company's ability to generate revenue and cash flow to meet its obligations on a timely basis and its ability to raise financing or dispose of certain noncore assets as required.** The Company's plans may be adversely impacted if it fails to realize its assumed levels of revenues and expenses or savings from its cost reduction activities.

14    34.    Identiv also faced the looming threat of being delisted from the NASDAQ

15 Capital Market.  On June 11, 2013, shortly before the start of the Class Period, Identiv

16 received a warning from NASDAQ, advising the Company that it no longer met the

17 requirements for continued listing because the minimum bid price of Identiv common stock

18 was below $1.00 over a period of 30 consecutive trading days.

19    35.    In response to the NASDAQ warning, Identiv implemented a reverse stock split

20 at a 1-for-10 ratio (the "Reverse Stock Split"), which effectively decreased the Company's

21 outstanding common shares from approximately 80 million shares to 8 million.  Through the

22 Reverse Stock Split, Identiv was able to prop up the Company's stock price above the $1.00

23 threshold and satisfy NASDAQ's minimum bid price listing requirement, at least temporarily.

24    36.    Despite the implementation of the Reverse Stock Split, Identiv continued to

25 face the risk of delisting during the Class Period.  The Reverse Stock Split was nothing more

26 than a temporary stop-gap measure, which, as set forth in Company's Annual Report filed

27 March, 23, 2015 with the SEC on Form 10-K for fiscal year 2014 ("FY 2014 10-K"), "could

28 result in greater volatility in the price per share of our common stock," which in turn, could

1  lead to "future non-compliance with the NASDAQ Capital Market's minimum bid price or

2  other listing requirements."  According to the FY 2014 10-K, any subsequent delisting by

3  NASDAQ would have a "material adverse effect on our stock price, our business and our

4  ability to raise capital."  Thus, any subsequent delisting or adverse action by NASDAQ would

5  be disastrous to the Company's ability to continue operating, particularly given the significant

6  operating losses and cash flow problems it was already facing.

7       37.     Against this backdrop, investors were very concerned about: (i) Identiv's

8  ongoing ability to reduce costs on a companywide basis; and (ii) whether the Company's stock

9  price would remain at a stable level to support continued NASDAQ listing.  During the Class

10 Period, Defendants were therefore careful to maintain the impression that the Company was

11 successfully implementing its cost-cutting measures and that there were no material

12 disruptions in the Company's ability to operate.  In an effort to maintain this bright and rosy

13 picture of the Company, Hart and Nelson purposely avoided disclosing material adverse facts

14 about the Company, including the existence of the Entity Level Controls Weakness, which

15 Hart ultimately exploited to improperly expense personal items to the Company.

16      38.     In the fall of 2013, Identiv initiated a comprehensive restructuring program to

17 streamline its business operations and address its cash flow problems.  Defendant Hart was

18 elevated to the position of CEO in September 2013 to implement and direct the Company's

19 restructuring program.

20      39.     During Identiv's third quarter FY2013 ("Q3 2013") earnings conference call on

21 November 7, 2013, Hart discussed Identiv's restructuring program and, in particular,

22 highlighted the companywide mandate to cut costs and improve cash flow:

23          We, of course, are still challenged by the cash . . . but it's important for our
           investors to understand that today *the number one priority for the*
24          *management team is simplification and, as part of that, addressing the long-*
           *term balance sheet and cash position of the business*. . . .  *We've obviously*
25          *focused on significant cost reductions and we will talk more about that next*
           *quarter*. . . .  We are inward focused, for now, and I will leave you with,
26          really, one – my number one priority over the next few weeks is looking at
           restructuring of debt as we obviously focus on our cash position.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

40.     In November 2013, shortly after Hart's appointment as Identiv's CEO, Defendant Nelson was elevated to the position of CFO.  Hart and Nelson knew each other well, having previously served together as CEO and CFO, respectively, at idOnDemand, the company founded by Hart that was subsequently acquired by Identiv in 2011.  Nelson was Hart's trusted, right-hand man at idOnDemand, and Nelson's appointment as CFO at Identiv came as no surprise given their prior history together.

41.     Like Hart, Nelson had a critical role in directing the Company's restructuring program, particularly the companywide efforts to reduce costs and improve cash flow.  During Identiv's fourth quarter FY2013 ("Q4 2013") earnings conference call on March 20, 2014, Hart confirmed that Nelson was laser-focused on reducing the Company's operating expenses ("OpEx") and general and administrative ("G&A") expenses, which include executive compensation and payroll expenses:

> ***OpEx, we cannot take our eye off OpEx.  We have done a lot of these to get the OpEx down***, and the new architecture of the business supports a streamlined OpEx, where you will see cost coming out of G&A.  ***So Brian [Nelson] will – if you were on any of our management calls, [Nelson] is pumping his fists, and will not let up on OpEx.  We cannot.  We have an objective, and we will be EBITDA positive this year***.

42.     Hart also highlighted Nelson's ongoing efforts to monitor and reduce operating and general and administrative expenses during the Company's first quarter FY2014 ("Q1 2014") earnings conference call on May 14, 2014, stating: "First, I would like to pass on my kudos to Brian [Nelson] and the team for all they have been diligently running the operations of the business and substantially reducing the G&A that has always plagued this company."

43.     During the Company's earnings conference calls throughout the Class Period, Nelson provided detailed updates about management's efforts to reduce operating and general and administrative expenses.  For example, during the Q4 2013 earnings call, Nelson reported:

> G&A expenses decreased due to cost reduction measures initially enacted in Q3, including a reduction in headcount and the use of external services in Q4. We expect to see G&A decrease as a percentage of revenue in 2014, as a result of those actions and actions we initiated in the fourth quarter of 2013, and the continued focus on cost reduction measures.

11

1    44.    Given Defendants' explicit, across-the-board focus on monitoring and reducing

2    costs, Hart and Nelson had clear visibility into the Company's operating expenses and general

3    and administrative expenses, including the glaring and improper personal reimbursements that

4    Hart sought and were paid during the Class Period, as discussed below.  Also, in light of the

5    looming threat of adverse action by NASDAQ, Hart and Nelson were keenly motivated to

6    stabilize Identiv's stock price and therefore purposely avoided disclosing material adverse

7    facts about the Company that would cause declines in the stock price.

8    45.    In addition to experiencing cash flow problems and the looming threat of

9    delisting by NASDAQ, Identiv faced yet another serious business concern.  Heading into and

10   continuing throughout the Class Period, the Company was plagued by significant material

11   weaknesses in its internal control procedures.  As detailed below, Identiv was suffering from a

12   material weakness concerning its "financial statement close process," which purportedly arose

13   from "insufficient review and oversight of the recording of complex and non-routine

14   transactions." Also, during the Class Period, the Company was impaired by the Entity Level

15   Controls Weakness, which Defendants concealed from investors.

16   46.    As set forth below, Defendant Hart systematically took advantage of the Entity

17   Level Controls Weakness to misappropriate the Company's resources for his own personal

18   use—serious corporate misconduct that Defendant Nelson not only knew about, but facilitated.

19   The Entity Level Controls Weakness involved Hart and Nelson actively overriding the efforts

20   of an Identiv employee to follow proper expense reimbursement and accounting procedures.

21   Defendants Hart and Nelson were, in effect, the source of the Entity Level Controls Weakness

22   that caused BDO to later resign and disassociate from the Company's 2015 financial

23   statements.  While Defendants were aware of the material weakness in the Company's entity

24   level controls, they made no attempt to disclose the material weakness during the Class Period,

25   in part to avoid the risk of destabilizing Identiv's stock price and the risk delisting of the

26   Company.

27

28

**B.** **During the Class Period, Defendants Had an Obligation to Report All Internal Control Weaknesses, Including the Entity Level Controls Weakness, But Failed to Do So.**

47. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")[4] and the Exchange Act, a registrant company's CEO and CFO are required to sign and certify, in each annual or quarterly report, that the report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading. The company's officers must also sign and certify that they have evaluated the effectiveness of the company's internal controls as of a date within 90 days prior to the report, and have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date. Finally, the company's officers must certify that they have disclosed to the company's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function), all significant deficiencies in the design or operation of internal controls which could adversely affect the company's ability to record, process, summarize, and report financial data, and have identified for the company's auditors any material weaknesses in internal controls, and any fraud that involves management or other employees who have a significant role in the issuer's internal controls. *See* SOX, Section 302 (15 U.S.C. § 7241).

48. At all relevant times herein, Defendants Hart and Nelson, as CEO and CFO of Identiv, respectively, were responsible for monitoring and ensuring the effectiveness of the Company's internal controls and procedures relating to the disclosure and reporting of financial information to the SEC, in accordance with GAAP.[5] Hart and Nelson's duties and obligations over the Company's internal controls and procedures were set forth in Identiv's Annual Report filed March 31, 2014 with the SEC on Form 10-K for the 2013 fiscal year (the "FY 2013 10-K"), as follows:

---

[4] SOX was enacted in the wake of the Enron and WorldCom accounting fraud scandals to protect investors by improving the accuracy and reliability of corporate disclosures.

[5] Generally Accepted Accounting Principles (or "GAAP") are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

13

**Evaluation of Disclosure Controls and Procedures**

As of the end of the fiscal year ended December 31, 2013, as required in Rule 13a-15(b) under the Exchange Act, *we carried out an evaluation under the supervision and with the participation of members of our senior management, including our CEO and CFO, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act)*. Disclosure controls and procedures are those controls and other procedures that are designed to provide reasonable assurance that the information required to be disclosed in our SEC reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) is accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

. . .

***Management's Report on Internal Control over Financial Reporting***

*Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act, to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States, or U.S. GAAP*. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. Internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with U.S. GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and or directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the interim or annual consolidated financial statements.

49.     Pursuant to SOX, Identiv disclosed the existence of a material weakness in the Company's internal controls over financial reporting related to "the financial statement close process" in its Annual Report filed March 19, 2013 with the SEC on Form 10-K for the 2012 fiscal year (the "FY 2012 10-K"). The FY 2012 10-K provides in relevant part:

Based on management's assessment, including consideration of the control deficiencies discussed below, management has concluded that the Company's internal control over financial reporting was not effective as of December 31, 2012, due to the following material weakness:

*Inadequate design of controls related to financial statement close process—* Management determined that the Company's design and operating effectiveness of controls over the financial statement close process related to the application of the Company's accounting policies and the presentation of disclosures in the notes to the financial statements was inadequate. Specifically, ***this material weakness arises from insufficient review and oversight of the recording of complex and non-routine transactions.*** This material weakness created a situation where a reasonable possibility exists that a material error related to complex and non-routine transactions could occur in our financial statements and not be prevented or detected in a timely manner.

