1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   LIKAR ROK,                          No. 15-cv-5775-CRB

12              Plaintiff,               **ORDER GRANTING MOTIONS TO
                                         DISMISS**
13        v.

14   IDENTIV, INC., JASON HART, and
     BRIAN NELSON
15
                Defendants.
16   _____/

17

18        This is a putative securities fraud class action based on alleged corporate excess at

19   Identiv, Inc.[1]  In August, the Court dismissed Lead Plaintiff Thomas Cunningham's First

20   Amended Complaint.  See Order Denying Motion to Strike and Granting Motions to Dismiss

21   with Leave to Amend (hereinafter "Order re FAC") (dkt. 52); FAC (dkt. 34).  Cunningham

22   has now filed a Second Amended Complaint, see SAC (dkt. 55), and Defendants Identiv,

23   Inc.; Identiv's former CEO, Jason Hart; and Identiv's former CFO, Brian Nelson, each again

24   move to dismiss, see Identiv MTD SAC (dkt. 57); Hart MTD SAC (dkt. 60); Nelson MTD

25   SAC (dkt. 58).  Because the SAC does not correct the problems the Court identified with the

26   FAC, the Court GRANTS Defendants' motions, this time with prejudice.

     **I.    BACKGROUND**
27
          Identiv is a "global security technology company."  SAC ¶ 28.  Throughout the class
28

     _____
     [1] The same alleged conduct forms the basis of the Oswald v. Humphries derivative shareholder
     case.  See Case No. 16-241-CRB.

_United States District Court_
_For the Northern District of California_

United States District Court
For the Northern District of California

period of November 13, 2013 to November 30, 2015, Identiv's stock was actively traded on the NASDAQ.  Id. ¶ 23.  Jason Hart was the CEO of Identiv from September 2013 until September 2015.  He served as Identiv's President from July 2014 to February 2016.  Id. ¶ 24.  Hart had previously been the CEO of idOnDemand, a company acquired by Identiv, where he worked with Brian Nelson.  Id. ¶ 25.  Brian Nelson was the CFO of Identiv from December 2013 to November 2015, when he became the company's Vice President of Business Strategy.  Id. ¶ 26.  Nelson has more than 20 years of experience in accounting and finance, and was previously the CFO of idOnDemand.  Id.

In the quarters leading up to the class period, and continuing throughout the class period, Identiv was experiencing cash flow problems, as well as a looming threat of being delisted from the NASDAQ because of a low minimum bid price for Identiv common stock. Id. ¶¶ 33–34.  Identiv implemented a reverse stock split to avoid delisting, as delisting "would have [had] 'a material adverse effect on [its] stock price, [its] business and [its] ability to raise capital.'"  Id. ¶¶ 35–36.  Plaintiff alleges that investors remained concerned about Identiv's ability to reduce costs and about whether the stock price would remain stable. Id. ¶ 36.  Hart and Nelson made various statements about Identiv's restructuring program and the companywide mandate to cut costs.  See, e.g., id. ¶ 39 (Hart: "We're obviously focused on significant cost reductions. . . .");  id. ¶ 41 ("Hart confirmed that Nelson was laser-focused on reducing the Company's operating expenses").  Plaintiff alleges that "[g]iven Defendants' explicit, across-the-board focus on monitoring and reducing costs, Hart and Nelson had clear visibility into [Identiv's] operating expenses and general and administrative expenses," which would include "glaring and improper personal reimbursements."  Id. ¶ 12.

Against this backdrop, Identiv disclosed in its March 19, 2013 FY 2012 Annual Report (SEC Form 10-K) the existence of a "material weakness" related to "inadequate" internal controls over the "financial statement close process."  Id. ¶ 49.  That filing attributed the material weakness (hereinafter "the Disclosed Weakness") to an "insufficient review and oversight of the recording of complex and non-routine transactions" that could lead to a situation "where a material error . . . could occur in our financial statements and not be

prevented or detected in a timely manner." Id.  Identiv stated that the Disclosed Weakness resulted from "an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP." Id. ¶ 50.

Identiv's FY 2014 Quarterly Reports stated that the Disclosed Weakness persisted. See id. ¶ 52 (quoting Quarterly Reports from May 15, 2014, August 14, 2014, and November 14, 2014).[2]  Identiv also repeatedly cautioned that "a control system, no matter how well designed and operated, can only provide reasonable assurance that the objectives of the control system are met" and that "no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been or will be detected." See Ex. 6 (FY 2014 10-K of 3/23/2015) at 92;[3] Ex. 3 (Form 10-Q of 5/15/2014); Ex. 4 (Form 10-Q of 8/14/2014); Ex. 5 (Form 10-Q of 11/14/2014).[4]

In its 2014 Annual Report, filed March 23, 2015, Identiv announced that it had "remediated" the Disclosed Weakness by "add[ing] personnel with experience and training" and "streamlin[ing] our reporting processes and simplif[ying] our operational structure." SAC ¶ 54; Ex. 6 at 92.  Hart and Nelson signed Sarbanes-Oxley Act ("SOX") certifications, filed with Identiv's FY 2014 10-K, representing that they had disclosed to Identiv's auditors and the audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial

---

[2] "[E]ach stated: 'As disclosed in our Annual Report on Form 10-K for the year ended December 31, 2013, our management identified a material weakness in our internal control over financial reporting as of December 31, 2013, namely that we had an insufficient review and oversight of the recording of complex and non-routine transactions due to an insufficient number of accounting personnel with appropriate knowledge, experience or training in U.S. GAAP." Id.

[3] All cites to exhibits are to exhibits within the McGrath Declaration (dkt. 57-2).

[4] Defendants ask the Court to take judicial notice of these documents.  The Court does so.  A court can take judicial notice of documents properly submitted with the complaint or upon which the complaint necessarily relies if the material's "authenticity . . . is not uncontested," as well as "matters of public record." Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001) overruled on other grounds by Galbraith v. Cty. of Santa Clara, 307 F.3d 1119 (9th Cir. 2002) (citation omitted).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   reporting."  SAC ¶ 56.

2          Shortly thereafter, Hart's former executive assistant filed a civil complaint, <u>Ruggiero</u>

3   <u>v. Identiv, Inc.</u>, No. HG15764795 (Cal. Super. Ct. Alameda County., filed Apr. 2, 2015), in

4   state court for discrimination, harassment, and retaliation.  <u>See</u> SAC ¶ 59; Ex. 7 (hereinafter

5   referred to as the <u>Ruggiero</u> complaint).  The <u>Ruggiero</u> complaint alleges that Hart frequently

6   submitted personal expenses for business reimbursement, including thousands of dollars of

7   purchases through eBay and other vendors in 2013, and two trips to Las Vegas with Nelson

8   and other individuals in 2014.  <u>See id.</u> ¶¶ 59–68.  The <u>Ruggiero</u> complaint contends that

9   Ruggiero "complain[ed]" about having to process these reimbursements, which both Hart

10  and Nelson knew were "improper."  <u>See e.g.</u>, <u>id.</u> ¶ 63.  It asserts that Ruggiero "regularly

11  discussed the issue with Nelson," and that "Nelson made no effort to stop Hart's continued

12  misappropriation of corporate funds, but instead, acquiesced to Hart's improper demands for

13  personal reimbursement and authorized the Company's payments thereof."  <u>Id.</u> ¶ 65.  It

14  further alleges that in the Summer of 2014, Hart had financial problems related to his

15  divorce, and Nelson accepted approximately $1,000,000 in stock compensation shortly after

16  loaning Hart $26,000 to pay his American Express bill.  <u>Id.</u> ¶ 69.  "Ruggiero then connected

17  those shares to her prior assistance in her obtaining a $26,000 loan from Nelson for Hart."

18  <u>Id.</u>  Ruggiero told Nelson "that Hart seemed to be out of money and 'using Identiv as his

19  personal bank account for a lifestyle he apparently could not afford."  <u>Id.</u> ¶ 72.  Ruggiero

20  gave an interview to an NBC news affiliate in which she repeated the allegations in the

21  <u>Ruggiero</u> complaint.  <u>Id.</u> ¶ 80.

22          Echoing some of the allegations in the <u>Ruggiero</u> complaint, the SAC also includes

23  testimony from a confidential witness, CW1—an individual who was a Human Resources

24  Manager at Identiv from 2013 until July 2014.  <u>Id.</u> ¶ 81.  CW1 allegedly "had responsibility

25  for all accounts payable for Identiv and took direction directly from" Nelson.  <u>Id.</u>  CW1 had

26  responsibility for an employee who processed Hart's American Express card, and CW1

27  observed that "it was a daily fight for [that employee] to obtain the expense reports and

28  receipts from Hart . . . to support the charges to the Company."  <u>Id.</u> ¶ 82.  Nelson instructed

United States District Court
For the Northern District of California

CW1 to pay Hart for charges that did not have an accompanying receipt, and "we will figure it out later." Id.  When CW1 objected, Nelson would tell him, "you have to do it." Id.

In response to the Ruggiero complaint, Identiv announced on May 1, 2015, that it would amend its 2014 Annual Report "to complete the information called for by Item III of Form 10-K, including the executive compensation information." Id. ¶ 86.  The company revealed the existence of the Ruggiero complaint and its allegations regarding "certain expense reimbursement issues with respect to certain executive officers." Id.  Identiv further revealed that it had "formed a Special Committee to investigate" the allegations. Id.  On May 18, 2015, Identiv disclosed that it could not file its Q1 2015 quarterly report on time because of the ongoing investigation. See id. ¶ 87.

On November 30, 2015, Identiv disclosed in a Current Report (Form 8-K) that its independent accounting firm, BDO, had resigned, and was "unwilling to be associated with the consolidated financial statements prepared by management" for 2015. Id. ¶ 88.  The report did not state that BDO objected to Identiv's prior financial statements. See Ex. 14 (11/30/2015 Form 8-K).[5]  Identiv disclosed that:

> During the fiscal year 2015, the Board formed a Special Committee to investigate the allegations contained in a complaint.  BDO advised the Board that BDO disagrees with the scope and the remediation of the special investigation that was undertaken by the Special Committee of the Board.  The subject matter of the special investigation was first disclosed by the Company in a Form NTN 10-K filed with the [SEC] on May 1, 2015 and a Current Report on Form 8-K filed with the SEC on May 4, 2015.  The Board determined that the scope and the remediation of the special investigation were appropriate.