50.     The Company reported in its FY2013 10-K that the material weakness relating to the financial statement close process continued to exist in fiscal year 2013, explaining that the material weakness was due in part to "an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP."  The FY2013 10-K stated in relevant part:

*Inadequate design of controls related to financial statement close process -* Management determined that the Company's design and operating effectiveness of controls over the financial statement close process related to the application of the Company's accounting policies and the presentation of disclosures in the notes to the financial statements was inadequate. Specifically, ***this material weakness arises from insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP***. This material weakness creates a situation where a reasonable possibility exists that a material error related to complex and non-routine transactions could occur in our financial statements and not be prevented or detected in a timely manner. This material weakness was previously identified and disclosed in our Annual Report on Form 10-K for the year ended December 2012 and a remediation plan was implemented; however, recent changes in the Company's operational structure have delayed full remediation of the material weakness, as discussed below.

51.     BDO was not Identiv's independent registered public accounting firm for the 2013 fiscal year, and therefore did not evaluate the adequacy of the Company's internal controls for that period.

52.     The Company's fiscal year 2014 Quarterly Reports stated that the material weakness concerning the financial statement close process that was originally identified in the FY 2012 10-K, persisted in fiscal year 2014.  The respective Quarterly reports, which were filed on May 15, 2014, August 14, 2014, and November 14, 2014, each stated:

1

2

3

4

> As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2013, our management identified a material weakness in our internal control over financial reporting as of December 31, 2013, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP.

5   53.   In each of the fiscal year 2014 Quarterly Reports, the Company stated that it

6   was in the process of remediating the material weakness, but reassured investors that "the

7   material weakness will not be considered remediated until the applicable remedial controls

8   operate for a sufficient period of time and management has concluded, through testing, that

9   these controls are operating effectively, which we expect to occur within the current fiscal

10  year."

11  54.   The Company disclosed that it had completely remediated the material

12  weakness related to the financial statement close process in its FY 2014 10-K.  Therein, the

13  Company stated in relevant part:

14  

15  

16  

> During 2014, we completed the transition of our accounting and finance function to California and added personnel with experience and training in U.S. GAAP. Additionally, as part of our reorganizational changes, we streamlined our reporting processes and simplified our operational structure to create additional efficiencies.

17  

18  

19  

> **The Company has completed the implementation of remediation measures to address the material weakness described above and, as of December 31, 2014, has concluded that the remediation activities implemented are sufficient to allow us to conclude that the previously disclosed material weakness has been remediated as of December 31, 2014.**

20  55.   The FY2014 10-K reiterated Defendant Hart and Nelson's ongoing

21  responsibility to monitor and evaluate the Company's internal controls and ensure their

22  effectiveness:

23  

24  

25  

26  

27  

> **Based on our evaluation, our management, including our CEO and CFO, concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of December 31, 2014.** Our management, including our CEO and CFO, has concluded that the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with generally accepted accounting principles in the United States, or U.S. GAAP.

> . . .

28

16

*Our management, including our CEO and CFO, assessed our internal control over financial reporting as of December 31, 2014.* In making the assessment of internal control over financial reporting, our management based its assessment on the criteria issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in "Internal Control—Integrated Framework of 1992." *Our management's assessment included evaluation of such elements as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment.* This assessment is supported by testing and monitoring performed by our internal accounting and finance organization.

56.     In addition to the declaration by the Company that the material weakness relating to the financial statement close process had been remediated, Defendants Hart and Nelson signed SOX certifications, filed with the Company's FY 2014 10-K, reassuring investors that all other "significant deficiencies and material weaknesses" relating to the Company's internal controls had been disclosed.  Hart and Nelson also certified that they disclosed "any fraud" involving them, "whether or not material."  The SOX certifications provided in relevant part:

The registrant's other certifying officer and I . . . have . . . Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles . . .
. . .

*The registrant's other certifying officer and I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

*Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

57.     Notably, while BDO audited the statements of operations, comprehensive loss, stockholders' equity, and cash flows for the year ended December 31, 2014, that were provided in the Company's FY 2014 10-K, BDO did not perform an audit of the Company's internal controls, and therefore did not express an opinion of the Company's internal controls

17

1  for the period.  In Identiv's FY 2014 10-K, under the section labeled "Report of Independent

2  Registered Public Accounting Firm," BDO stated:

> We have audited the accompanying consolidated balance sheet of Identiv, Inc. as of December 31, 2014 and the related consolidated statements of operations, comprehensive loss, stockholders' equity, and cash flows for the year ended December 31, 2014. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. ***The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.*** An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Identiv, Inc. at December 31, 2014, and the results of its operations and its cash flows for the year ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.

18  58.    Despite Defendants' claim in the FY 2014 10-K that the material weakness had

19  been remediated and their specific reassurances in the SOX certifications that there were no

20  other material weaknesses, Defendants knew that the Company's internal controls contained

21  an altogether separate and ongoing material weakness concerning ***entity level controls*** that the

22  Company was not reporting in fiscal years 2013 and 2014.  Defendants were similarly aware

23  of the Entity Level Controls Weakness at the time each Quarterly and Annual Report was

24  issued during the Class Period, which contained similar SOX certifications.  The existence of

25  the Entity Level Controls Weakness was only revealed after BDO's resignation and

26  disassociation from the Company's financial statements, at the end of the Class Period.

1

2

**C.      Defendant Hart Exploited the Entity Level Controls Weakness and Misappropriated Corporate Funds With the Authorization of Defendant Nelson**

3    59.    During the Class Period, Defendants Hart and Nelson knowingly concealed the

4    existence of the Entity Level Controls Weakness, which Hart exploited for his own personal

5    gain, all under the watchful eye of Nelson.  Hart's misappropriation of corporate resources was

6    documented in the *Ruggiero* Complaint filed by Ana Ruggiero, which asserts claims against

7    Identiv and Hart for age discrimination, disability discrimination, retaliation, and harassment.

8    The *Ruggiero* Complaint details Hart's practice of inappropriately charging the Company for

9    personal expenses, and also reveals a pattern of disregard for the adequacy of internal controls

10   and accurate reporting of financial data by both Hart and Nelson.

11   60.    Ruggiero had personal, firsthand knowledge of Hart's misconduct.  Ruggiero

12   became Hart's executive assistant around May 2012, when Hart was CEO of idOnDemand and

13   Nelson was the CFO.  Toward the end of 2012, after not receiving a raise for three years,

14   Ruggiero asked Hart for a raise.  Hart responded by offering Ruggiero $10,000, in exchange

15   for Ruggiero handling personal tasks for him and handling tasks for one of his corporations,

16   Mojo Ideas, Inc.  Ruggiero also managed Hart's personal affairs, including his divorce, his

17   estranged child, his personal banking, his transportation and transportation for his wife and

18   children, and other management of business affairs, doctor's appointments, and his personal

19   calendar.

20   61.    As alleged in the *Ruggiero* Complaint, shortly after becoming CEO of Identiv,

21   Hart began misappropriating corporate funds by charging the Company for his own personal

22   expenses.  This fact was eventually confirmed by BDO's resignation and its comments related

23   to the results of the Company's special investigation into *Ruggiero* Complaint's allegations,

24   and later by the Company in its amendment to the FY 2014 10-K filed on December 18, 2015

25   (the "FY 2014 10-K/A").  In its FY 2014 10-K/A, the Company disclosed that Hart charged to

26   the Company "$13,147 in 2013," which the Company "subsequently determined should not

27   have been reimbursed either because such expenses were not consistent with the Company's

28

1   expense guidelines and policies or because insufficient documentation was provided to support

2   such expense reimbursements."

3       62.     As detailed in the *Ruggiero* Complaint, Hart routinely charged the Company for

4   excessive personal expenses.  For example, Hart submitted his personal American Express bill

5   that included PayPal purchases, Amazon.com purchases, restaurant charges, and other personal

6   expenses to the Company for reimbursement.  The *Ruggiero* Complaint also alleges that Hart

7   purchased servers through eBay in 2013 at a price of approximately $18,000 each—which

8   were on Hart's American Express bill and were submitted to the Company for

9   reimbursement—and which Hart kept at his home for personal, not Identiv's, use.

10      63.     As laid out in the *Ruggiero* Complaint, Hart was aware that charging such items

11  to the Company was improper because, as early as 2013, Ruggiero would ask him to provide

12  backup documents and names of participants to clarify that the requested expenses were work-

13  related Identiv expenses.  However, Hart would simply ignore Ruggiero's emails and calls, or

14  would pick an expense category and tell her to "figure it out."

15      64.     Defendant Nelson, as Identiv's CFO and a highly-trained CPA, was also fully

16  aware that Hart was improperly charging the Company for personal expenses in 2013.  As

17  detailed in the *Ruggiero* Complaint, Ruggiero regularly discussed the issue with Nelson, and

18  Nelson often returned Hart's expense reports to Ruggiero, asking for the same supporting

19  information that Hart originally failed to provide to Ruggiero.  There were also discussions

20  concerning Hart's personal expenses between Ruggiero, Hart, and Nelson because the issue

21  had to be resolved in order to complete the expense reports.

22      65.     As discussed above, Hart's demand for reimbursement for tens of thousands of

23  dollars in personal charges came at a time when the Company's management was laser-

24  focused on implementing a comprehensive restructuring program, which involved, among

25  other things, monitoring cash flow and cutting operating general and administrative costs.

26  Despite the company-wide focus on reducing costs, Nelson made no effort to stop Hart's

27  continued misappropriation of corporate funds, but instead, acquiesced to Hart's improper

28  demands for personal reimbursement and authorized the Company's payments thereof.

66.     Hart continued to improperly charge the Company for personal expenses during fiscal year 2014.  As admitted by the Company in its FY 2014 10-K/A, Hart charged the Company "$97,868 in 2014" which the Company "subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."

67.     The *Ruggiero* Complaint highlights the improper personal charges made by Hart in 2014.  In April 2014, Identiv purchased a drone for approximately $5,000, which Hart kept at his home for personal use.  In June 2014, Hart submitted approximately $3,000 in American Express gift cards to Identiv for reimbursement; however, the gift cards were used to pay the groundskeeper for a different company's property (with which Hart was associated).