Id. (emphasis added).  Identiv also disclosed that BDO had identified "two material weaknesses in the Company's internal control over financial reporting." See id.; SAC ¶89.  First, BDO identified a weakness related to Identiv's "entity level controls": "with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an

---

[5] BDO has also repeatedly consented to its audit report of Identiv's 2014 financial statements being incorporated by reference in Identiv's later SEC filings. See Ex. 16 (Form S-8 of 6/3/2016) at 23.2; Ex. 20 (Form 10-K of 3/31/2016) at 23.2.  The parties dispute the significance of this.

5

United States District Court
For the Northern District of California

environment where accountability is valued." See Ex. 14; SAC ¶ 89 (emphasis added).

Second, BDO identified a weakness related to "revenue recognition": "the Company has not designed and implemented appropriate controls to provide reasonable assurance that revenue transactions are adequately analyzed and reviewed to prevent or timely detect and correct misstatements." See id. The SAC alleges that "[o]n news of the material weakness and confirmation by BDO's statements that the results of the Special Committee investigation . . . indicated Identiv's management did not foster an environment where internal controls and accurate financial reporting are valued (which allowed Hart to use the Company as his own personal checking account), the Company's stock price fell." SAC ¶ 90.

Later, on December 18, 2015, Identiv filed an amended 2014 Annual Report (Form 10-K/A), stating under "All Other Compensation" that Identiv had "reimbursed expenses of $97,868 in 2014 and $13,147 in 2013" to Hart, "which the Company subsequently determined should not have been reimbursed either because such expenses were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements." Ex. 15 (Form 10-K/A of 12/18/2015) at 9; SAC ¶ 91. Identiv's share price increased after this disclosure. See Ex. 17.

Plaintiffs filed suit for securities fraud pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. See Compl. (dkt. 1). The Court appointed Thomas Cunningham as lead plaintiff. See Order of 3/8/16 (dkt. 30). In May 2016, Cunningham filed the FAC on behalf of "himself and all other similarly situated purchasers" of Identiv securities during the Class Period. See FAC ¶ 1. Defendants Identiv, Hart, and Nelson separately moved to dismiss the FAC. See generally Indentiv MTD FAC (dkt. 39); Hart MTD FAC (dkt. 40); Nelson MTD FAC (dkt. 41). The Court dismissed with leave to amend, finding that Cunningham failed to adequately plead a material misrepresentation as to internal controls statements,[6] failed to plead a strong inference of scienter as to all

---

[6] The Order held that Cunningham had adequately pled a material misstatement as to executive compensation. See Order re FAC at 3 n.2.

**United States District Court**
For the Northern District of California

1  misrepresentations, and failed to plead loss causation.  <u>See</u> Order re FACs at 3–4.

2  Cunningham has now amended, <u>see</u> SAC, and Defendants have again moved to

3  dismiss, <u>see</u> Identiv MTD SAC; Hart MTD SAC; Nelson MTD SAC.

4  **II.    LEGAL STANDARD**

5  Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be

6  dismissed for failure to state a claim upon which relief may be granted.  Dismissal may be

7  based on either "the lack of a cognizable legal theory or the absence of sufficient facts

8  alleged under a cognizable legal theory."  <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d

9  696, 699 (9th Cir. 1990).  For purposes of evaluating a motion to dismiss, a court "must

10  presume all factual allegations of the complaint to be true and draw all reasonable

11  inferences in favor of the nonmoving party."  <u>Usher v. City of L.A.</u>, 828 F.2d

12  556, 561 (9th Cir. 1987).  A complaint must plead "enough facts to state a claim to relief that

13  is plausible on its face.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  A claim is

14  plausible "when the plaintiff pleads factual content that allows the court to draw the

15  reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft v.</u>

16  <u>Iqbal</u>, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action,

17  supported by mere conclusory statements, do not suffice."  <u>Id.</u>

18  Claims for fraud must meet the heightened pleading standard of Rule 9(b), which

19  requires that "a party . . . state with particularity the circumstances constituting fraud or

20  mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b) requires "an account of the time, place, and

21  specific content of the false representations as well as the identities of the parties to the

22  misrepresentations."  <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 764 (9th Cir. 2007) (internal

23  quotation marks omitted).  Security fraud claims must also meet the heightened pleading

24  requirements of the Private Securities Litigation Reform Act ("PSLRA"): "[T]he complaint

25  shall specify each statement alleged to have been misleading, the reason or reasons why the

26  statement is misleading, and, if an allegation regarding the statement or omission is made on

27  information and belief, the complaint shall state with particularity all facts on which that

28  belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); <u>Tellabs, Inc. v. Maker Issues & Rights, Ltd.,</u>

United States District Court
For the Northern District of California

1    551 U.S. 308, 321 (2007).  The Court is to dismiss any complaint that does not meet these

2    requirements.  See 15 U.S.C. § 78u-4(b)(3)(A).

### III.    DISCUSSION

4         The SAC brings claims for (A) violations of Section 10(b) of the Exchange Act and

5    SEC Rule 10b-5, i.e., securities fraud, against all defendants; and (B) violation of Section

6    20(a) of the Exchange Act, i.e., controlling person liability for securities fraud, against Hart

7    and Nelson.  As discussed below, the Court dismisses both claims.

### A.    Claim for Violations of SEC Section 10(b) and SEC Rule 10b-5

9         Securities Exchange Act Section 10(b) prohibits "any manipulative or deceptive

10   device or contrivance in contravention of" SEC regulations "in connection with the purchase

11   or sale of any security registered on a national securities exchange."  15 U.S.C. § 78j(b)

12   (2010).  Under SEC Rule 10b-5, a company may not "make any untrue statement of a

13   material fact" or "omit to state a material fact necessary in order to make the statements made

14   . . . not misleading."  See 17 C.F.R. § 240.10b–5(b).  A violation of Section 10(b) and its

15   associated SEC rules "affords a right of action to purchasers or sellers of securities injured by

16   its violation."  Tellabs, 551 U.S. at 318.

17        Plaintiffs alleging securities fraud under this section must plead the following

18   elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the

19   purchase or sale of a security; (4) reliance on the misrepresentation; (5) economic loss; and

20   (6) loss causation (a causal connection between the material misrepresentation and the

21   economic loss).  See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005); Loos v.

22   Immersion Corp., 762 F.3d 880, 886–87 (9th Cir. 2014).  In the pending motions, Defendants

23   contest three of these elements: (1) material misrepresentations; (2) scienter; and (3) loss

24   causation.  This Order addresses each of the contested elements in turn, concluding that the

25   SAC fails as to each.

### 1.    Material Misrepresentations

27        Plaintiffs are to "specify each statement alleged to have been misleading, [and] the

28   reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B); Tellabs,

**United States District Court**
For the Northern District of California

551 U.S. at 321.  "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  Nathanson v. Polycom, 87 F. Supp. 3d 966, 973 (N.D. Cal. 2015) (internal quotation marks and citation omitted).

The SAC identifies two types of material misrepresentations.  See SAC ¶¶ 93–116.

The first type of misrepresentation in the SAC involves executive compensation.  The SAC points to the 2013 Proxy Statement and the 2014 Proxy Statement, which list Hart's total compensation at $250,056 and $3,515,504 respectively.  Id. ¶¶ 96–98.  The SAC alleges that these statements were materially false when made because in December 18, 2015, Identiv stated that it had "reimbursed expenses of $97,868 in 2014 and $13,147 in 2013" to Hart "which the Company subsequently determined should not have been reimbursed. . . ." Id. ¶ 99; see also Ex. 15 (Form 10-K/A of 12/18/2015) at 9.  The Court previously held that the FAC "did adequately plead that the statements related to executive compensation are material misrepresentations," see Order re FAC at 3 n.2, and the parties do not re-litigate that holding here.

The second type of misrepresentation in the SAC, and the one that is at issue in the pending motions, is about an alleged "Entity Level Controls Weakness," which, loosely defined, is the set of circumstances in place that "allowed Hart to improperly expense personal items to the Company" in 2013 and 2014.  See SAC ¶¶ 101–116; see also SAC ¶ 59 ("allowed Hart to improperly expense personal items to the company" due to "a pattern of disregard for the adequacy of internal controls and accurate reporting of financial data by both Hart and Nelson"); ¶ 65 ("Hart[] demand[ed] reimbursement for tens of thousands of dollars in personal charges. . . . Nelson made no effort to stop Hart's continued misappropriations of corporate funds, but instead, acquiesced").

Although labeled somewhat differently, this alleged Entity Level Controls Weakness was also a part of the FAC.  See FAC ¶ 13 ("egregious nature of Hart's misconduct and Defendants' unwillingness to properly address the issue."); ¶ 91 ("weakness relating to the Company's 'entity level controls' identified by BDO which allowed Hart to improperly

expense personal items to the Company.").[7]  The Court held that the Entity Level Controls

Weakness was not adequately pled in the FAC, as the FAC did not allege with particularity

that such a weakness was "present simultaneously and distinct from [the Disclosed

Weakness]."  Order re FAC at 4.  The Court further held that "[e]ven if a second entity level

controls weakness existed in 2013 and/or 2014 (one that BDO did not establish until a year

later), Identiv did not have an 'affirmative duty' to disclose it during those years."  Id. (citing

Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)).

The SAC, in seeking to revive the same claim, identifies two bases of

misrepresentations about the Entity Level Controls Weakness: (a) 10-Qs and 10-Ks filed in

2013 and 2014; and (b) the 2013 and 2014 SOX certifications.[8]  Id. ¶¶ 101–16.

### a.     10-Q and 10-K

The SAC alleges that the various statements Identiv made in its 10-Q and 10-K filings

in 2013 and 2014 about the Disclosed Weakness—that there was a material weakness in

Identiv's internal control over financial reporting, that it was due to an insufficient number of

accounting personnel, that Identiv was in the process of remediating the Disclosed

Weakness, and that it had been remediated, see SAC ¶¶ 101, 103, 105–109—"were

materially false and/or misleading" for "fail[ing] to disclose the existence of a separate,

ongoing material weakness," "the Entity Level Weakness identified by BDO, which allowed

Hart to improperly expense personal items to the Company," id. ¶ 111.  Defendants argue

that the SAC's allegations do not fix the problems the Court identified with the FAC and still

do not allege with particularity a material misrepresentation or omission about an Entity

Level Controls Weakness.  See, e.g., Identiv MTD SAC at 22.

There are at least two reasons why the 10-Q and 10-K statements fail as a basis for a

misrepresentation.

---

[7] The FAC also alleged a third type of misrepresentation regarding the remediation of the Disclosed Weakness, see id. ¶¶ 91, 94, 97, 100, which is no longer part of the SAC.