68.     Around July 4, 2014, Hart went to Las Vegas, Nevada with Defendant Nelson, Identiv Board member (and member of the Company's Compensation and Audit Committees) Gary Kremen, a contact in the U.S. government, Hart's girlfriend, Hart's girlfriend's sister, and the sister's boyfriend.  Another recently hired female employee (and roommate of Hart's girlfriend) met the group in Las Vegas.  Everyone stayed at the Cosmopolitan hotel under Hart's name.  Hart payed the group's charges, which also included "champagne showers" at the MGM club "Wet Republic."  Champagne showers involve spraying champagne on oneself, simulating the activity athletes perform after winning a championship.  Hart also racked up bills of approximately $5,000 for top shelf vodka, $5,000 at the XS-Encore restaurant, $1,900 in massages for Kremen, and thousands more for various other items.  All these charges, totaling $17,585, were submitted to Identiv for reimbursement.

69.     The *Ruggiero* Complaint further alleges that in the summer of 2014, Hart was suffering financial problems from a divorce, and that Nelson accepted approximately $1,000,000 in stock compensation, in the summer of 2014, right after Hart obtained a $26,000 loan from Nelson to pay an American Express bill, indicationg that Hart used Identiv not only to pay his personal expenses, but also to reward others for paying Hart's personal expenses:

1
2
3

[I]n around August 2014, Nelson suddenly received approximately $1,000,000.00 in shares from Identiv. ***Ms. Ruggiero then connected those shares to her prior assistance in her obtaining a $26,000 loan from Nelson for Hart because Hart needed to pay his American Express bill.***

4    70.    The Company's 10-K/A filed on December 18, 2015 supports these allegations.

5    The 10-K/A reports stock awards to Nelson in the amount of $710,450 and option awards in

6    the amount of $632,060 for 2014, compared to no stock awards, and only $178,750 in option

7    awards for 2013.   As such, Nelson's total 2014 compensation was $1,754,777 in 2014

8    compared to $187,827 for 2013.   Moreover, the Company's April 11, 2016 Proxy Statement

9    indicates that Nelson's compensation dropped considerably the following year: from

10   $1,754,777 in 2014 to $321,325 in 2015, with no option or stock awards for 2015.

11   71.    Also during the summer of 2014, the *Ruggiero* Complaint alleges that Hart

12   steered Identiv business to an individual who gave him a personal loan of $19,000.   Shortly

13   after the loan, Hart facilitated a services contract between the friend's company and Identiv

14   that required Identiv to pay the friend's company $26,000.

15   72.    During the summer of 2014 time period, Ruggiero also noticed that Hart's

16   personal bank accounts were depleted when she accessed his Chase account to obtain the

17   direct payment records relating to Hart's Marriott account and to get his bank statements in

18   response to issues relating to his divorce.   Nelson had a conversation with Ruggiero regarding

19   Hart's financial condition given that Nelson had personally loaned money to Hart and that

20   Hart was submitting astronomical credit card statements for lavish personal expenses.   As set

21   forth in her Complaint, Ruggiero told Nelson that Hart seemed to be out of money and "using

22   Identiv as his personal bank account for a lifestyle he apparently could not afford."

23   73.    Hart also converted his personal car—a Porsche Cayenne Turbo—into a

24   company vehicle so that Identiv would bear more of the costs associated with the car.

25   74.    Additionally, around the time of the Company's public offering of 2 million

26   shares that took place on or around September 11, 2014, Hart again racked up a large personal

27   bill—this one totaling $28,959.19—on another trip to Las Vegas that included Hart's friend,

28   his girlfriend, and the roommate of Hart's girlfriend (who was also an Identiv employee).   This

1    included Hart spending $14,500 at a nightclub at the MGM Grand, approximately $8,000 in

2    hotel suites, and another few thousand dollars in entertainment. Nelson also accompanied Hart

3    on the trip, along with Identiv director Kremen, Identiv Board Chairman Steve Humphries,

4    and a DLA Piper attorney. The *Ruggiero* Complaint states that Hart submitted the $28,959.19

5    bill to Identiv for reimbursement "in typical Hart fashion" but that this time, "he skipped

6    obtaining the requisite two signatures needed for approval and signed off on it himself." Hart

7    then asked Ruggiero to submit the bill for reimbursement.

8          75.    Defendant Hart knew that the identified (and many more) personal expenses

9    Hart charged to the Company in 2014 were improper. There was at least one instance when

10   Hart instructed Ruggiero to misrepresent the expense in order to conceal an improper expense:

11   with respect to the 4th of July Las Vegas expenses, Hart told Ruggiero to label the expense

12   "customer event – senior exec and board plus customers including us marshal." Moreover, at

13   or around the time of the July 4th weekend, Ruggiero became very vocal about Hart's

14   improper expenses, which ensured that Hart was aware that he was improperly charging the

15   Company for personal expenses.

16         76.    Finally, on or around October 3, 2014, Hart sent Ruggiero an email berating her

17   out of frustration for her continued complaints about his improper expenses. According to the

18   *Ruggiero* Complaint, "[Hart] had heard enough from Nelson about her questioning his actions

19   and 'trying to protect him.' [Hart] had become exhausted by her constant challenges to Hart

20   carrying-along [Hart's girlfriend and his girlfriend's roommate] to business trips and making

21   Identiv pay for their presence and expenses." Hart had already taken away some of her job

22   duties and given them to his girlfriend's roommate, had eliminated her access to certain

23   sections of the workplace, and in general was "very nasty, dismissive, evasive, and

24   disrespectful" to Ruggiero.

25         77.    Nelson was also aware of Hart's improper expenses during 2014. Around

26   July 4, 2014, Ruggiero again brought Hart's expenses to the attention of Nelson—specifically

27   noting the alcohol portion of the bill and telling Nelson the expenses were unethical. In

28   response, Nelson reassured Ruggiero that he would speak with Hart about the matter. Around

1  this time, Ruggiero also explained to Nelson that she believed Hart was using the Company to

2  finance his lifestyle because Hart was out of money.

3      78.    Additionally, Nelson accompanied Hart on the trip to Las Vegas after the public

4  offering, so he personally witnessed Hart racking up large personal expenses which Hart later

5  submitted to Identiv for reimbursement.    After the trip, Ruggiero called Nelson and

6  communicated her frustrations to Nelson regarding Hart charging the post-offering Las Vegas

7  "business trip" to the Company.    In response, Nelson confirmed with Ruggiero that he

8  understood and agreed with her concerns, "and then called her back to further explain that he

9  understood her concerns."

10      79.    Nelson was plainly complicit in Hart's corporate misconduct, as he directly

11  observed Hart's improper practice of billing the Company for personal expenses on multiple

12  occasions, yet still authorized Hart's demands for reimbursement.    Nelson's continued

13  acquiescence to Hart's demands for personal reimbursement was particularly egregious

14  because Nelson, as CFO and a highly trained accountant, had been tasked with overseeing the

15  Company's restructuring program and was directly responsible for monitoring and

16  implementing the Company's cost-cutting efforts.    In light of those responsibilities, Nelson

17  had clear visibility into the Company's operating and general and administrative expenses,

18  including Hart's personal charges.  Nelson therefore had knowledge of: (i) Hart's undisclosed

19  misappropriation of corporate resources for personal gain,; (ii) the Company's deficient entity

20  level controls that allowed this misappropriation to continue,; and (iii) that the Company's

21  Proxy Statements relating to executive compensation, described below, contained false

22  information regarding Hart's compensation.

23      80.    In an interview conducted by an NBC news affiliate, Ruggiero confirmed the

24  allegations in the *Ruggiero* Complaint concerning Hart's corporate misappropriation and lack

25  of ethics, as detailed in an article entitled "Former Employee Sues Identiv, Alleges Fraud and

26

27

28

Improper Spending on a Government Employee" published on January 9, 2016. [6]   The article

provides in relevant part:

> In her job as an executive assistant at Identiv, Ana Ruggiero says her job routinely included processing all kinds of expenses for then CEO and current president Jason Hart. But she says when she started noticing he was submitting personal expenses to Identiv for reimbursement, she began to raise red flags.

> Now she's filed a lawsuit with the Alameda County Superior Court against her former boss and Identiv, claiming she was fired in "retaliation for her complaints about Hart's unlawful and fraudulent conduct" in addition to age discrimination.

> "It was unethical what he was doing," Ruggiero said in an exclusive interview with NBC Bay Area. She contends Hart spent company money on gifts for a government official, personal expenses, and wild parties.

> Her lawsuit claims Hart's personal expenses included 5-6 servers purchased on eBay for $18,000 each. Servers, she says, that "were at his home" and never "part of Identiv's information technology system." She also points to $3,000 in American Express gift cards that were designated for "rewarding employees." She claims the gift cards actually went to Hart's groundskeeper because he "owed him money."

> Ruggiero said, "The company didn't benefit from it. It was his lifestyle that was being funded."

81.     The testimony of a former employee and confidential witness ("CW1") further

confirms that Hart was improperly charging personal expenses to the Company and that

Nelson was aware of it.  CW1 was a long-time employee of Identiv, having joined Hirsch

Electronics in 1998 as a Finance Assistant and later became a Professional Services Process

Manager.  Hirsch Electronics was acquired by Identiv in 2009.  In 2013, CW1 was promoted

to Human Resources Manager at Identiv and continued to be employed in that capacity until

July 2014.  As Human Resources Manager, CW1 had responsibility for all accounts payable

for Identiv and took direction directly from Defendant Nelson.

82.     CW1 had responsibility over an employee (the "Sub-Employee") that processed

an American Express credit card that was used by Hart.  CW1 stated that a lot of time had been

spent writing SOX processes before Hart and Nelson became CEO and CFO, but when Hart

---

[6]   *See*   http://www.nbcbayarea.com/investigations/Former-Employee-Sues-Identiv-Alleges-Fraud-and-Improper-Spending-on-a-Government-Employee---364587281.html

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

and Nelson arrived, the processes "went out the door." Also, according to CW1, it was a daily fight for the Sub-Employee to obtain the expense reports and receipts from Hart or Hart's Assistant to support the charges to the Company. For charges that did not have an accompanying receipt, CW1 stated that Nelson instructed CW1 to pay the expenses and would comment "we will figure it out later." When CW1 would push back regarding the improper expenses, Nelson would tell CW1, "you have to do it." CW1 stated that it was a common joke around the office that you had to do what Hart wanted or you would be fired.