[8] Specifically, the SAC points to the SOX certification signed by Hart and attached as an exhibit to the Q3 2013 10-Q, and the SOX certification signed by both Hart and Nelson and attached as an exhibit to the Q1 2014 10-Q.  SAC ¶¶ 102–04.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

First, the SAC assumes that the BDO announcement established that the Entity Level Controls Weakness existed, see SAC ¶ 111 ("the Entity Level Controls Weakness identified by BDO"); see also Opp'n at 12, but that assumption is unfounded.  The parties spill much ink over the meaning of the November 23, 2015 form 8-K disclosing BDO's resignation, but the Court does not see any plausible reading of the document as confirming that there was an Entity Level Controls Weakness in 2013 or 2014, or even confirming as true the allegations in the Ruggiero complaint.[9]  BDO's objection was to the Special Committee investigation in 2015.  See Ex. 14 ("BDO disagrees with the scope and the remediation of the special investigation that was undertaken by the Special Committee of the Board").  Although BDO identified two material weaknesses regarding financial reporting, the revenue recognition weakness it identified is irrelevant, and the other weakness related to "the Company's entity level controls, including a determination by BDO that 'with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued."  Id.  BDO's problems with Identiv's leadership were tied to the "results of the special investigation," not to any independent assessment BDO had undertaken of 2013 or 2014 conduct.  Cunningham argues that the word "including" in the above language means that "Identiv did not disclose the entirety of BDO's description of the Entity Level Controls Weakness."  See Opp'n at 14 n.17.  Perhaps so, but neither does it enable Cunningham to adequately plead that BDO in 2015 confirmed the presence of an Entity Level Controls Weakness relating to Hart's reimbursements in 2013 and 2014.  The filing regarding BDO's resignation did not say anything about any irregularities,

---

[9] The Ruggiero complaint itself says nothing of entity level controls, although it does allege extensive misconduct by Hart.  See generally Ex. 7 (Ruggiero complaint). The allegations by CW1 (discussed below in connection with scienter) do relate to improper reimbursements but also (accepting them as true) do not establish that an entity level controls weakness existed in 2013 and 2014. See Nelson Reply (dkt. 67) at 3 n.6.  Nor does the SAC offer any legal support for the assertion that Hart's alleged misconduct would be an internal controls weakness.  See Identiv Reply (dkt. 66) at 13 n.20 (noting that Opposition—not the SAC—cites only to auditing standards applicable to public accounting firms); Opp'n (dkt. 62) at 11–12.

United States District Court
For the Northern District of California

misappropriation, fraud, or BDO's inability to rely on the representations of Hart or Nelson.[10]

Second, even assuming that such a weakness existed, Cunningham has not sufficiently alleged that, by not disclosing it, the 10-Q and 10-K statements in 2013 and 2014 made misleading, rather than merely "incomplete," statements.  Section 10(b) and Rule 10b-59(b) "do not create an affirmative duty to disclose any and all material information."  Matrixx, 563 U.S. at 44.  Under Matrixx, "section 10(b)(5) and Rule 10b-5 prohibit only misleading and untrue statements, not statements that are incomplete."  In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 880 n.8 (9th Cir. 2012) (citing Matrixx, 131 S. Ct. at 1321–22).  A company must disclose "only" what is "necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  See Matrixx, 563 U.S. at 44 (internal quotation marks omitted).  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988).

The alleged 10-K and 10-Q misrepresentations are omissions: Identiv made no affirmative representations about expense reimbursements and internal controls related thereto.  But Cunningham's theory—that once Identiv made a statement about the Disclosed Weakness, it was obligated to disclose additional information about weaknesses in internal controls, see, e.g., SAC ¶ 111—conflicts with the holdings of Matrixx and In re Rigel on omissions claims.  The SAC fails to point to any statement in the 10-Qs or 10-Ks that was rendered misleading due to the nondisclosure of the alleged additional weakness.  See In re Rigel, 697 F.3d at 880 n.8 (standard is misleading, not incomplete).  In his Opposition, Cunningham describes the 10-Q and 10-K statements as "point[ing] to [the Disclosed

---

[10] The parties disagree about whether BDO would have been obligated to disclose in some way its belief that there were entity level controls weaknesses in 2013 and 2014 if it so found.  Compare Nelson Reply (dkt. 67) at 2 ("BDO further had a duty to communicate any significant deficiencies or material weaknesses in internal controls it identified in the course of its audit to management and those charged with the governance of the Company."); id. at 2–3 ("In addition, contrary to Plaintiff's argument, BDO could not and would not have given its consent to inclusion of its audit report on Identiv's 2014 financial statements in Identiv's later registration statement and 2015 10-K had it concluded that there was an undisclosed material weakness in Identiv's 2014 entity level controls."); with Opp'n at 13–15 ("the subsequent discovery of an Entity Level Controls Weakness did not necessarily require revision of Identiv's 2014 financial statements. . . . BDO did not furnish an opinion on the effectiveness of Identiv's internal controls for 2014, so no withdrawal or retraction of its audit opinion was required.").  Although the Court finds Defendants' authority more persuasive on this point, it does not reach this issue, as nothing in the November 23, 2015 statement warrants it.

United States District Court
For the Northern District of California

Weakness] as the Company's only material weakness, giving investors the misleading impression that there was no Entity Level Controls Weakness while Hart exploited that very weakness to steal from the Company." Opp'n at 18–19.[11]  But the statements did not say "only material weakness."  The statements said, repeatedly, that the Company may identify additional internal controls weaknesses, and they cautioned that "no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been or will be detected."  See Ex. 2 at 19; Ex. 6 (FY 2014 10-K of 3/23/2015) at 22, 92; Ex. 3 (Form 10-Q of 5/15/2014); Ex. 4 (Form 10-Q of 8/14/2014); Ex. 5 (Form 10-Q of 11/14/2014).  It is therefore difficult to see the omissions as misleading rather than merely incomplete.

An analogous case is Nathanson, 87 F. Supp. 3d at 970, in which an internal investigation revealed that Polycom's CEO allegedly "claimed reimbursements for numerous extravagant personal expenses," its CFO had to "sign off on expense reports," the CEO resigned, and "Polycom's stock dropped significantly."  The court concluded that public filings declaring Polycom's internal controls over financial reporting "effective" were not misleading, even though the internal controls failed to catch the CEO's misappropriation of funds.  See id. at 977.  The court held that the allegation consisted only of a "non-actionable generalized claim[] of mismanagement."  See id. (internal quotation marks omitted).  Even though Polycom's assurances about its internal controls might seem "misleading" after the internal investigation issued its finding, "there is no securities fraud by hindsight," and the plaintiff failed to plead how the internal controls were "inadequate."  See id. at 978 (internal quotation marks omitted).  Consequently, Nathanson "fail[ed] to plead any actionable misstatements or omissions with respect to these statements."  See id. at 974.

Schueneman v. Arena Pharmaceuticals, Inc., 840 F.3d 698 (9th Cir. 2016), to which Cunningham cites, see Opp'n at 39, illustrates an important distinction.  In Schueneman, a defendant made positive public statements about a drug's safety.  Id. at 700.  At the same

---

[11] There are no allegations suggesting that Hart stole from the company; the allegations are that he sought and received reimbursements to which he was not entitled.

United States District Court
For the Northern District of California

time that it made those statements, it knew that rats receiving the drug were getting cancer. Id.  The court found that, while the company might not have had a stand-alone duty to disclose the rat study, by publicly touting the drug's safety and positive animal studies, its statements were misleading absent the disclosure of the rat study.  Id. at 707–08.  Here, Identiv did not publicly tout the strength of its practices surrounding expense reimbursements and the internal controls related thereto, and so it did not undertake a duty to disclose.

More analogous is In re Rigel, in which a plaintiff complained that a press release should have had more safety information.  697 F.3d at 880.  The court explained that the press release at issue had identified "certain side effects as 'key safety results,' not 'all safety results' or even just 'safety results.'"  Id. at 880 (emphasis in original).  Here, similarly, Identiv never identified the Disclosed Weakness as the only internal controls weakness. Cunningham has not explained how Identiv's disclosure of one internal controls weakness obligated it to disclose an additional weakness, even if such a weakness would have been "material" to investors.  See Matrixx, 563 U.S. at 44; see also Order re FAC (finding that "Identiv did not have an 'affirmative duty' to disclose [same weakness] during those years").[12]

Cunningham's argument about the materiality of the alleged Entity Level Controls Weakness therefore misses the point. See In re Rigel, 697 F.3d at 880 n.8 ("The materiality of information is different from the issue of whether a statement is false or misleading. . . . 'Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.'") (quoting Matrixx, 131 S. Ct. at 1322).  Cunningham argues that Identiv's failure to disclose the alleged Entity Level Controls Weakness is a material

---

[12] Cunningham's Opposition—but not the SAC—argues that Identiv had a duty to disclose the alleged Entity Level Controls Weakness under 17 C.F.R. § 229.308(a)(3), and 17 C.F.R. § 229.308(c), which require registrants to disclose "any change in the registrant's internal control over financial reporting . . . that occurred during the registrant's last fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting." See Opp'n at 19.  But as Identiv points out, there has never been a financial restatement due to alleged improper expense reporting or the alleged Entity Level Controls Weakness, and so those issues did not affect Identiv's control over financial reporting.  See Identiv Reply at 14–15, n.24.  Accordingly, the alleged Entity Level Controls Weakness did not need to be disclosed under this regulation.

United States District Court
For the Northern District of California

1   misstatement because it "would have been viewed by the reasonable investor as having

2   significantly altered the 'total mix' of information made available."  See Opp'n at 21–22

3   (citing In re Tesla Motors, Inc. Sec. Litig., 75 F. Supp. 3d 1034, 1041 (N.D. Cal. 2014)); see

4   also In re Cutera Sec. Litig., 610 F.3d 1103, 1108 (9th Cir. 2010) (determining materiality

5   "should ordinarily be left to the trier of fact.").  It was based on this authority that the Court

6   found that the FAC had adequately pled a material misrepresentation regarding executive

7   compensation.  See Order re FAC at 3 n.2.  But Cunningham's argument conflates the two

8   types of alleged misrepresentations.  See Opp'n at 22 ("Had Defendants informed the market

9   of the Entity Level Controls Weakness . . . it would have essentially revealed Hart's

10  misconduct"), id. at 23 ("misrepresentations concerning a CEO's improper claims for

11  reimbursement for personal expenses are material").  The alleged Entity Level Controls

12  Weakness is a separate basis of liability, and one that (given the two infirmities discussed

13  above) the SAC has failed to adequately plead.