83.    CW1 interacted with Ruggiero, Hart's personal assistant and the whistleblower that filed the *Ruggiero* Complaint**.** According to CW1, Hart was using an American Express Card from Hirsch Electronics (acquired by Identiv in 2009) for his expenses. Ruggiero had the responsibility of submitting Hart's expense reports to an account manager who was responsible for processing those expenses. When the account manager had issues, she consulted CW1. CW1 saw the bills for the servers which are mentioned in the *Ruggiero* Complaint and stated that no one knew where the servers were located. Through direct conversations with Ruggiero, CW1 learned that Ruggiero was also was handling Hart's personal finances, including issues related to Hart's divorce and child support.

84.    Hart and Nelson's activities clearly violated the Company's "Code of Conduct and Ethics" (the "Code").[7]  The Code provides that "Identiv's Directors, Chief Executive Officer and Chief Financial Officer are responsible for ensuring that Identiv's public disclosures meet these requirements and guidelines, and that adequate financial and disclosure controls exist for this purpose." The Code also requires that "Identiv's Directors and employees must promote the accurate and reliable preparation and maintenance of Identiv's financial and other records and must ensure that any information or data they report to management is accurate and honest[,]" that "Identiv employees must record and report all information accurately and honestly[,]" and that employees "[n]ever make misrepresentations or dishonest statements to any person or organization." Finally, in the event an employee has

---

[7]  Available at: http://www.identiv.com/images/pdfs/_Code_of_Conduct_and_Ethics.pdf (last accessed August 31, 2016).

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

1   knowledge of a violation of the Code, "it is [his] responsibility to report this to Identiv

2   management in person or through the Confidential Employee Hotline."   Hart flagrantly

3   violated this Code, while Nelson permitted him to do so.

4          85.    Despite their obligations as the senior-most executives of Identiv to "record and

5   report all financial information accurately and honestly," as well as their responsibility to

6   monitor and cut costs pursuant to the company-wide restructuring program, Defendants Hart

7   and Nelson caused and/or directed the filing of financial statements that provided false and

8   misleading information about the nature and amount of Hart's executive compensation.   The

9   statements concerning Hart's compensation were false, as the Company admitted in the

10  FY 2014 10-K/A, identifying "payments to Mr. Hart of previous reimbursed expenses of

11  $97,868 in 2014 and $13,147 in 2013 as to which the Company subsequently determined

12  should not have been reimbursed either because such expenses were not consistent with the

13  Company's expense guideline or because insufficient documentation was provided to support

14  such expense reimbursements."

15         **D.     The Company Formed a "Special Committee" to Investigate Hart's**
           **Improprieties, but Continued to Conceal Deficiencies in the Company's**
16         **Internal Controls**

17         86.    On May 1, 2015, in response to the allegations raised in the *Ruggiero*

18  Complaint, Identiv announced its intent to file an amendment to its FY 2014 10-K on Form

19  10-K/A "to complete the information called for by Item III of Form 10-K, including the

20  executive compensation information" which the Company did not include in its FY 2014

21  10-K.  The Company also disclosed the existence of the *Ruggiero* Complaint to investors,

22  characterizing it as "***a complaint . . . from a former employee alleging, among other things,***

23  ***certain expense reimbursement issues with respect to certain executive officers and certain***

24  ***other employees of the Company.***"   The Company informed investors that it had formed the

25  "Special Committee" to investigate the allegations contained in the *Ruggiero* Complaint.

26         87.    On May 18, 2015, Identiv filed a Notice of Late Filing of Form 12b-25

27  informing investors that the Company would not be filing its Form 10-Q for the quarterly

28  period ended March 31, 2015 ("Q1 2015") because it was not able to complete the executive

27

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

1    compensation portion of the FY 2014 10-K, due to the ongoing investigation by the Special

2    Committee.

3        **E.    The Company Disclosed the Entity Level Controls Weakness on**
          **November 30, 2015, When BDO Refused to Be "Associated With"**
4        **Any of the Company's 2015 Financial Statements**

5        88.    The nature of the Company's Entity Level Controls Weakness was revealed on

6    November 30, 2015, when the Company filed a Current Report on Form 8-K with the SEC

7    disclosing that its independent accounting firm BDO "is unwilling to be associated with the

8    consolidated financial statements prepared by management for any of the fiscal periods within

9    2015 and will not complete its reviews of the interim financial information as of or for the

10   periods ended March 31, 2015, June 30, 2015 or September 30, 2015, and additionally will not

11   audit the Company's consolidated financial statements as of and for the year ending December

12   31, 2015" because BDO "disagrees with the scope and the remediation of the special

13   investigation that was undertaken by the Special Committee of the Board."

14       89.    The Company also reported that BDO informed the Board of "material

15   weaknesses in the Company's internal control over financial reporting."  One of the material

16   weaknesses related to the Company's entity level controls, including a determination by BDO

17   that "with respect to the results of the special investigation undertaken by the Special

18   Committee during 2015, the Company's senior management leadership and operating style

19   and the Board's oversight did not result in an open flow of information and communication

20   and did not support an environment where accountability is valued."

21       90.    On news of the material weakness and confirmation by BDO's statements that

22   the results of the Special Committee investigation into the Ruggiero Complaint allegations

23   indicated Identiv's management did not foster an environment where internal controls and

24   accurate financial reporting are valued (which allowed Hart to use the Company as his own

25   personal checking account), the Company's stock price fell, thereby injuring investors.

26       91.    The Company later further confirmed BDO's determination of the lack of

27   management accountability on December 18, 2015, by admitting that the Company reimbursed

28   Hart for expenses he was not entitled to.  In an amendment to the Company's FY 2015 10-K

                                              28

1    filed on December 18, 2015, the Company stated that it "reimbursed expenses of $97,868 in

2    2014 and $13,147 in 2013" to Hart "which the Company subsequently determined should not

3    have been reimbursed either because such expenses were not consistent with the Company's

4    expense guidelines and policies or because insufficient documentation was provided to support

5    such expense reimbursements."

6          92.     Nonetheless, Hart was ultimately rewarded, rather than punished for his bad

7    acts warranting termination for cause.  Although he was replaced as CEO, Hart benefitted from

8    a new employment agreement (attached to the Company's September 16, 2015 Form 8-K),

9    which granted Hart up to $875,000 in compensation plus non-cash benefits including business

10   expense reimbursement, employee benefit plans available to senior execs, four weeks paid

11   vacation, a company car for business and personal use, and $10,000 annually for personal

12   financial planning services.  Later, on February 2, 2016, the Company announced Hart's

13   departure from the Board and the end of his employment as "President" of Identiv, and stated

14   that his "departure was in connection with a restructuring plan . . . ." and that he received a

15   generous severance package (12 months base salary and benefits and 100% of bonuses or

16   actual commissions paid in the prior 12 months).

17   **V.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING
           STATEMENTS AND OMISSIONS**

18

19         93.     During the Class Period, Defendants filed periodic reports with the SEC,

20   including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the

21   Company's reported financial statements.  The Company's 10-Qs and 10-Ks contained false

22   information regarding the Company's internal controls.  The following chart identifies the

23   date, signatories, and period covered by each relevant report filed during the Class Period:

24

25

26

27   / / /

28   / / /

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

| Form | Period | Date Filed | Defendant Signatories | Referred to Below As |
|------|--------|-----------|----------------------|---------------------|
| 10-Q | 2013 Fiscal Third Quarter | 11/13/2013 | Hart | Q3 2013 10-Q |
| 10-K | 2013 Fiscal Year | 3/31/2014 | Hart | FY 2013 10-K |
| 10-Q | 2014 Fiscal First Quarter | 5/15/2014 | Hart & Nelson | Q1 2014 10-Q |
| 10-Q | 2014 Fiscal Second Quarter | 8/14/2014 | Hart & Nelson | Q2 2014 10-Q |
| 10-Q | 2014 Fiscal Third Quarter | 11/14/2014 | Hart & Nelson | Q3 2014 10-Q |
| 10-K | 2014 Fiscal Year | 3/23/2015 | Hart | FY 2014 10-K |

94.     The Company attached CEO and CFO signed certifications regarding the Company's internal controls to the filed Form 10-Qs and 10-Ks, as required by SOX.  The certifications contained false statements regarding the Company's internal controls.  The chart below identifies the certification signatories associated with each relevant Form 10-Q and 10-K.

| Form | Cert. Signatories |
|------|------------------|
| Q3 2013 10-Q | Hart & David Wear |
| FY 2013 10-K | Hart & Nelson |
| Q1 2014 10-Q | Hart & Nelson |
| Q2 2014 10-Q | Hart & Nelson |
| Q3 2014 10-Q | Hart & Nelson |
| FY 2014 10-K | Hart & Nelson |

95.     The Company's FY 2013 10-K and FY 2014 10-K directed investors' attention to the Company's Proxy Statements for information related to executive compensation.  The Preliminary Proxy Statement and Definitive Proxy Statements referenced by the FY 2013 10-K were filed on April 18, and April 28, 2014, respectively (the "2013 Proxy Statements").  The Preliminary Proxy Statement referenced by the FY 2014 10-K was filed on April 17, 2015 (the "2014 Proxy Statement").   The Proxy Statements contained false and misleading information regarding Hart's compensation and the improper Company payments made to him.

/ / /

/ / /

A.    **Defendants' Materially False and/or Misleading Executive Compensation Figures**

96.    The Company's 2013 Proxy Statements reported "Total" compensation for Hart for the year 2013 as "$250,056." The Company also reported "All Other Compensation"—which is a subcategory of total compensation—for Hart for the year 2013 as "$56" which the Company attributed to "payments made on behalf of Mr. Hart in 2013 for life insurance."

97.    The reported total compensation and All Other Compensation figures identified in the paragraph above were materially false when made because, as admitted by the Company in its FY 2014 10-K/A filed with the SEC on December 18, 2015, Hart's total compensation for 2013 was "$263,203," and Hart's All Other Compensation for 2013 was "$13,203" which included "$13,147 in 2013 as to which the Company subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."

98.    The Company's 2014 Proxy Statement reported "Total" compensation for Hart for the year 2014 as "$3,515,504." The Company also reported "All Other Compensation"—which is a subcategory of total compensation—for Hart for the year 2014 as "$17,004." The Company's 2014 Proxy Statement also reported, and reiterated, "Total" compensation for Hart for the year 2013 as "$250,056" and "All Other Compensation" for Hart for the year 2013 as "$56" which the Company attributed to "payments made on behalf of Mr. Hart . . . for life insurance in 2013."