14          The 10-K and 10-Q statements about the Disclosed Weakness do not provide an

15  adequate basis for a material misrepresentation about the alleged Entity Level Controls

16  Weakness.

17                              **b.    SOX Certifications**

18          The SAC also alleges that Hart's and Nelson's[13] SOX certifications were material

19  misrepresentations because, like the 10-Q and 10-K filings discussed above, they "failed to

20  disclose the existence of a separate, ongoing material weakness," that is, "the Entity Level

21  Weakness identified by BDO, which allowed Hart to improperly expense personal items to

22  the Company.  SAC ¶ 111.  Defendants argue that SOX certifications are not actionable

23  under section 10(b) or Rule 10b-5, and that even if they are, the allegations here still fail.

24  See, e.g., Hart MTD SAC at 10–12.

25

26          [13] Nelson is not alleged to have signed the Q3 2013 10-Q or accompanying SOX certification,
    so he cannot be liable for those statements.  See SAC ¶¶ 93, 94.  "For purposes of Rule 10b-5, the maker
27  of a statement is the person or entity with ultimate authority over the statement."  Janus Cap. Grp., Inc.
    v. First Derivative Traders, 564 U.S. 135, 142 (2011); see also City of Royal Oak Retirement Sys. v.
28  Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1070 (N.D. Cal. 2012) ("A defendant can be held liable
    under § 10(b) for a false or misleading statement only if the defendant 'made the statement.'").

The Court will not wade into the question of whether SOX certifications are actionable, noting that courts are divided about whether such boilerplate language can constitute a material misrepresentation.[14]  Instead, the Court holds that—regardless of whether SOX certifications are actionable generally—the allegations here are inadequate.  As discussed above, it is not clear that the alleged Entity Level Controls Weakness existed, and the SAC did not adequately plead that there was an affirmative duty to disclose it even if it did.  There are at least two additional problems with the SOX certification allegations.

First, Cunningham's allegations in the SAC are not sufficiently particular.  The heightened pleading rules for securities fraud require "particularized allegations of the circumstances constituting fraud, including . . . setting forth what is false or misleading . . . about the statement and why the statements were false or misleading at the time they were made."  In re Rigel, 697 F.3d at 876; 15 U.S.C. § 78u-4(b)(1).  If plaintiffs "fail to individually identify the specific statements asserted to be 'false and/or misleading,' or provide specific facts or reasons to show how each statement was false or misleading," the complaint must be dismissed.  See In re VeriFone Sec. Litig., No. 13-cv-1038-EJD, 2014 WL 3920322, at *4 (N.D. Cal. Aug. 8, 2014).  Here, the SAC includes a page-and-a-half-long block quote consisting of the entire SOX certification.  See SAC ¶ 102.  The Opposition purports to identify which portions of the SOX certification are false or misleading, see Opp'n at 18, but the Court's review at this stage is of the complaint itself, see Schneider v. Cal. Dep't of Corr., 151 F.3d 1194, 1197 (9th Cir. 1998).

Second, even the portions of the SOX certifications that Cunningham identifies in his

---

[14]  Compare Bruce v. Suntech Power Holdings Co., No. 12-04061-RS, 2013 WL 6843610, at *4 (N.D. Cal. Dec. 26, 2013) (finding SOX certification "not actionable as the failure to detect fraud does not itself render false standard certifications about the adequacy of internal controls."); and In re Silicon Storage Tech., Inc. Sec. Litig., No. C 05-295 PJH, 2007 WL 760535, at *17 (N.D. Cal. Mar. 9, 2007) ("there is nothing in either the 1934 Security Exchange Act or the Sarbanes-Oxley Act and implementing regulations that authorizes plaintiffs to base a claim for securities fraud on an alleged misstatement in a Sarbanes-Oxley certification."); with Backe v. Novatel Wireless, Inc., 642 F. Supp. 2d 1169, 1182 (S.D. Cal. 2009) (rejecting claim based on false SOX certifications not because such a claim is not possible but because of failure to plead with particularity); Limantour v. Cray Inc., 432 F. Supp. 2d 1129, 1158–60 (W.D. Wash. 2006) ("[T]he Complaint adequately alleges that the . . . SOX 302 certifications . . . were false or misleading based on the [subsequent] disclosure . . . that there were material weaknesses in [the company's] internal controls and procedures.").

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Opposition do not adequately allege falsity.  See Opp'n at 18.  The preface of the SOX

certification is: "I have disclosed . . . to the registrant's auditors and the audit committee. . . ."

SAC ¶ 102.  But, as Nelson points out, the SAC has never alleged that Defendants failed to

disclose the alleged Entity Level Controls Weakness to the auditors.  See Nelson Reply at

6.[15]  The two claimed representations within the SOX certification also fail.  Cunningham

points to the claimed disclosure of "[a]ll significant deficiencies and material weaknesses in

the design or operation of internal controls over financial reporting which are reasonably

likely to adversely affect the registrant's ability to record, process, summarize and report

financial information."  See Opp'n at 18.  But there has never been a financial restatement

due to alleged improper expense reporting or the alleged Entity Level Controls Weakness,

and so the alleged Entity Controls Weakness could not have affected Identiv's control over

financial reporting.  See Identiv Reply at 14–15, n.24.  Cunningham also points to the

claimed disclosure of "[a]ny fraud, whether or not material, that involves management or

other employees who have a significant role in the registrant's internal control over financial

reporting."  See Opp'n at 18.  But there has never been a finding that Hart or Nelson engaged

in fraud, and the SAC does not support such an inference.

The Court holds that the SOX certifications do not provide an adequate basis for a

material misrepresentation about the alleged Entity Level Controls Weakness, and therefore

that Cunningham has failed to plead a material misrepresentation as to that weakness.

## 2. Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."

Tellabs, 551 U.S. at 319 (internal quotation marks omitted).  A complaint must "state with

particularity facts giving rise to a strong inference that the defendant acted" with scienter.

See 15 U.S.C. § 78u–4(b)(2)(A); Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759

F.3d 1051, 1061 (9th Cir. 2014).  A court should deny a motion to dismiss "only if a

reasonable person would deem the inference of scienter cogent and at least as compelling as

_____

[15] Cunningham's claim is instead that Defendants made misrepresentations to investors.  See, e.g., SAC ¶ 5 ("Defendants knew of but concealed from investors . . .:").

United States District Court
For the Northern District of California

1    any opposing inference one could draw from the facts alleged" in the complaint.  See

2    Tellabs, 551 U.S. at 324.  Plaintiffs must "plead with particularity facts that give rise to a

3    'strong'—i.e., a powerful or cogent— inference."  Id. at 323.  To demonstrate scienter, the

4    defendants must have contemporaneously made "false or misleading statements either

5    intentionally or with deliberate recklessness."  See Zucco Partners, LLC v. Digimarc Corp.,

6    552 F.3d 981, 991 (9th Cir. 2009) (internal quotation marks omitted).  "[M]ere recklessness

7    or a motive to commit fraud and opportunity to do so" is not enough.  Reese v. Malone, 747

8    F.3d 557, 569 (9th Cir. 2014).  Rather, the defendant must show "a highly unreasonable

9    omission" and "an extreme departure from the standards of ordinary care" that "presents a

10   danger of misleading buyers or sellers that is either known to the defendant or is so obvious

11   that the actor must have been aware of it."  See Zucco, 552 F.3d at 991 (quoting Hollinger v.

12   Titan Capital Corp., 914 F.2d 1564 (9th Cir. 1990)).  Courts must "assess all the allegations

13   holistically," not "scrutinize each allegation in isolation."  Tellabs, 551 U.S. at 326.

14        The Court rejected the scienter allegations in the FAC, holding that Cunningham

15   failed to allege particularized facts showing strong scienter as to the executive compensation

16   statements that was "at least as compelling as any opposing inference."  See Order re FAC at

17   5 (citing Tellabs, 551 U.S. at 324; Hart MTD FAC at 17–18 (re "sloppy management")).

18   The Court also held that Cunningham failed to allege particularized facts showing strong

19   scienter as to the alleged Entity Level Controls Weakness.  Id.

20        The SAC includes additional allegations of scienter.  It now alleges that the executive

21   compensation misrepresentations "were made with scienter because Hart and Nelson were

22   aware that Hart was improperly charging the Company for personal expenses," and "given

23   Defendants' . . . focus on expenses, including executive compensation expenses, and

24   Nelson's extensive financial background, Defendants knew that the misrepresentations and

25   omissions regarding Hart's improper expenses would translate into false executive

26   compensation reporting."  SAC ¶ 100.  It also alleges that the Entity Level Controls

27   Weakness misrepresentations "were made with scienter because Hart and Nelson were aware

28   that Hart was actively disregarding the Company's 'entity level' internal controls by

improperly charging the Company for personal expenses . . . and that the Company was not reporting these expenses as part of Hart's compensation." Id. ¶ 112.[16]  Defendants argue that the SAC's scienter allegations remain inadequate. See, e.g., Identiv MTD SAC at 4–15. Cunningham responds that the factors supporting scienter include (a) the Defendants' direct involvement in and knowledge of the fraud, and Hart's and Nelson's roles as hands-on senior managers, (b) the corroborating accounts of the Ruggiero complaint and CW1, (c) BDO's "noisy" resignation, (d) Identiv's restatement of Hart's compensation figures, (e) the SOX certifications, (f) that the actions of Hart and Nelson violated Identiv's code of ethics, and (g) Hart's and Nelson's "resulting loss of their corporate positions." Opp'n at 24–25.

### a. Defendants' Direct Involvement and Hands-On Roles

Cunningham cites to South Ferry LP v. Killinger, 542 F.3d 776, 785–86 (9th Cir. 2008), for the proposition that allegations regarding management's role can satisfy the scienter requirement "without accompanying particularized allegations, in rare circumstances where the nature of the relevant facts is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter.'" See Opp'n at 25.  He argues that "it would be 'absurd' to suggest that [Hart and Nelson] were unaware of Hart's misappropriation of corporate funds, the deficient entity level controls that Hart exploited in furtherance of the misappropriation, and the manipulation of the Company's financial reporting to conceal his misappropriation." Id.  The Court cannot agree.  While it might well be absurd to suggest that Hart was unaware that he repeatedly sought improper reimbursements for personal items, or that Nelson was unaware that he repeatedly allowed such reimbursements, it is quite another thing to suggest that both were obviously aware of

---

[16] It further alleges that the false statements relating to the remediation of the previously identified weakness in the Company's internal controls were made with scienter because (i) correcting the internal control issue was one of Defendants' primary focuses; (ii) the Company stated that 'the material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time . . . ; (iii) the control deficiency was of such an extreme nature that BDO was unwilling to be associated with the Company's 2015 financial statements; and (iv) Defendants demonstrated a complete and willing lack of care for blatant internal control deficiencies." Id. ¶ 116. But Cunningham no longer alleges a material misrepresentation regarding the remediation of the Disclosed Weakness. See id. ¶¶ 93–116 (material misrepresentation allegations). This allegation is therefore likely a vestige from the FAC.