99.    The reported total compensation and All Other Compensation figures identified in the paragraph above were materially false when made because, as admitted by the Company in the FY 2014 10-K/A, Hart's total compensation for 2014 and 2013 were "$3,763,372" and "$263,203," respectively, and Hart's All Other Compensation for 2014 and 2013 were "$114,872" and "$13,203," respectively, which included "payments to Mr. Hart of previously reimbursed expenses of $97,868 in 2014 and $13,147 in 2013 as to which the Company subsequently determined should not have been reimbursed either because such expenses were

31

1  not consistent with the Company's expense guidelines and policies or because insufficient

2  documentation was provided to support such expense reimbursements."

3         100.   The false statements with regard to compensation reporting were made with

4  scienter because Hart and Nelson were aware that Hart was improperly charging the Company

5  for personal expenses as detailed in ¶¶59-85, 117-124.  In addition, given Defendants' (and

6  particularly Nelson's) focus on expenses, including executive compensation expenses, and

7  Nelson's extensive financial background, Defendants knew that the misrepresentations and

8  omissions regarding Hart's improper expenses would translate into false executive

9  compensation reporting.

**B.     Defendants' Materially False and/or Misleading Statements and Omissions Concerning the Entity Level Controls Weakness**

12         101.   In the Q3 2013 10-Q, under Item 4, "Controls and Procedures," the Company

13  stated:

> As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2012, ***our management identified a material weakness in our internal control over financial reporting as of December 31, 2012, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions. We continue to improve our policies and procedures relating to internal controls over financial reporting, including putting in place an increased level of accounting and reporting oversight and controls at the corporate level.*** We expect to complete the implementation of remediation measures, and as a result remediate the existing material weakness described above, by the end of 2013.

20         102.   Hart, through his SOX certification which was attached as an exhibit to the

21  Q3 2013 10-Q stated:

> 1. I have reviewed this quarterly report on Form 10-Q of Identiv Group, Inc.;
>
> 2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and***

*cash flows of the registrant as of, and for, the periods presented in this report*;

4. ***The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have***:

    a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

    b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

    a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

    b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

103.    In the FY 2013 10-K, under Item 9A, "Controls and Procedures," the Company stated:

> Based on management's assessment, including consideration of the control deficiencies discussed below, management has concluded that the Company's internal control over financial reporting was not effective as of December 31, 2013, due to the following material weakness.
>
> *Inadequate design of controls related to financial statement close process -* Management determined that the Company's design and operating effectiveness of controls over the financial statement close process related to the application of the Company's accounting policies and the presentation of disclosures in the notes to the financial statements was inadequate. ***Specifically, this material weakness arises from insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP.*** This material weakness creates a situation where a reasonable possibility exists that a material error related to complex and non-routine transactions could occur in our financial statements and not be prevented or detected in a timely manner. This material weakness was previously identified and disclosed in our Annual Report on Form 10-K for the year ended December 2012 and a remediation plan was implemented; however, recent changes in the Company's operational structure have delayed full remediation of the material weakness, as discussed below.

104.    Hart and Nelson signed SOX certifications that were submitted with the FY 2013 10-K.   The content of the certifications for the FY 2013 10-K was substantively identical to the SOX certification described in ¶102.

105.    In the Q1 2014 10-Q, under Item 4, "Controls and Procedures," the Company stated:

> As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2013, our ***management identified a material weakness in our internal control over financial reporting as of December 31, 2013, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP.***
>
> . . .
>
> Management has developed a timetable for the implementation of the foregoing remediation efforts and will monitor the implementation. In addition, under the direction of the Audit Committee, ***management will continue to review and make necessary changes to the overall design of the Company's internal control environment, as well as to policies and procedures to improve the overall effectiveness of internal control over financial reporting. Management believes the foregoing efforts will effectively remediate the material weakness.*** However, the material weakness will not be considered remediated until the applicable remedial controls

34

1   operate for a sufficient period of time and management has concluded,
    through testing, that these controls are operating effectively, which we expect
2   to occur within the current fiscal year.

3   106.   Hart and Nelson signed SOX certifications that were submitted with the Q1

4   2014 10-Q. The content of the Q1 2014 10-Q certifications was substantively identical to the

5   SOX certification described in ¶102.

6   107.   In the Q2 2014 10-Q, under Item 4, "Controls and Procedures," the Company

7   stated:

8   As disclosed in our Annual Report on Form 10-K for the year ended
    December 31, 2013, our *management identified a material weakness in our*
9   *internal control over financial reporting as of December 31, 2013, namely*
    *that we had an insufficient review and oversight of the recording of complex*
10  *and non-routine transactions due to an insufficient number of accounting*
    *personnel with appropriate knowledge, experience or training in U.S.*
11  *GAAP*.

12  . . .

13  Management has developed a timetable for the implementation of the
    foregoing remediation efforts and will monitor the implementation. In
14  addition, under the direction of the Audit Committee, *management will*
    *continue to review and make necessary changes to the overall design of the*
15  *Company's internal control environment, as well as to policies and*
    *procedures to improve the overall effectiveness of internal control over*
16  *financial reporting. Management believes the foregoing efforts will*
    *effectively remediate the material weakness*. However, the material weakness
17  will not be considered remediated until the applicable remedial controls
    operate for a sufficient period of time and management has concluded,
18  through testing, that these controls are operating effectively, which we expect
    to occur within the current fiscal year.
19

20  108.   Hart and Nelson signed SOX certifications that were submitted with the Q2

21  2014 10-Q. The content of the Q2 2014 10-Q certifications was substantively identical to the

22  SOX certification described in ¶102.

23  109.   In the Q3 2014 10-Q, under Item 4, "Controls and Procedures," the Company

24  stated:

25  As disclosed in our Annual Report on Form 10-K for the year ended
    December 31, 2013, our *management identified a material weakness in our*
26  *internal control over financial reporting as of December 31, 2013, namely*
    *that we had an insufficient review and oversight of the recording of complex*
27  *and non-routine transactions due to an insufficient number of accounting*
    *personnel with appropriate knowledge, experience or training in U.S.*
28  *GAAP*.

35

. . .

> Management has developed a timetable for the implementation of the foreging remediation efforts and will monitor the implementation. In addition, under the direction of the Audit Committee, **management will continue to review and make necessary changes to the overall design of the Company's internal control environment, as well as to policies and procedures to improve the overall effectiveness of internal control over financial reporting. Management believes the foregoing efforts will effectively remediate the material weakness.** However, the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively, which we expect to occur within the current fiscal year.

110.    Hart and Nelson signed SOX certifications that were submitted with the Q3 2014 10-Q.  The content of the Q3 2014 10-Q certifications was substantively identical to the SOX certification described in ¶102.

111.    The statements identified in ¶¶101-110 above were materially false and/or misleading because Defendants failed to disclose the existence of a separate, ongoing material weakness in the Company's internal controls—namely, the weakness relating to the Company's Entity Level Controls Weakness identified by BDO, which allowed Hart to improperly expense personal items to the Company as described in more detail in ¶¶59-85.

112.    These false statements were made with scienter because Hart and Nelson were aware that Hart was actively disregarding the Company's "entity level" internal controls by improperly charging the Company for personal expenses as detailed in ¶¶59-85, 117-124, and that the Company was not reporting these expenses as part of Hart's compensation.

113.    In the FY 2014 10-K, under Item 4, "Controls and Procedures," the Company stated:

> As previously reported in Part II, Item 9A. "Controls and Procedures" of our Annual Reports on Form 10-K for the years ended December 31, 2013 and 2012, **we identified a material weakness in our internal control over financial reporting as of December 31, 2013 and 2012, which arose due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP. Specifically, this material weakness resulted from insufficient review and oversight involving the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP.** This material weakness created a situation where a reasonable possibility that a material error related to complex and non-routine

36

transactions could occur in our financial statements and not be prevented or detected in a timely manner.

In response to this material weakness, we developed remediation plans to address the material weakness. However, because of the reorganization of and changes to our management team initiated at the end of 2013, the move of our executive headquarters to Fremont, California and the timing of the transition of our accounting and finance function from Ismaning, Germany to Santa Ana, California, mentioned elsewhere in this Form 10-K, certain remedial actions were delayed and the prior material weakness had not been fully remediated. During 2014, we completed the transition of our accounting and finance function to California and added personnel with experience and training in U.S. GAAP. Additionally, as part of our reorganizational changes, we streamlined our reporting processes and simplified our operational structure to create additional efficiencies.

***The Company has completed the implementation of remediation measures to address the material weakness described above and, as of December 31, 2014, has concluded that the remediation activities implemented are sufficient to allow us to conclude that the previously disclosed material weakness has been remediated as of December 31, 2014***.

In addition, under the direction of the Audit Committee of the Board, our management will continue to review the overall design of our internal control environment, and make changes to policies and procedures to improve the overall effectiveness of internal control over financial reporting.

114.    Hart and Nelson signed SOX certifications that were submitted with the Company's FY 2014 10-K.  The content of the certifications was substantively identical to the certification described in ¶102.

115.    The statements identified in ¶¶113-114 above were materially false and/or misleading because Defendants failed to disclose the existence of an additional material weakness in the Company's internal controls—namely, the weakness relating to the Company's "entity level controls" identified by BDO, which allowed Hart to improperly expense personal items to the Company.,,

116.    The false statements relating to the existence of a material weakness in the Company's internal controls were made with scienter because Hart and Nelson were aware that Hart was actively utilizing the Company's Entity Level Controls Weakness to improperly charge the Company for personal expenses as detailed in ¶¶59-85, 117-124, and that the Company was not reporting these expenses as part of Hart's compensation.   The false statements relating to the remediation of the previously identified weakness in the Company's

37

1   internal controls were made with scienter because: (i) correcting the internal control issue was

2   a primary focus of Defendants; (ii) the Company stated that "the material weakness will not be

3   considered remediated until the applicable remedial controls operate for a sufficient period of

4   time and management has concluded, through testing, that these controls are operating

5   effectively"; (iii) the control deficiency was of such an extreme nature that BDO was unwilling

6   to be associated with the Company's 2015 financial statements; and (iv) Defendants

7   demonstrated a complete and willing lack of care for blatant internal control deficiencies

8   throughout the Class Period as detailed in ¶¶47-58, 59-85.