United States District Court
For the Northern District of California

1   "the manipulation of the Company's financial reporting to conceal [the] misappropriation,"

2   id.—which is the only item on Cunningham's list that is relevant to securities fraud.

3   Moreover, as Hart points out: "[o]ne can read the SAC from front to back without finding

4   any allegation of accounting fraud or manipulation of Identiv's financial statements."  Hart

5   Reply (dkt. 68) at 4.  Although Cunningham cites to In re Daou Systems, Inc. Security

6   Litigation, 411 F.3d 1006, 1023 (9th Cir. 2005), for the proposition that "specific allegations

7   of direct involvement in the production of false accounting statements and reports are . . .

8   probative of scienter," see Opp'n at 25 n.26, there are no allegations here that Hart or Nelson

9   were directly involved in producing false accounting statements.

10          Nor are there plausible allegations that Hart, who did not prepare his own expenses,

11   and presumably did not prepare the Other Compensation lines of the relevant proxy

12   statements, understood (or should have understood) that minor variances in the Other

13   Compensation lines would mislead investors.  See Zucco, 552 F.3d at 991 (requiring danger

14   of misleading buyers that is "so obvious that the actor must have been aware of it.").  As

15   there was no revision of Identiv's financial statements, much less a restatement,

16   Cunningham's assertion that Defendants "certainly recognized" "the impact of these

17   practices on the Company's financial reports," see Opp'n at 1, 2, 25, 29, 40, rings hollow.

18   The scienter that the SAC is required to allege is an intent to defraud investors—not an intent

19   to get reimbursed for personal items, or an intent to reimburse someone else for personal

20   items.  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 186 (1976) ("intentional or willful

21   conduct designed to deceive or defraud investors by controlling or artificially affecting the

22   price of securities."); Bruce, 64 F. Supp. 3d at 1370–71 (scienter is "a mental state embracing

23   intent to deceive, manipulate, or defraud."); Varjabedian v. Emulex Corp., 152 F. Supp. 3d

24   1226, 1234 (C.D. Cal. 2016) (required scienter is intent "to deceive or mislead Plaintiff and

25   the other shareholders."); see also ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP

26   Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) ("facts alleged must support an

27   inference of an intent to defraud the plaintiffs rather than some other group.").

28          The SAC alleges that Nelson instructed CW1 to pay unspecified expenses that did not

United States District Court
For the Northern District of California

1   have an accompanying receipt, and that Nelson would comment, "we will figure it out later."

2   See SAC ¶¶ 81–82.  While that plausibly alleges an intent to cut corners on reimbursements,

3   it is not the same thing as alleging that Nelson did not intend for the expenses to be properly

4   recorded and reported, or that he intended to mislead investors with respect to those

5   expenses.  The court made a similar distinction in Nathanson, 87 F. Supp. 3d at 978, holding

6   that the "central thrust" of the case was the board's failure to correctly assess the adequacy of

7   its internal controls—not that the board had "sought to deceive investors about the quality of

8   those controls."  See also Cement & Concrete Workers District Council Pension Fund v.

9   Hewlett Packard Co., 964 F. Supp. 2d 1128, 1143 (N.D. Cal. 2013) ("Plaintiffs have not

10   alleged any facts independently establishing that Hurd knew his conduct would have the

11   effect of misleading investors. . . . Plaintiff . . . inadequately alleged the scienter requirement,

12   because nothing suggests that Hurd thought that he could mislead investors").

13        Cunningham argues that the SAC "provides compelling reasons why Nelson went out

14   of his way to cover for Hart." Opp'n at 27.  Cunningham argues that Nelson did not want to

15   jeopardize his status as Hart's trusted, right-hand man" by exposing Hart's corporate fraud.

16   Id. at 28 (citing SAC ¶ 26).  He also agues that Nelson benefitted from Hart's wrongdoing by

17   receiving $1,000,000 in stock compensation in the summer of 2014, right after loaning Hart

18   $26,000 to pay an American Express bill.  Id. at 28 (citing SAC ¶¶ 69–70).  These allegations

19   are unpersuasive.  It is insufficient to allege a generalized motive not to lose one's position.

20   See, e.g., In re Energy Recovery Inc. Sec. Litig., No. 15-cv-265-EMC, 2016 WL 324150, at

21   *23 (N.D. Cal. Jan. 27, 2016); Zucco, 552 F.3d at 998.  And the allegation about the $26,000

22   personal loan is not even plausible, as it makes little sense for the Board to give Nelson

23   $1,000,000 in stock when it could have just given Hart a $26,000 loan directly.  In addition,

24   the basis for that allegation—that Ruggiero "connected those shares to her prior assistance in

25   her obtaining a $26,000 loan from Nelson" is wholly speculative.  See SAC ¶ 69.

26   Defendants also point to evidence that Nelson received a stock award because all of Identiv's

27   executive officers received increased stock and options awards in 2014 pursuant to the

28   Company's 2011 Incentive Compensation plan.  See Ex. 15 at 7–8.

United States District Court
For the Northern District of California

Cunningham separately argues that Hart's and Nelson's roles as Identiv's senior-most officers, who had direct access to relevant information concerning the alleged misconduct and were actually "involved in monitoring the type of issues that were the subject of the fraud," supports an inference of scienter.  See Opp'n at 29 (citing SAC ¶ 41, "laser-focus" on reducing costs).  Cunningham argues that in light of these roles, "to suggest that they had no knowledge . . is absurd, particularly given that (i) Hart was the person responsible for misappropriating corporate funds, (ii) Hart's reimbursement demands were exorbitant and clearly concerned personal, non-work items; and (iii) Nelson was repeatedly alerted to Hart's misconduct by multiple employees."  Id. at 30.  This argument overlaps significantly with the direct involvement argument, and, like it, fails because it treats what might well be a plausibly pled intent to receive or pay improper reimbursements as synonymous with an intent to defraud investors in the purchase or sale of securities.  Defendants also observe that it is not atypical for a CFO to be focused on reducing expenses, and that if the SAC's "allegations about Mr Nelson's role, background, and focus on reducing expenses were sufficient to show scienter, then the scienter requirement would become meaningless when applied to most CFOs, violating" Zucco.  Nelson Reply at 9.

A few additional factors weigh against finding scienter in this case.  First, there are no allegations that Nelson or Hart sold any stock during the class period.  See In re Rigel, 697 F.3d at 884–85 (that "none of the defendants sold stock during the period between the allegedly fraudulent statements and the subsequent public disclosure" does not support an inference of scienter and "[i]n fact, it supports the opposite inference.").  Second, the amount of money Hart received for his allegedly improper personal expenses was relatively small.  It makes little sense for Defendants to engage in securities fraud by making misrepresentations about $111,000 over the course of two years, when Hart made over $3.75 million and Identiv earned more than $155 million in net revenue over those same two years.  See Identiv MTD at 6; Ex. 15 at 9; see also Taleo Corp. Sec. Litig., No. 09-151-JSW, 2010 WL 597987, at *1-*2, *4, *11 (N.D. Cal. Feb. 17, 2010) (decrease in total revenue by "only" four percent, a reduction in a "secondary form of revenue," was "not so significant that [it] would support a

1 strong inference of scienter.").  And third, Defendants disclosed the Disclosed Weakness.

2 See Nelson MTD SAC at 13 ("Why would Mr. Nelson specifically identify, in those

3 documents, a material weakness in the Company's internal controls if his intent was to

4 fraudulently conceal the existence of a material weakness in the Company's internal

5 controls?").

6         **b.**    **Ruggiero Complaint and CW1**

7       Overwhelmingly, the SAC's scienter allegations are based on two sources: the

8 Ruggiero complaint and the testimony of CW1.  See, e.g., SAC ¶ 59 ("Hart's

9 misappropriation of corporate resources was documented in the Ruggiero complaint"); ¶ 61

10 ("As alleged in the Ruggiero complaint,"); ¶ 63 ("As laid out in the Ruggiero complaint,");

11 ¶ 67 ("The Ruggiero Complaint highlights the improper personal charges"); ¶ 81 ("The

12 testimony of [CW1] further confirms that Hart was improperly charging personal expenses").

13       As to the Ruggiero complaint, the Court previously denied the Defendants' motion to

14 strike, holding that there was "no indication that Cunningham's counsel acted in bad faith by

15 referencing" it.  Order re FAC at 2–3.  That is not the same thing as having "found the

16 Ruggiero allegations . . . reliable," as Cunningham now claims.  See Opp'n at 32.  In fact, the

17 Court is concerned about Ruggiero's lack of personal knowledge for many allegations.  The

18 SAC and Opposition assert that Ruggiero has personal knowledge because she was Hart's

19 executive assistant.  See SAC ¶ 60, Opp'n at 32.  Although this position enabled Ruggiero to

20 allege with personal knowledge that Ruggiero would ask Hart to provide backup documents

21 and names of participants to clarify that expenses were work related, that Hart would ignore

22 her or tell her to "figure it out," see, e.g., SAC ¶ 63, and that she routinely spoke with Nelson

23 about Hart's expenses, including telling Nelson "that Hart seemed to be out of money and

24 'using Identiv as his personal bank account for a lifestyle he apparently could not afford,'"

25 id. at 72, the SAC falls short in alleging personal knowledge for Ruggiero's assertions that,

26 for example, trips she did not attend were improper, servers were not used for business

27 purposes, and restaurant and online charges were improper and not for customers or other

28 business purposes, see SAC ¶¶ 68, 74–75; Ex. 7 ¶¶ 21–23, 27–28; SAC ¶ 62; Ex. 7 ¶ 21–23,

United States District Court
For the Northern District of California

1  27–28; SAC ¶ 62; Ex. 7 ¶¶ 16–17; SAC ¶ 62; Ex. 7 ¶ 14.[17]

2      The other problem with the allegations based on the <u>Ruggiero</u> complaint is that they

3  say very little about either entity level controls or Hart's or Nelson's intent to defraud

4  investors.  Rather, they show a CEO impatient to be reimbursed for personal expenses

5  without following the necessary processes, and a CFO more interested in granting

6  reimbursements than in following the necessary processes.[18]  Such allegations might support

7  a derivative shareholder suit, a state law suit for a breach of fiduciary duty, or Ruggiero's

8  state law retaliation suit, but they do not provide the necessary scienter in a securities fraud

9  case.  <u>See</u> <u>Santa Fe Industries, Inc. v. Green</u>, 430 U.S. 462, 479 (1977) ("Congress by

10 [§] 10(b) did not seek to regulate transactions which constitute no more than internal

11 corporate mismanagement") (internal quotation marks omitted); <u>cf.</u> <u>Cement & Concrete</u>

12 <u>Workers</u>, 964 F. Supp. 2d at 1143 ("Wanting to keep something secret, in and of itself, is

13 insufficient to implicate the PSLRA.").  Nor do such allegations provide the necessary

14 "specific contemporaneous statements or conditions that demonstrate the intentional or the

15 deliberately reckless false or misleading nature of the statements when made."  <u>See</u> <u>Ronconi</u>

16 <u>v. Larkin</u>, 253 F.3d 423, 432 (9th Cir. 2001) (internal quotation marks omitted).