9   **VI.    ADDITIONAL ALLEGATIONS OF SCIENTER**

10          117.   As alleged herein, each of the Defendants acted with scienter in that each

11  Defendant knew or recklessly disregarded that the public documents and statements issued or

12  disseminated in the name of the Company were materially false and misleading or omitted to

13  state facts necessary in order to make the statements made, in light of the circumstances under

14  which they were made, not misleading. Each Defendant knew that such statements or

15  documents would be issued or disseminated to the investing public and knowingly and

16  substantially participated or acquiesced in the making, issuance or dissemination of such

17  statements or documents as a primary violation of the federal securities laws.  By virtue of

18  their receipt or reckless disregard of information reflecting the true facts regarding Identiv,

19  their control over and/or receipt and/or modification of Identiv's materially misleading

20  statements, and/or their other associations with Identiv, each Defendant was privy to

21  confidential information concerning Identiv and knowingly or recklessly participated in the

22  fraudulent scheme and conduct alleged herein.

23          118.   Defendants' Substantial Visibility As To Operating Costs and Expenses,

24  Including Executive Compensation:  Pursuant to the companywide restructuring program,

25  implemented shortly before the start of the Class Period and continuing throughout the Class

26  Period, Defendants Hart and Nelson, in their respective capacities as CEO and CFO, were

27  chiefly responsible for monitoring and reducing the Company's operating and general and

28  administrative expenses, which include executive compensation and payroll expenses.  In light

1   of the Company's across-the-board focus on cost reduction, Defendants Hart and Nelson had

2   clear visibility into the Company's operating costs, included the excessive and improper

3   personal reimbursements that Hart sought and was paid during the Class Period. Accordingly,

4   Defendants knew that the Proxy Statements relating to executive compensation contained false

5   and misleading information regarding the nature and amount of Hart's compensation.

6       119.    <u>Defendants' SOX Certifications Further Demonstrate That They Acted With</u>

7   <u>the Requisite Level of Scienter</u>: In conjunction with Identiv's public financial statements filed

8   with the SEC during the Class Period, Defendants Hart and Nelson issued certifications

9   pursuant to § 302 of SOX, attesting that they reviewed the contents of the filings to confirm

10  that the "report does not contain any untrue statement of a material fact or omit to state a

11  material fact necessary to make the statements made, in light of the circumstances under which

12  such statements were made, not misleading," and that "the financial statements, and other

13  financial information included in this report, fairly present in all material respects the financial

14  condition, results of operations and cash flows of [Identiv] as of, and for, the periods presented

15  in this report." *See* SOX certification attached to the Q3 2013 10-Q.

16      120.    To assure each certification was not simply a hollow gesture, Defendants Hart

17  and Nelson were required to and did further confirm that they were responsible for

18  "design[ing] such disclosure controls and procedures, or caus[ing] such disclosure controls and

19  procedures to be designed under our supervision, to ensure that material information relating

20  to [Identiv] . . . is made known to us . . . ." Hart and Nelson acknowledged that they had

21  designed such controls to assure "to provide reasonable assurance regarding the reliability of

22  financial reporting and the preparation of financial statements for external purposes in

23  accordance with generally accepted accounting principles." *See* FY 2013 10-K. Hart and

24  Nelson further certified that they had disclosed "[a]ll significant deficiencies and material

25  weaknesses in the design or operation of internal control over financial reporting," as well as

26  "[a]ny fraud, whether or not material, that involves management or other employees who have

27  a significant role in the registrant's internal control over financial reporting." *See* SOX

28  certifications, filed with FY 2014 10-K.

121. Despite Defendants' SOX certifications, and their specific assurances concerning Identiv's internal controls, which conveyed that all known accounting issues had been disclosed and were being remediated, Hart and Nelson knowingly concealed the existence of the Entity Level Controls Weakness during the Class Period, which Hart exploited for his own personal gain, all under the watchful eye of Nelson.

122. <u>Defendants' Fraudulent Conduct Allowed Them to Artificially Prop Up Identiv's Stock Price and Avoid Delisting by NASDAQ</u>: Defendants violated GAAP, SEC Rules and Identiv's own internal policies, and made false and misleading statements about Hart's misappropriation of corporate funds and the quality and effectiveness of Identiv's internal controls, to avoid the prolonged decline in the Company's stock price and subsequent delisting from the NASDAQ, Capital Market. As set forth in the FY 2014 10-K, any subsequent delisting by NASDAQ would have a "material adverse effect on our stock price, our business and our ability to raise capital." Such adverse action by NASDAQ therefore would have a severe negative impact on the Company's ability to continue to operate and raise money, particularly in light of the fact that the Company was already suffering cash flow problems. Hart and Nelson were therefore motivated to conceal material adverse facts about the Company, so as to mitigate the risk of any adverse action by NASDAQ.

123. <u>Defendants' Fraudulent Conduct Allowed Them to Preserve Their Executive Positions</u>: The individual Defendants were motivated to make the alleged false and misleading statements to preserve their executive positions, and in Hart's case, to continue his systematic misappropriation of corporate funds. Indeed, Hart exploited the Company's weak internal controls and improperly sought reimbursement of personal charges, all under the watchful eye of Nelson, who authorized the reimbursements. Although Nelson was fully aware that Hart was improperly seeking reimbursement for purely personal charges, Nelson signed off on the charges because of: (i) Nelson's longstanding relationship of trust with Hart; (ii) Nelson's receipt of approximately $1,000,000 in stock compensation after Hart obtained a $26,000 loan from Nelson to pay an American Express bill; and (iii) Nelson's desire to preserve his position as CFO under Hart. Defendants then improperly reported the nature and amount of Hart's

1   compensation in the Proxy Statements, in violation of GAAP, SEC rules, and Identiv's own

2   internal policies.

3       124.   There Is a Strong Inference that Identiv Acted with the Requisite Scienter:

4   Identiv's corporate liability derives from the actions of its agents.   The allegations herein

5   establish a strong inference that Identiv, as an entity, acted with corporate scienter throughout

6   the Class Period, as its officers, management and agents had actual knowledge of the

7   misrepresentations and omissions of material facts set forth herein, or acted with reckless

8   disregard for the truth, because they failed to disclose the truth about Defendant Hart's

9   improper demands for reimbursement of personal charges and the existence of ongoing

10   weaknesses in the Company's internal controls, even though such facts were available to them.

11   Taken collectively, these facts create a strong inference that Identiv acted with the requisite

12   scienter.

13   **VII.   LOSS CAUSATION**

14       125.   Defendants' wrongful conduct, as alleged herein, directly and proximately

15   caused the economic loss suffered by Lead Plaintiff and other Class members. During the

16   Class Period, Lead Plaintiff and other Class members purchased or acquired Identiv securities

17   at artificially inflated prices in reliance on Defendants' material misrepresentations and

18   omissions.  The price of those securities declined significantly when information disclosed to

19   the market for the first time corrected those material misrepresentations and omissions.

20       126.   The truth regarding Identiv's internal controls and CEO misconduct was

21   partially revealed, and/or the concealed risks materialized, on or about: May 1, 2015;

22   May 4, 2015; May 18, 2015; November 30, 2015; and December 18, 2015.  As a direct result

23   of certain of these partial disclosures, the price of Identiv's stock declined precipitously.  And

24   over the course of these disclosures, the Company's stock price fell from a closing price of

25   $9.73 per share on April 30, 2015, to a closing price of just $2.09 per share on

26   December 18, 2015.

27       127.   The damage suffered by Lead Plaintiff and other members of the Class was a

28   direct result of Defendants' practice of issuing false information and withholding material

41

1   information from Identiv investors, and the subsequent significant decline in the value of

2   Identiv securities when the truth was revealed.   During the Class Period, investors were

3   focused on the integrity of Identiv's internal controls and financial reporting.

4          128.   On Friday, May 1, 2015, after the market closed, the Company filed a Notice of

5   Late Filing with the SEC on Form 12b-25.   Therein, the Company disclosed that it had been

6   served with a Complaint by a former employee alleging "certain expense reimbursement issues

7   with respect to certain executive officers and certain other employees of the Company" and

8   that the Board of Directors of the Company had formed a Special Committee to investigate the

9   allegations contained in the Complaint.   The Company also disclosed that it would not be able

10  to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 on time,

11  because the Company required additional time to complete the information called for by Item

12  III of the 10-K, including executive compensation information.   In greater detail and in

13  relevant part, the Company stated in the FY 2014 10-K:

> Identiv, Inc. (the "Company") is filing this Form 12b-25 with respect to its
> annual report on Form 10-K for the period ended December 31, 2014 (the
> "Annual Report"). The Company needs additional time to complete the
> information called for by Item III of Form 10-K, including the executive
> compensation information (the "Part III Information") which the Company
> was not able to complete by April 30, 2015 (the prescribed due date for the
> inclusion of the Part III Information in the Company's Annual Report filing)
> without unreasonable effort or expense due to the circumstances described
> below.
>
> The Company has been served with a complaint (the "Complaint") from a
> former employee alleging, among other things, certain expense reimbursement
> issues with respect to certain executive officers and certain other employees of
> the Company. The Board of Directors of the Company has formed a special
> committee (the "Committee") to investigate the allegations contained in the
> Complaint and related matters with the assistance of independent counsel.
>
> The Company is currently unable to predict when it will be in a position to file
> an amendment to its Annual Report on Form 10-K/A to include the required
> Part III Information as well as to file a definitive proxy statement in
> connection with the 2015 annual meeting.

25          129.   On May 4, 2015, the following Monday, the Company filed a Current Report

26  on Form 8-K with the SEC reiterating and re-emphasizing certain of its prior disclosures.   In

27  relevant part, the Company stated:

28

1   On May 1, 2015 Identiv, Inc. (the "Company") filed a Form 12b-25 with the Securities and Exchange Commission with respect to its annual report on Form 10-K for the period ended December 31, 2014 (the "Annual Report"). The Company needs additional time to complete the information called for by Item III of Form 10-K, including the executive compensation information (the "Part III Information") which the Company was not able to complete by April 30, 2015 (the prescribed due date for the inclusion of the Part III Information in the Company's Annual Report filing) without unreasonable effort or expense due to the circumstances described below.

The Company has been served with a complaint (the "Complaint") from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company. The Board of Directors of the Company has formed a special committee (the "Committee") to investigate the allegations contained in the Complaint and related matters with the assistance of independent counsel.