17     As to CW1, the Court previously disregarded his testimony altogether, holding that

18 the FAC failed to provide CW1's specific job description and responsibilities, and that CW1

19 did not "offer with particularity any evidence beyond hearsay to establish [his] reliability

20 regarding Hart's and Nelson's scienter."  Order re FAC at 6 n.4.  The Court further held that

21 CW1's statements were not indicative of scienter and were not based on personal knowledge.

22 <u>Id.</u>  In a complaint for securities fraud, confidential witnesses must first "describe[] with

23 sufficient particularity . . . their reliability and personal knowledge" to introduce their

---

24 [17] The SAC also relies on an interview Ruggiero gave "confirming the allegations in the

25 <u>Ruggiero</u> complaint," <u>see</u> SAC ¶ 80, but repeating the same allegations twice does not make them more plausible.

26

27 [18] Nelson's argument that "[f]ar from demonstrating wrongful intent, this allegation shows on its face that Mr. Nelson was focused on wanting the expense reports to be proper and supported,

28 weighing <u>against</u> an inference of scienter," Nelson MTD SAC at 11, is a stretch.  Nelson's purported concern about Hart's inadequate paperwork would reflect well on Nelson only if Nelson had not gone on to reimburse Hart notwithstanding the inadequate paperwork.

24

United States District Court
For the Northern District of California

statements establishing a defendant's scienter.  Zucco, 552 F.3d at 995.  "Second, those

statements . . . must themselves be indicative of scienter."  Id.

The SAC includes additional allegations about CW1, and now identifies his specific

job description (Human Resources Manager) and responsibilities (all accounts payable for

Identiv).  See SAC ¶ 81.[19]  However, CW1's testimony still fails to allege with particularity

any evidence that CW1 had personal knowledge of Hart's improper receipts beyond hearsay

from the employee whom CW1 supervised, or hearsay from Ruggiero.  See SAC ¶¶ 82, 83.

Nor are CW1's statements actually "indicative of scienter," see Zucco, 552 F.3d at 995; they

provide no personal knowledge that Hart and Nelson knowingly made false or misleading

statements in the public filings on executive compensation or entity level controls.  That

SOX processes "went out the door" when Hart and Nelson arrived at Identiv is both

conclusory and just as plausibly evidence of mismanagement as it is an intent to commit

securities fraud.  See Tellabs, 551 U.S. at 324.  There is also a more likely opposing

inference for why it "was a daily fight for the Sub-Employee to obtain the expense reports

and receipts from Hart"—that busy executives are sometimes too busy to painstakingly

gather, organize, and submit their receipts.  Because CW1 cannot add anything about Hart's

or Nelson's states of mind, the Court again disregards all statements made by CW1 on which

the SAC relies to plead scienter.  See Nathanson, 87 F. Supp. 3d at 980–81 ("generalized

claims about corporate knowledge that offer no reliable personal knowledge concerning the

individual defendants' mental state are insufficient to satisfy the scienter requirement")

(internal quotation marks and brackets omitted).

### c.    BDO Resignation

Auditors' resignations by themselves are insufficient to support an inference of

scienter.  See Zucco, 552 F.3d at 1002.  In this case, of course, Cunningham alleges a noisy

resignation: "BDO's resignation was . . . a strong, corrective measure taken by the

accounting firm to distance itself from the wrongdoing committed by the Company's senior

management and to alert the public of the deficient entity level controls that allowed the

---

[19] The SAC does not explain how authority over accounts payable—money owed by a company to its creditors—gives one authority over or insight into executive reimbursements.

wrongdoing to occur." Opp'n at 35. As discussed above, the Court rejects this interpretation. Because the BDO resignation was tied to the Special Committee's 2015 investigation of the <u>Ruggiero</u> complaint, the BDO resignation did not reflect a finding by BDO that Defendants made false statements in 2013 and 2014 about either an Entity Level Controls Weakness or Hart's compensation. Accordingly, it is not a basis for finding scienter.

### d.    Adjustment of Hart's Compensation

Identiv's adjustment of Hart's compensation also does not support the necessary inference of scienter. Cunningham argues that Identiv's December 18, 2015 Form 10-K/A, which stated under "All Other Compensation" that Identiv had incorrectly "reimbursed expenses of $97,868 in 2014 and $13,147 in 2013" to Hart, <u>see</u> Ex. 15 (Form 10-K/A of 12/18/2015) at 9, "confirmed BDO's determination of the lack of management accountability." Opp'n at 36. He also urges that the BDO resignation in combination with the adjustment of Hart's compensation demonstrates that BDO "had strong misgivings about the conduct of senior management and the adequacy of its entity level controls, which support a compelling inference of scienter." <u>Id.</u> As discussed above, the allegation that BDO found a lack of management accountability or Entity Level Controls Weakness in 2013 and 2014 is unfounded. In addition, it is unclear how Identiv's adjustment of Hart's compensation could demonstrate that BDO had "strong misgivings," or how any BDO misgivings could demonstrate Defendants' contemporaneous state of mind in 2013 and 2014. <u>Cf.</u> <u>In re Am. Apparel, Inc. Shareholder Litig.</u>, 855 F. Supp. 2d 1043, 1084 (C.D. Cal. 2012) ("fact that an auditor resigns because it feels it cannot rely on management's representations, by itself, does not demonstrate that management was intentionally, recklessly, or deliberately withholding information as opposed to acting incompetently").

Defendants note that "the mere publication of a restatement is not enough to create a strong inference of scienter." Nelson Reply re MTD SAC at 10 (citing <u>Zucco</u>, 552 F.3d at

United States District Court
For the Northern District of California

1000).[20]  Despite Cunningham's characterization of the December 18, 2015 adjustment, see Opp'n at 36 ("restatement of Hart's compensation"), there has never been a financial restatement due to alleged improper expense reporting or the alleged Entity Level Controls Weakness in this case.  See Identiv Reply at 14–15, n.24.  Moreover, the Form 10-K/A here does not support an inference of scienter because it explains that the $97,868 in 2014 and $13,147 in 2013 "should not have been reimbursed either because they were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."  See Ex. 15 at 9.  It says nothing about the Defendants' knowledge of the improprieties, their intentions, or their participation in accounting fraud.[21]  Accordingly, it is not a basis for finding scienter.

### e.     The SOX Certifications

Neither do the SOX certifications support an inference of scienter.  The Court will not reexamine its holding on this point from its previous order.  See Order re FAC at 5 ("Cunningham cannot use Hart's and Nelson's Sarbanes-Oxley certifications on Identiv's SEC filings . . . to show a strong inference of scienter.") (citing Zucco, 552 F.3d at 1003–04).[22]

### f.     Identiv's Code of Ethics

The Opposition also alleges in conclusory fashion that Hart and Nelson violated Identiv's Code of Conduct and Ethics ("Code"), and that this is probative of scienter.  Opp'n

---

[20] Zucco recognized an exception to this rule when "it would be 'absurd' to suggest that management was without knowledge of the matter," id., but the Court does not believe that the exception applies here.

[21] It also says nothing about the Ruggiero complaint.  Identiv notes that "there is a clear disconnect between the Ruggiero claims and the reclassification of Hart's executive compensation"—while the Ruggiero complaint alleges that Hart improperly expensed multiple $18,000 servers in 2013, Identiv only reclassified $13,147 in total for that year.  See Identiv MTD at 11 n.13 (citing SAC ¶ 62; Ex. 7 ¶¶ 16–17; Ex. 15 at 9).

[22] While the Opposition cites to Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736 (9th Cir. 2008) for the proposition that SOX certificates are "only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements," see Opp'n at 37, the allegations here do not support a finding that the Defendants were severely reckless.  As the Ninth Circuit recognized in Glazer, 549 F.3d at 747, if courts were to reply solely on SOX certifications, "scienter would be established in every case where there was an accounting error . . . thereby eviscerating the pleading requirements for scienter set forth in the PSLRA."  In addition, Zucco, which held that SOX certifications "are not sufficient, without more, to raise a strong inference of scienter," 552 F.3d at 1004, both post-dates and cites to Glazer.

United States District Court
For the Northern District of California

at 38. Identiv's Code provided that its CEO and CFO were "responsible for ensuring that Identiv's public disclosures meet [certain] requirements and guidelines, and that adequate financial and disclosure controls exist for this purpose." Id. ¶ 84. It also spoke of promoting "accurate and reliable preparation and maintenance of Identiv's financial and other records" and ensuring "that any information or data they report to management is accurate and honest." Id. And it required that employees "[n]ever make misrepresentations or dishonest statements to any person or organization." Id.