The Company is currently unable to predict when it will be in a position to file an amendment to its Annual Report on Form 10-K/A to include the required Part III Information as well as to file a definitive proxy statement in connection with the 2015 annual meeting. The Company expects to provide an update on its earnings call with respect to the quarter ended March 31, 2015.

130.    The revelations on May 1 and May 4, 2015, alerted investors to the existence of the *Ruggiero* Complaint, and the announced investigation indicated to investors that the allegations in the complaint were serious and had merit.  As such, the Company's disclosures partially revealed that Identiv improperly reported executive compensation in previous SEC filings, that Hart engaged in theft of Company resources through improperly expensing personal items to the Company, and that the Company lacked adequate (entity level) internal controls that would have prevented Hart's misconduct.

131.    On this news, Identiv common stock fell $0.13 per share, to close at $9.28 per share on May 4, 2015, the very next trading day following the disclosure.

132.    On May 18, 2015, after the market closed, the Company filed another Notice of Late Filing with the SEC on Form 12b-25.  Therein, in addition to previously disclosed information, the Company disclosed that the Special Committee's investigation was still ongoing and that "the Company does not plan to file an amendment to its Annual Report on Form 10-K to include the required Part III information or file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 until it has additional information from such investigation."  In greater detail and in relevant part, the Company stated:

43

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

Identiv, Inc. (the "Company") is filing this Form 12b-25 with respect to its quarterly report on Form 10-Q for the period ended March 31, 2015 (the "Quarterly Report"). As reported on Form 12b-25 filed on May 1, 2015, the Company needs additional time to complete the information called for by Item III of its Annual Report on Form 10-K, including the executive compensation information (the "Part III Information") which the Company was not able to complete by the prescribed due date for the inclusion of the Part III information in such report without unreasonable effort or expense due to the circumstances described below.

The Company has been served with a complaint (the "Complaint") from a former employee alleging, among other things, certain expense reimbursement issues with respect to certain executive officers and certain other employees of the Company. The Board of Directors of the Company has formed a special committee (the "Committee") to investigate the allegations contained in the Complaint and related matters with the assistance of independent counsel. The investigation is ongoing and the Company does not plan to file an amendment to its Annual Report on Form 10-K to include the required Part III information or file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 until it has additional information from such investigation. On May 15, 2015, the Company did file a Report on Form 8-K furnishing certain of the financial information that typically would be included in a Quarterly Report on Form 10-Q.

The Company is currently unable to predict when it will be in a position to file its Annual Report on Form 10-K/A to include the Part III Information or to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015.

133.   The May 18, 2015 revelation informed investors that the investigation was affecting the filing of a Form 10-Q in addition to the already disclosed Form 10-K, emphasizing the seriousness of the investigation, and Hart's and the Company's wrongdoing. The disclosure again alerted investors to the existence of the *Ruggiero* Complaint, and the continuing investigation indicated to investors that the allegations in the complaint were material and had merit.  As such, the Company's disclosures partially revealed that Identiv improperly reported executive compensation in previous SEC filings, that Hart engaged in theft of Company resources through improperly expensing personal items to the Company, and that the Company lacked adequate (entity level) internal controls that would have prevented Hart's misconduct.

134.   On this news, Identiv's common stock fell $0.24 per share, to close at $6.63 per share on May 19, 2015.

135.   On November 30, 2015, after the market closed, the Company filed a Current Report with the SEC on Form 8-K, disclosing that on November 23, 2015, BDO had resigned

44

1   as the Company's independent registered public accounting firm.  The Company disclosed that

2   BDO was unwilling to be associated with the Company's financial statements for any fiscal

3   period in 2015, would not complete its review of financial information for the quarters ended

4   March 31, 2015, June 30, 2015, and September 30, 2015, and would not audit the Company's

5   financial statements for the year ended December 31, 2015.  The Company also announced

6   that BDO informed the Board of a material weakness in the Company's entity level controls.

7   In relevant part, the Company stated:

8        On November 23, 2015, Identiv, Inc. (the "Company") received notice from
         BDO USA, LLP ("BDO") that BDO had resigned, effective immediately, as
9        the Company's independent registered public accounting firm.

10       The    reports    of    BDO    and    of    Ernst &    Young    GmbH
         Wirtschaftspruefungsgesellschaft ("EY") on the Company's consolidated
11       financial statements for the year ended December 31, 2014 and 2013,
         respectively, did not contain an adverse opinion or a disclaimer of opinion and
12       were not qualified or modified as to uncertainty, audit scope, or accounting
         principles except EY's report with respect to the fiscal year ended December
13       31, 2013, which indicated that there was substantial doubt as to the
         Company's ability to continue as a going concern.
14
         BDO has advised the Board of Directors (the "Board") of the Company that
15       BDO is unwilling to be associated with the consolidated financial statements
         prepared by management for any of the fiscal periods within 2015 and will not
16       complete its reviews of the interim financial information as of or for the
         periods ended March 31, 2015, June 30, 2015 or September 30, 2015, and
17       additionally will not audit the Company's consolidated financial statements as
         of and for the year ending December 31, 2015 because of the disagreement
18       described below in this Current Report on Form 8-K.

19       For the purposes of this Current Report on Form 8-K, the term "disagreement"
         is interpreted and used broadly, to include any difference of opinion
20       concerning any matter of accounting principles or practices, financial
         statement disclosure or auditing scope or procedure which, if not resolved to
21       the satisfaction of the independent registered public accountant, would have
         caused it to make reference to the subject matter of the disagreement in
22       connection with its report.

23       During fiscal year 2015, the Board formed a Special Committee to investigate
         the allegations contained in a complaint. ***BDO advised the Board that BDO***
24       ***disagrees with the scope and the remediation of the special investigation***
         ***that was undertaken by the Special Committee of the Board.*** The subject
25       matter of the special investigation was first disclosed by the Company in a
         Form NTN 10-K filed with the Securities and Exchange Commission (the
26       "SEC") on May 1, 2015 and a Current Report on Form 8-K filed with the SEC
         on May 4, 2015. The Board determined that the scope and the remediation of
27       the special investigation were appropriate.

28

                                            45
         SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
                 FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

1
2
3
4
5

In addition, BDO has informed the Board of two material weaknesses in the Company's internal control over financial reporting. ***The first material weakness identified by BDO related to the Company's entity level controls, including a determination by BDO that "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued."***

6

. . .

7
8
9
10

While the full Audit Committee of the Board and BDO have not discussed the subject matter of the disagreement with BDO, the Audit Committee through its Chairman has had discussions with BDO concerning the subject matter of the disagreement. The Company has authorized BDO to respond fully to the inquiries of the Company's successor accountant, Burr Pilger Mayer Inc., concerning the subject matter of this Current Report on Form 8-K (this "Report").

11

136.    BDO, through Identiv's disclosure in the November 23, 2015 8-K, confirmed

12

that Hart was engaged in the wrongdoing identified in ,¶¶59-85, and that Identiv's Entity Level

13

Controls Weakness existed during fiscal years 2013 and 2014.  First, BDO's "disagreement"

14

with Identiv confirmed these truths.  As admitted in the 8-K, BDO advised the Board that

15

BDO disagreed with the ***remediation*** of the special investigation that was undertaken by the

16

Special Committee of the Board.  The remediation included a slap on the wrist punishment for

17

Hart that allowed him to retain his compensation, benefits, and Board position (*see* ¶92), and

18

no admission by the Company the presence of an Entity Level Controls Weakness.  BDO's

19

"disagreement" therefore implied that Hart's conduct was more egregious than Identiv was

20

treating it—*i.e.* that the allegations in the *Ruggiero* Complaint were accurate, and that Hart's

21

conduct was not prevented due to inadequate entity level controls.   Second, Identiv's

22

identification of the Entity Level Controls Weakness confirmed these truths.  As Identiv stated

23

in the 8-K, BDO identified an entity level controls material weakness in the Company's entity

24

level controls that included (but was not limited to) a determination by BDO that "with respect

25

to the ***results*** of the special investigation," "the Company's ***senior management leadership***

26

***and operating style*** and the Board's oversight ***did not result in an open flow of information***

27

***and communication and did not support an environment where accountability is valued***."  In

28

other words, BDO was not merely criticizing the investigation itself.  BDO was also criticizing

46

the **results** of the investigation, specifically, Identiv's failure to recognize and address: (i) the fact that the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued; and (ii) the fact that there was an Entity Level Controls Weakness.  Moreover, BDO's criticism of "senior management" in addition to the Board, makes clear that BDO's identification of the Entity Level Controls Weakness applied to more than just the investigation—which was solely undertaken by members of the Board—but also related to the underlying conduct of management that was being investigated.  Given that the subject matter of the special investigation related to Hart's misconduct occurring in fiscal years 2013 and 2014, BDO's disagreement and identification of the Entity Level Controls Weakness with respect to the **results** of the investigation indicate that BDO believed the Entity Level Controls Weakness existed in fiscal years 2013 and 2014.

137.    By definition, Hart's practice of improperly expensing personal items to Identiv and then overriding subordinates' attempts to properly account for and classify the expenses, as laid out in the *Ruggiero* Complaint (*see* ¶¶59-85), is an Entity Level Controls Weakness; and BDO's identification of the Entity Level Controls Weakness confirmed to investors that this weakness existed during fiscal years 2013 and 2014.[8]  As explained by the Public Company Accounting Oversight Board ("PCAOB"),[9] Auditing Standard No. 5, "[e]ntity-level controls include . . . [c]ontrols over management override."  Standard No. 5 also states that "[a]s part of identifying and testing entity-level controls . . . the auditor should evaluate whether the company's controls sufficiently address identified risks of material misstatement due to fraud and controls intended to address the risk of management override of other

---

[8] The Entity Level Controls Weakness identified by BDO "**included**," **but was not limited to**, the fact that "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued."

[9] PCAOB is a nonprofit corporation established by Congress to oversee the audits of public companies in order to protect investors and the public interest by promoting informative, accurate, and independent audit reports.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB

controls." The *Ruggiero* Complaint accused Hart (and Nelson) of improperly overriding the Company's expense reporting procedures, and the Company later admitted that improper reimbursement had occurred (not in accord with the Company's policies). As such, BDO confirmed to investors that Hart and Nelson's misconduct was permitted through the inadequate entity level controls.