Cunningham argues that it is well settled that violation of a company's internal policies is probative of scienter. Opp'n at 38 (citing In re Adaptive Broadband Sec. Litig., No. C 01-1092 SC, 2002 WL 989478, at *17 (N.D. Cal. Apr. 2, 2002); In re Cirrus Logic Sec. Litig., 946 F. Supp. 1446, 1459 n.10 (N.D. Cal. 1996)). But In re Adaptive Broadband, 2002 WL 989478, at *17, involved an individual who allegedly "overrode internal revenue recognition policies and refused to reverse his decision even after being confronted by accounting staff" as well as "an internal policy that orders could not be shipped to [the company's] own warehouse without a written lease agreement," about which he was also confronted. It did not involve an ethics policy. Similarly, In re Cirrus Logic, 946 F. Supp. at 1458 n.10, involved an internal accounting policy, not an ethics policy; the court explained: "[w]here . . . a company deviates from its own procedures in a way that violates GAAP, that deviation from internal policy may be evidence of scienter."). Cunningham cites to no cases involving violations of ethics codes, and one would think that if alleging the violation of a broadly worded ethics code was sufficient to allege scienter, it would "eviscerat[e] the pleading requirements for scienter set forth in the PSLRA." See Glazer, 549 F.3d at 747; cf. Nathanson, 87 F. Supp. 3d at 976 (ethics code "inherently aspirational and hence immaterial.") (internal quotation marks omitted). Accordingly, the alleged violation of the Code does not support finding scienter.

### g.     Resignations of Hart and Nelson

Finally, Cunningham argues that the allegations that Hart and Nelson resigned from their positions in temporal proximity to BDO's resignation and the Company's financial restatement further strengthens the inference of scienter. See Opp'n at 38. "[A] plaintiff

28

United States District Court
For the Northern District of California

must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." <u>Zucco</u>, 552 F.3d at 1002. <u>Zucco</u> held that when an employee resigns just before or after a restatement, a plaintiff must plead particularized facts supporting scienter. <u>Id.</u> Here, there was no restatement. <u>See</u> Identiv Reply at 14–15, n.24.

Even where a defendant resigns upon revelation of misconduct, that is "minimal, non-dispositive supporting evidence of scienter." <u>See</u> <u>Cement & Concrete Workers</u>, 964 F. Supp. 2d at 1143 (citing <u>In re Impax Labs., Inc. Sec. Litig.</u>, No. C 04-4802 JW, 2007 WL 7022753 (N.D. Cal. July 18, 2007)). The allegations of Hart's and Nelson's resignations are not nearly so damning. Nelson was CFO until November 18, 2015, when he became the Company's Vice President of Business Strategy. SAC ¶ 26. His transition to another high-level position does not support an inference of scienter. The SAC alleges that on September 9, 2015, "after reviewing the findings of the Special Committee," Identiv's Board replaced Hart as CEO. SAC ¶ 24. Though he served as President through February 2, 2016, <u>id.</u>, the timing at least makes it more likely that Hart's departure was related to the December 2015 adjustment. Nonetheless, even if Hart was removed in connection with Identiv announcing that it had incorrectly "reimbursed [him] expenses of $97,868 in 2014 and $13,147 in 2013," <u>see</u> Ex. 15 at 9, that announcement, as already discussed, does not say that Hart committed fraud, much less that he had any particular intent in 2013 and 2014.

Accordingly, the allegations about Hart's and Nelson's resignations do not support scienter. Courts are to "assess all the allegations holistically," not "scrutinize each allegation in isolation." <u>Tellabs</u>, 551 U.S. at 326. Looking at all of the scienter allegations together—particularly the allegations pertaining to the Defendants' direct role in the alleged fraud and the <u>Ruggiero</u> complaint—there is support for the proposition that Hart intended to get reimbursed for personal items, and that Nelson intended to facilitate those reimbursements. But the SAC does not adequately plead a contemporaneous intent to defraud investors. <u>See</u> <u>Ernst & Ernst</u>, 425 U.S. at 186.

### 3.    Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss" faced by the plaintiff. <u>Dura Pharm.</u>, 544 U.S. at 342. "[T]he complaint must allege

**United States District Court**
For the Northern District of California

that the defendant's share price fell significantly after the truth became known." Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1062 (9th Cir. 2008) (internal citations omitted). The misrepresentation need not be the "sole" reason for the decline as long as it is a "substantial cause," and the allegations, "if assumed true, are sufficient" to indicate a causal relationship between the company's "financial misstatements" and "the drop in [its] stock price." See Daou, 411 F.3d at 1025, 1026. "At the pleading stage . . . the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity," rather than other factors. Loos, 762 F.3d at 887. The ultimate question is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1210 (9th Cir. 2016).

The FAC alleged that the truth regarding Identiv's internal controls and CEO misconduct was revealed to the market on seven occasions: May 1, 2015, May 4, 2015, May 18, 2015, August 15, 2015, November 30, 2015, December 18, 2015, and March 29, 2016. FAC ¶ 103. The Court held that Cunningham had failed to adequately plead loss causation, explaining that "[a]nnouncements of Identiv's internal investigation into the Ruggiero complaint's allegations . . . cannot plead loss causation . . . absent a 'subsequent corrective disclosure.'" FAC at 6 (citing Lloyd, 811 F.3d at 1210). The Court further held that the FAC did not adequately plead a stock decline for the December 18, 2015 Form 10-K/A, nor that a material misrepresentation would have caused the decline. Order re FAC at 6. The Court noted that Cunningham "did not allege any drop after Identiv filed its amended 2014 10-K/A that corrected Hart's 2013 and 2014 compensation information," and that Cunningham failed to show that the November 30, 2018 Form 8-K, announcing the BDO resignation, "is related to an actual material misrepresentation." Id. at 6–7.

The SAC alleges, much as the FAC did, that, as a result of Identiv's "material misrepresentations and omissions," the prices of Identiv's securities were "artificially inflated," and that when subsequent disclosures "corrected" these statements, Cunningham and other investors in the company experienced an economic loss due to the "significant[]" price decline. See SAC ¶ 125. It further alleges that the truth about Identiv's internal

controls and Hart's misconduct was "partially revealed, and/or the concealed risks materialized" on five occasions. SAC ¶ 126.[23] These occasions are as follows:

(1) On May 1, 2015, Identiv filed a Notice of Late Filing (Form 12b-25), in which it "disclosed that it had been served with a Complaint by a former employee" and had "formed a Special Committee to investigate the allegations contained in the Complaint." Id. ¶ 128.

(2) On May 4, 2015, Identiv filed a Form 8-K, "reiterating and re-emphasizing" that it was investigating the Ruggiero complaint. Id. ¶ 129. Cunningham alleges that "The revelations on May 1 and May 4, 2015 alerted investors to the existence of the Ruggiero Complaint, and the announced investigation indicated to investors that the allegations on the complaint were serious and had merit." Id. ¶ 130. It asserts that these early May disclosures "partially revealed that Identiv improperly reported executive compensation in previous SEC filings, that Hart engaged in theft of Company resources through improperly expensing personal items . . . and that the Company lacked adequate (entity level) internal controls that would have prevented Hart's misconduct." Id. Identiv's stock fell $0.13 per share the next trading day. Id. ¶ 131.

(3) On May 18, 2015, Identiv filed another Notice of Late Filing (Form 12b-25), disclosing that the Special Committee's investigation was ongoing. Id. ¶ 132. Cunningham alleges that the May 18, 2015 filing "again alerted investors that the allegations in the complaint were material and had merit," and thereby partially revealed the Defendants' fraud. Id. ¶ 133. Identiv's stock fell $0.24 per share the next trading day. Id. ¶ 134.

(4) On November 30, 2015, Identiv filed a Current Report (Form 8-K), disclosing that BDO had resigned, that it was unwilling to be associated with Identiv's 2015 financial statements, that BDO disagreed with the scope and the remediation of the special investigation that was undertaken by the Special Committee, and that BDO had identified "two material weaknesses in the Company's internal control over financial reporting," one about the results of the special investigation undertaken by the Special Committee during 2015, and the other about "revenue recognition." Id. ¶ 135. Cunningham argues that this disclosure "confirmed that Hart was engaged in the wrongdoing [alleged] and that Identiv's Entity Level Controls Weakness existed during fiscal years 2013 and 2014." Id. ¶ 136. He further asserts that "Investors interpreted Identiv's and BDO's statements surrounding BDO's resignation as confirmation that (i) Hart did in fact . . . engage in the improper activity alleged in the Ruggiero complaint . . . and (ii) Identiv maintained a system of inadequate internal controls that allowed Hart to engage in the improper activity." Id. ¶ 138. The SAC cites to a December 1, 2015 report in Seeking Alpha, an investment website, about the news, as well as a commentator identified as "steady888," who commented on it. Id. ¶¶ 138–39.[24] Identiv's stock fell $0.46 per share, or close to 15.5% on December 1,

---

[23] But see Opp'n at 42 (four occasions).

[24] The Seeking Alpha report is a nearly verbatim recitation of quotes from the November 30, 2015 form. See generally Ex. 18. Contrary to the SAC's claim that the report "clearly identified the Entity Level Controls Weakness as a 'material weakness[]' in Identiv's internal control over financial reporting' and not merely as a weakness related to the Special Committee investigation," see SAC ¶ 138, the report offers no new analysis of Identiv's disclosure, see generally Ex. 18. The steady888 comment was: "Basically that means there is a lack of internal control in the finance department. Or there is very little check and balance! It's really a severe lack of accountability for your money! No wonder Hart

2015 on unusually high trading volume.  Id. ¶ 140.

(5)    On December 18, 2015, Identiv filed an amendment to its fiscal year 2014 Annual Report adjusting Hart's compensation  by $97,868 in 2014 and $13,147 in 2013.  Id. ¶ 141.  The SAC does not allege any resulting stock drop.

For the same reasons these occasions did not establish loss causation in the FAC, they fail to establish loss causation in the SAC.

The May 1, 2015 filing does not support loss causation because it merely announced an internal investigation.  See Order re FAC at 6.  The Ninth Circuit in Loos, 762 F.3d at 890, explained that "the announcement of an investigation, without more, is insufficient to establish loss causation."  Loos, 762 F.3d at 890.  In that case, after repeated reports of net losses, the defendant company "disclosed a potential problem with its previously reported revenues" and "revealed it had launched an internal investigation."  See id. at 885.  The company's stock dropped over twenty-three percent.  Id. at 885.  According to the plaintiff, a series of "partial disclosures" from the "disappointing earning results" in the defendant's quarterly reports to the defendant's "subsequent announcement of an internal investigation" "revealed" the defendant's "fraudulent accounting."  Id. at 887.  The Ninth Circuit disagreed: "at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal."  See id. at 887, 890.  An investigation gives "notice of a potential future disclosure," see id. at 890 (emphasis in original), but amounts only to "market speculation" that "cannot form the basis of a viable loss causation theory."  See id. "A mere 'risk' or 'potential' for fraud is insufficient to establish loss causation."  Id. at 889 (discussing Metzler, 540 F.3d at 1055, 1063).