138. Investors interpreted Identiv's and BDO's statements surrounding BDO's resignation as confirmation that: (i) Hart did in fact did engage in the improper activity alleged in the *Ruggiero* complaint (*see* ¶¶59-85); and (ii) Identiv maintained a system of inadequate internal controls that allowed Hart to engage in the improper activity. On December 1, 2015, *Seeking Alpha*, a popular investment website, published a news report on BDO's resignation, and its identification of the Entity Level Controls Weakness. The report clearly identified the Entity Level Controls Weakness as a "material weakness[] in Identiv's internal control over financial reporting" and not merely as a weakness related to the Special Committee investigation, stating:

> BDO "disagrees with the scope and the remediation" of a special committee investigation (disclosed in May) into accounting issues, ***and has found two material weaknesses in Identiv's internal control over financial reporting. One relates to entity level controls - BDO asserts "the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued*** – and the other involves revenue recognition.

139. Additionally, in the comment section in the *Seeking Alpha* report, a commenter identified as "steady888" articulated what was obvious to market observers: that BDO's statements disclosed the existence of a material weakness in Identiv's internal controls which allowed Hart's misconduct in 2013 and 2014. Indeed, steady888 stated:

> ***Basically that means there is a lack of internal control in the finance department. Or there is very little check and balance!*** It's really a severe lack of accountability for your money! ***No wonder Hart was able to play loose what's business related and what's not. He basically thought no one was going to find out!***

140. On this news, Identiv common stock fell $0.46 per share, or 15.5% to close at $2.49 per share on December 1, 2015 on unusually heavy trading volume. The stock price

1    continued to decline, falling a total of $1.31 per share, or 44.4%, over five trading days, to

2    close at $1.64 per share on December 7, 2015, on unusually heavy trading volume.

3    141.    On December 18, 2015, after the market closed, the Company filed an

4    amendment to its fiscal year 2014 Annual Report with the SEC on Form 10-K/A.  Therein, the

5    Company restated Hart's compensation under the category "All Other Compensation"—which

6    includes certain executive expense reimbursements—for the fiscal years ended December 31,

7    2013 and December 31, 2014:

| Hart's Reported "All Other Compensation" | | | |
|---|---|---|---|
| Fiscal Year | Initial Report | As Restated | Percentage Increase |
| 2013 | $56 | $13,203 | 23477% |
| 2014 | $17,004 | $114,872 | 576% |

11   142.    As stated by the Company, the adjustments reflect "payments to Mr. Hart of

12   previously reimbursed expenses of $97,868 in 2014 and $13,147 in 2013 as to which the

13   Company subsequently determined should not have been reimbursed either because such

14   expenses were not consistent with the Company's expense guidelines and policies or because

15   insufficient documentation was provided to support such expense reimbursements."

16   **VII.    PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)**

17   143.    The fraud-on-the-market presumption of reliance applies because the market for

18   Identiv's securities was open, well-developed, and efficient at all relevant times for the

19   following reasons, among others:

20           (a)    Identiv's stock met the requirements for listing, and was listed and

21   actively traded on the NASDAQ, a highly efficient and automated market;

22           (b)    As a regular issuer, Identiv filed periodic reports with the SEC and the

23   NASDAQ;

24           (c)    Identiv regularly communicated with public investors via established

25   market communication mechanisms, including through regular disseminations of press

26   releases on the national circuits of major newswire services and through other wide-

27   ranging public disclosures, such as communications with the financial press and other

28   similar reporting services; and

(d)     Identiv was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and distributed to those brokerage firms' sales forces and certain of their customers.

144.    As a result of the foregoing, the market for Identiv stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in its stock price.  Under these circumstances, Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relied upon the integrity of the market price of Identiv's securities, and market information relating to Identiv.  All purchasers of Identiv securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices and the subsequent decline in the securities' price when the truth was revealed.

145.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

146.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements pleaded in this complaint.  None of the statements complained of herein were forward-looking statements.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

147.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not identified as "forward-looking statements" when made and/or were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

148.    To the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements were made, either the speaker knew that the statement was false or the statement was authorized or approved by an executive officer of Identiv who knew that the statement was false.

## IX.    CLASS ACTION ALLEGATIONS

149.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Identiv securities traded on the NASDAQ from November 13, 2013, through November 30, 2015, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Identiv at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

150.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Identiv common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members.  As of December 1, 2015, Identiv had 10,746,911 shares of common stock outstanding.  Class members who purchased Identiv common stock may be identified from records maintained by the Company or its transfer agents, and such members may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

151.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

152.    Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

153.    Common questions of law and fact exist to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Identiv;

(c)     whether Defendants acted with scienter; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

154.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in managing this action as a class action.

X.      **CLAIMS FOR RELIEF**

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against All Defendants**

155.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

1    156.    This Count is asserted on behalf of all members of the Class against Defendants

2    Identiv, Hart, and Nelson for violations of Section 10(b) of the Exchange Act, 15 U.S.C.

3    § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

4    157.    During the Class Period, Defendants knowingly or recklessly made false

5    statements of material fact and omitted to state material facts necessary to make their

6    statements made, in the light of the circumstances under which they were made, not

7    misleading.    These misrepresentations and omissions: (i) deceived the investing public,

8    including Lead Plaintiff and the Class, regarding, among other things, Identiv's internal

9    controls and officer compensation; (ii) artificially inflated and/or maintained the market price

10   of Identiv securities; and (iii) caused Lead Plaintiff and other members of the Class to

11   purchase Identiv securities at artificially inflated prices and suffer losses when the true facts

12   became publicly known.

13   158.    Defendants, individually and in concert, directly and indirectly, by the use of

14   means or instrumentalities of interstate commerce or of the mails, engaged in a course of

15   conduct that operated as fraud on Lead Plaintiff and the Class.  The facts alleged herein give

16   rise to a strong inference that Identiv and each of the Individual Defendants made materially

17   false and misleading statements and omissions with scienter.  They knew or recklessly

18   disregarded that the Class Period statements alleged herein contained material

19   misrepresentations and omissions.

20   159.    Identiv is liable for all materially false and misleading statements and omissions

21   made during the Class Period.

22   160.    Hart is liable for the materially false and misleading statements and omissions

23   he made during the Class Period, including the false statements contained in the Proxy

24   Statements regarding officer compensation, the false SOX certifications that he signed, the

25   false statements regarding the Company's internal controls contained in the SEC filings, and

26   the failure to inform investors of material weaknesses in the Company's internal controls.

27   161.    Nelson is liable for the materially false and misleading statements and

28   omissions he made during the Class Period, including the false statements contained in the

1  Proxy Statements regarding officer compensation, the false SOX certifications that he signed,

2  the false statements regarding the Company's internal controls contained in the SEC filings,

3  and the failure to inform investors of material weaknesses in the Company's internal controls.

4      162.    Lead Plaintiff and other Class members have suffered damages in that, in direct

5  reliance on the integrity of the market, they paid artificially inflated prices for Identiv

6  securities, and inflation was removed from the stock when the true facts became known.  Lead

7  Plaintiff and other Class members would not have purchased Identiv securities at the prices

8  they paid, or at all, if they had been aware that the market price had been artificially and

9  falsely inflated by Defendants' material misrepresentations and omissions.

10      163.    As a direct and proximate result of Defendants' wrongful conduct, Lead

11 Plaintiff and other Class members suffered damages attributable to the fraud alleged herein in

12 connection with their purchases or acquisitions of Identiv securities during the Class Period.

13                                          **COUNT II**

14                 **Violations of Section 20(a) of the Exchange Act**
                   **Against Individual Defendants Hart and Nelson**
15

16      164.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above

17 as if fully set forth herein.

18      165.    This Count is asserted on behalf of all members of the Class against the

19 Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

20      166.    During their tenures as officers and/or directors of Identiv, each of the

21 Individual Defendants was a controlling person of the Company within the meaning of Section

22 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers

23 and/or directors of Identiv, they had the power and authority to direct the management and

24 activities of the Company and its employees, and to cause the Company to engage in the

25 wrongful conduct complained of herein.  In their capacities as senior corporate officers of

26 Identiv, the Individual Defendants had direct involvement in the daily operations of the

27 Company; in reviewing and managing its regulatory and legal compliance; and in its

28 accounting, reporting, and public disclosure functions.  The Individual Defendants made the

1    false and misleading statements alleged herein, and they were able to and did control, directly

2    and indirectly, the content of the public statements made by Identiv during the Class Period,

3    thereby causing the dissemination of the material misrepresentations and omissions alleged

4    herein.

5        167.    Identiv is a primary violator of Section 10(b) and SEC Rule 10b-5 by its acts

6    and omissions alleged herein.   By virtue of their positions as controlling persons of the

7    Company and as a result of their own aforementioned conduct, the Individual Defendants are

8    liable pursuant to Section 20(a), jointly and severally with and to the same extent as the

9    Company is liable under Section 10(b) and Rule 10b-5, to Lead Plaintiff and other Class

10   members who purchased or otherwise acquired Identiv securities.

11       168.    As a direct and proximate result of the Individual Defendants' wrongful

12   conduct, Lead Plaintiff and other Class members suffered damages in connection with their

13   purchases or acquisitions of Identiv securities during the Class Period.

14   **XI.    PRAYER FOR RELIEF**

15       WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

16       (a) a declaration that the action is a proper class action pursuant to Fed. R. Civ. P. 23;

17       (b) an award of compensatory damages in favor of Lead Plaintiff and all other Class

18   members against all Defendants, jointly and severally, for all damages sustained as a result of

19   Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

20       (c) an award to Lead Plaintiff and the Class for their reasonable costs and expenses

21   incurred in this action, including attorney's fees and expert fees; and

22       (d) such other relief as the Court may deem just and proper.

23

24

25

26

27   / / /

28   / / /

1

**XII.    JURY DEMAND**

2

      Lead Plaintiff hereby demands a trial by jury.

3

4

Dated: September 12, 2016          JOHNSON & WEAVER LLP

5

6

By: _____*s/ Frank J. Johnson*_____
Frank J. Johnson
Phong L. Tran
7
600 West Broadway, Suite 1540
San Diego, CA 92101
8
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
9
Email:    frankj@johnsonandweaver.com
          phongt@johnsonandweaver.com
10

GLANCY PRONGAY & MURRAY LLP
11
Lionel Z. Glancy
Robert V. Prongay
12
Charles H. Linehan
1925 Century Park East, Suite 2100
13
Los Angeles, California 90067
Telephone: (310) 201-9150
14
Facsimile: (310) 201-9160
Email: info@glancylaw.com
15

16
*Co-Lead Counsel for Lead Plaintiff and the Class*

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS; Case No. 3:15-cv-05775-CRB