Despite the SAC's conclusory allegations, the May 4, 2015 filing added no new information about the Ruggiero complaint or the Special Committee's investigation.  See id. SAC ¶ 129 ("reiterating and re-emphasizing" prior disclosure); see SAC ¶ 130 (claiming that May 4, 2015 filing revealed that "Hart engaged in theft"); Ex. 9; Order re FAC at 6.  This is not sufficient to demonstrate loss causation.  See Meyer v. Greene, 710 F.3d 1189, 1197–98 (11th Cir. 2013) ("corrective disclosures must present facts to the market that are new, that is,

---

was able to play loose what's business related and what's not.  He basically thought no one was going to find out!"  Ex. 18 at 2.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

publicly revealed for the first time."); <u>Bonanno v. Cellular Biomedicine Grp., Inc.</u>, No. 15-cv-1795-WHO, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) ("New information is critical to demonstrating loss causation."). The same is true of the May 18, 2015 filing. <u>See</u> <u>id.</u>[25] The SAC also fails to account for alternative explanations for the share price decreases in May 2015—for example, that delayed SEC filings could enhance Identiv's risk of being delisted—thereby failing to adequately allege the requisite causal connection.

Cunningham notes, correctly, that "loss causation may be properly alleged even if the economic loss occurs before the fraud is fully revealed." <u>See</u> Opp'n at 41. Cunningham is also correct that "no stock price drop need accompany the subsequent corrective disclosure." <u>Id.</u> (citing <u>Lloyd</u>, 811 F.3d at 1210). But Cunningham's loss causation theory—that "four partial disclosures . . . together corrected and removed the effect of Defendants' fraud claim from Identiv's price, <u>see</u> Opp'n at 42—is both modeled on <u>Lloyd</u>, 811 F.3d 1200, and fails under <u>Lloyd</u>.

<u>Lloyd</u> answered a question left open in <u>Loos</u>: whether the announcement of an investigation, <u>paired with</u> a subsequent correction, can support loss causation. <u>See Loos</u>, 762 F.3d at 890 (noting that subsequent correction was not alleged in complaint); <u>Lloyd</u>, 811 F.3d at 1210 (noting that <u>Loos</u> reserved question). <u>Lloyd</u> answered in the affirmative. <u>See Lloyd</u>, 811 F.3d at 1210. In that case, defendant CVB had represented that it had no "serious doubt" about the ability of its biggest borrower, Garrett, to repay its borrowings. <u>Id.</u> at 1202. Then CVB announced receipt of an SEC subpoena regarding its lending practices and alleged misstatements, and its stock immediately fell by twenty-two percent. <u>See id.</u> at 1204. At the time, several analysts, including Dow Jones and Credit Suisse, noted the probable relationship between the subpoena and CVB's loans to Garrett. <u>Id.</u> at 1204. A month later, CVB announced that Garrett could not pay its loans. <u>Id.</u> at 1205. "[T]he market reacted hardly at all to CVB's bombshell disclosure about its largest borrower, confirming that

---

[25] It was not a new disclosure that the 10-Q would be delayed by the internal investigation, as Identiv had previously disclosed that the internal investigation would delay the 10-K. <u>See</u> Ex. 8 at Part III; Ex. 9 at Item 7.01. Even if that was a new disclosure, news of a delayed 10-Q is not a "subsequent corrective disclosure" because the SAC does not allege a prior misrepresentation about the timeliness of SEC filings. <u>See Dura</u>, 544 U.S. at 347 (requiring causal connection between economic loss and a material misrepresentation).

investors understood the SEC announcement as at least a partial disclosure of the inaccuracy" of CVB's alleged misstatements.  See id. at 1210.  Viewing the "totality" of the other alleged partial disclosures, the court concluded that the complaint "plausibly allege[d]" that the "disclosure of the subpoena caused [CVB's] stock price to drop," and that the market later confirmed its perceptions that the subpoena was "related to CVB's alleged misstatements" and its "concerns" about CVB's loans.  See id. at 1210–11.

Although the announcement of an investigation paired with a subsequent correction can satisfy the loss causation requirement, see Lloyd, 811 F.3d at 1210, the comparison to Lloyd fails because Cunningham cannot point to an analogous subsequent correction. See Meyer, 710 F.3d at 1197–98 ("to be corrective, [a] disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company."); Bonanno, 2016 WL 2937483, at *5 (quoting Lloyd for the proposition that "loss causation is satisfied by pleading 'the defendant revealed the truth through 'corrective disclosures' which caused the company's stock to drop and investors to lose money'").

Unlike the disclosure in Lloyd—a "bombshell disclosure about [CVB's] largest borrower" which was directly contrary to CVB's earlier representation, see 811 F.3d at 1202, 1210—the November 30, 2015 (Form 8-K) announcement of BDO's resignation did not reveal any fraud or even the outcome of the Special Committee's investigation.  See Ex. 14. As discussed above, the filing did not address the alleged 2013 and 2014 Entity Level Controls Weakness.  Although the November 30, 2015 filing was accompanied by a significant stock drop, see SAC ¶ 140, Opp'n at 46, Cunningham must demonstrate "that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors," see Loos, 762 F.3d at 887 (emphasis added).  Here, the stock drop might well have reflected the market's concerns about the two material weaknesses in Identiv's 2015 internal controls that the disclosure actually did identify.  See Ex. 14.  Cunningham has failed "to show that this disclosure" and the resultant stock drop, are "related to an actual material misrepresentation."  See Order re FAC at 7 (citing Metzler, 540 F.3d at 1062).

34

**United States District Court**
For the Northern District of California

Even if the November 30, 2015 filing did send a message to the market about the Ruggiero complaint, the rationale that Loos gives for why the announcement of an investigation does not cause loss causation—that it does not reveal fraud but only the risk of fraud, see Loos, 762 F.3d at 889–90—also applies here.  BDO's resignation was at most "an ominous event" that "put[] investors on notice of a potential future disclosure of fraudulent conduct."  See id. at 890.  Any decline in Identiv's stock price following the announcement of BDO's resignation that was related to the Ruggiero complaint "can only be attributed to market speculation about whether fraud has occurred."  See id. at 890.  The Court therefore rejects the argument of Plaintiff's counsel at the motion hearing that the market must have concluded, "there's truth to these allegations."  The November 30, 2015 filing cannot serve to establish a 'causal connection' to any economic loss."  See Order re FAC at 7.[26]

The December 18, 2015 10-K/A adjusting Hart's income also does not serve as the subsequent correction necessary to satisfy the loss causation requirement under Lloyd.  See Lloyd, 811 F.3d at 1210.  The December 18, 2015 filing did not disclose any prior misrepresentation about controls weaknesses or confirm (or mention) any of the allegations in the Ruggiero complaint.  It also did not disclose that the 2013 and 2014 executive compensation statements had been fraudulent; instead, it reclassified certain expenses as executive compensation, explaining that Identiv had determined that the payments "were not consistent with the Company's expense guidelines and policies or because insufficient documentation was provided to support such expense reimbursements."  Ex. 15 at 9.  In addition, the SAC does not allege any stock drop after the December 18, 2015 filing; Defendants note that the stock price actually increased after the disclosure, see Identiv MTD SAC at 20 (citing Ex. 17).  That is not dispositive under Lloyd, 811 F.3d at 1210, which held

---

[26] The SAC's reliance on the December 1, 2015 Seeking Alpha article as proving what the market understood is misplaced.  The Seeking Alpha article did not add anything new to the November 30, 2015 filing and certainly did not link the November 30, 2015 filing to the alleged Entity Level Controls Weakness in 2013 and 2014.  The comment from steady888, the anonymous commenter, actually does link the November 30, 2015 filing to allegations of Hart's improper reimbursements, see Ex. 18 at 2, if not to a particular misrepresentation, but that single comment does not mean that Cunningham has pled with particularity what the market understood.  See Lloyd, 811 F.3d at 1204 (discussing chatter of numerous analysis, including Dow Jones and Credit Suisse, in interpreting what market understood); see also Bonanno, 2016 WL 2937483, at *5 ("An anonymous poster's opinion cannot reveal to the market the falsity of [defendant's] misrepresentations").

United States District Court
For the Northern District of California

that "no stock price drop need accompany the subsequent corrective disclosure."  But in Lloyd, it was far more clear than it is here both that the market had already understood the fraud to have been revealed (based on the analysis of Dow Jones, Credit Suisse and other analysts at the time of the announcement of the SEC subpoena), and that the corrective disclosure (that its largest borrower could not pay its loans) was actually revealing the "truth" about an earlier misrepresentation (that there was no serious doubt about the largest borrower).

Because the Court concludes that Cunningham failed to adequately plead "that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity," see Loos, 762 F.3d at 887, the Court holds that Cunningham has failed to adequately plead loss causation.

As with the FAC, the SAC fails to adequately allege a material misrepresentation, scienter, or loss causation, and therefore fails to state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5.

### B.      Claim for Violation of Section 20(a) of the Exchange Act

To plead control person liability, a plaintiff must allege (1) a primary violation of federal securities laws and (2) that the defendant exercised actual power or control over the primary violator.  Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  The SAC alleges that Hart and Nelson were  "controlling persons" of Identiv.  See SAC ¶¶ 166-67.  However, because the SAC fails to allege a primary violation, the claim for control person liability also fails.  See Rudolph v. UTStarcom, 560 F. Supp. 2d 880, 892–93 (N.D. Cal. 2008).

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' motions as to both claims.  Although the SAC alleges corporate wrongdoing, it does not adequately allege a securities case.  See Nathanson, 87 F. Supp. 3d at 977 (claims of mismanagement not actionable).  Because Cunningham has previously been granted leave to amend and has failed to add the requisite particularity to his claims, the Court's discretion to deny leave to amend is broad.  See Zucco, 552 F.3d at 1007 (citing In re Read-Rite Corp., 335 F.3d 843, 845 (9th

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cir. 2003)).  The Court's previous dismissal order was based on many of the same points raised by this Order.  See generally Order re FAC.  That Cunningham failed to correct the deficiencies identified in the FAC suggests that he has "no additional facts to plead."  See Zucco, 552 F.3d at 1007 (citing In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1098 (9th Cir. 2002)).  Amendment cannot change the plain language of the SEC filings at issue here. Indeed, Plaintiff's counsel agreed at the motion hearing that "the facts are what they are at this point."  Because amendment would be futile, the Court's dismissal is with prejudice.

**IT IS SO ORDERED.**

Dated: January  4, 2017

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

37