IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIKAR ROK,<br><br>    Plaintiff,<br><br>v.<br><br>IDENTIV, INC., et al.,<br><br>    Defendants. | Case No. 15-cv-05775-CRB<br><br>**ORDER RE RULE 60(B) MOTION** |

In January of 2017, this Court granted with prejudice the motions to dismiss brought by Defendant Identiv, Inc., Defendant Jason Hart, and Defendant Brian Nelson, concluding that the Second Amended Complaint (SAC) failed to adequately state a claim under the securities laws. See generally Order Granting Motions to Dismiss (dkt. 73). The Court entered judgment for the Defendants, and the case is on appeal at the Ninth Circuit, with oral arguments scheduled for just over a month from now. See Judgment (dkt. 74); Mot. (dkt. 80) at 4. Notwithstanding the appeal, Lead Plaintiff Thomas Cunningham argues that there is newly discovered evidence that would change the disposition of the case, warranting the modification of the judgment and the filing of a Third Amended Complaint (TAC). See Mot. at 1 (citing Fed. R. Civ. P. 60(b)). Pursuant to Federal Rule of Appellate Procedure 12.1, Cunningham asks the Court to indicate whether it is inclined to grant relief under Rule 60(b), in which case Cunningham would ask the Ninth Circuit to remand the case. See id. at 13 (citing Fed. R. Civ. P. 60(b); Davis v. Yageo Corp., 481 F.3d 661, 685 (9th Cir. 2007)). The Court finds this matter suitable for resolution without oral argument and VACATES the motion hearing currently set for March 9, 2018. See

1  Civ. L. R. 7-1(b). Because the Court does not agree with Cunningham that the newly
2  discovered evidence would change the disposition of the case, it is not inclined to entertain
3  or grant the motion.

## I.     BACKGROUND

The Court discussed the underlying facts of this case in its dismissal Order, and will not repeat them here. See Order Granting Motions to Dismiss at 1–7. Some procedural history is relevant, however.

On January 4, 2017, the Court dismissed with prejudice the SAC, holding that while it sufficiently alleged material misrepresentations about Hart's executive compensation in three proxy statements filed in 2013 and 2014,[1] it failed to sufficiently allege either scienter or loss causation. See id. at 17, 29, 36; see also SAC ¶¶ 96–100; Order re FAC (dkt. 52) at 3 n.2. Because the allegations did not fix the problems the Court had identified with the First Amended Complaint, the Court concluded that further amendment would be futile, and dismissed with prejudice. Order Granting Motions to Dismiss at 37 (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1007 (9th Cir. 2009)).

Concurrent with this securities action, a related shareholder derivative case has been pending before this Court. See id. at 1 n.1 ("The same alleged conduct forms the basis of the Oswald v. Humphries derivative shareholder case. See Case No. 16-241-CRB."). On October 27, 2017, the Court denied Identiv's motion to dismiss the SAC in the shareholder derivative case. See Order Denying Motion to Dismiss (dkt. 56) in Oswald v. Identiv, Inc., No. 16-cv-00241-CRB (Oct. 27, 2017) (hereinafter Oswald Order). The Oswald Order discussed previously undisclosed information that the plaintiff had added to his complaint after conducting an inspection of Identiv's books and records. See id. at 3. While the SAC in that case was filed under seal, the Oswald Order was filed publicly. See SAC (dkt. 40); Order Granting Motion to Seal [as to SAC] (dkt. 42); Oswald Order; Order Denying

---

[1] The SAC also alleged a second set of material misrepresentations, regarding an "entity level controls weakness," but the Court found those allegations insufficient. See Order Granting Motions to Dismiss at 9–17. This Motion does not relate to the alleged "entity level controls weakness" material misrepresentations.

2

1 Motion to Seal [as to Oswald Order] (dkt. 58) at 1 (noting that "some of the information
2 comes from previously sealed documents").

3 Cunningham points to two pieces of new information discussed in the Oswald
4 Order: (1) the details of BDO's resignation letter; and (2) the magnitude of expenses that
5 Deloitte identified as problematic. See Mot. at 8–13. He argues that both constitute
6 "newly discovered evidence" that warrant relief under Rule 60(b)(2). Id.

## II. LEGAL STANDARD

Rule 60 provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for," among other things, "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). A movant must show that "the evidence . . . was of such magnitude that production of it earlier would have been likely to change the disposition of the case." Jones v. Aero/Chem Corp., 921 F.2d 875, 878 (9th Cir. 1990) (internal quotation marks omitted). Where a court has dismissed for failure to state a claim, a plaintiff must show that the newly discovered evidence would "cure the deficiencies identified by the Court in its order dismissing [the complaint]." Prosterman v. Am. Airlines, Inc., No. 16-cv-2017-MMC, 2017 WL 6759412, at *2 (N.D. Cal. Oct. 5, 2017).

## III. DISCUSSION

Defendants argue that the Motion should fail because it is procedurally improper, untimely, and because the new evidence would not change the disposition of the case. See Opp'n (dkt. 83). The Court agrees only with the last argument.

### A. Procedure

Once a case is on appeal, a district court lacks jurisdiction to decide a motion to vacate judgment. See Davis, 481 F.3d at 685. It may only entertain a Rule 60(b) motion if the movant "'ask[s] the district court if it wishes to entertain the motion, or to grant it, and then move[s] [the circuit] court, if appropriate, for remand of the case.'" Id. (quoting Gould v. Mut. Life Ins. Co. of N.Y., 790 F.2d 769, 772 (9th Cir. 1986)). Defendants argue

3

1    that "insofar as Plaintiff requests that this Court grant the Motion in the first instance . . .
2    the Motion is procedurally deficient." Opp'n at 5. Some language in the Motion and the
3    proposed order seems to seek relief that the Court is unable to grant. See Mot. at 13
4    (asking the Court to grant motion, set aside judgment, and grant leave to file amended
5    complaint); Proposed Order (dkt. 81) (same). But the Motion also discusses the
6    appropriate procedure, and so the Court understands Cunningham to be asking, as an initial
7    matter, whether "the Court is inclined to grant [the] Motion." See Mot. at 13 (citing to
8    Davis, Gould); see also Reply (dkt. 86) at 9–10 ("if the Court is inclined to grant the
9    requested relief under Rule 60(b), Plaintiff will follow the well-established procedures set
10   forth in Fed. R. App. P. 12.1."). Accordingly, the Motion is not procedurally improper.

### B. Timeliness

Rule 60(b) motions must be filed "within a reasonable time" and, in the case of newly discovered evidence, "no more than a year after the entry of judgment or order or the date of the proceeding." See Fed. R. Civ. P. 60(c)(1). "What constitutes 'reasonable time' depends upon the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." Ashford v. Steuart, 657 F.2d 1053, 1055 (9th Cir. 1981) (per curiam). Defendants argue that while Cunningham filed the Motion just under one year from the entry of judgment, it is nonetheless untimely because it comes "months after" the Oswald Order disclosed the new evidence "and on the eve of the one-year cut-off." Opp'n at ii, 5–7. Defendants cite to various cases holding that even a delay of a few months can be unreasonable. Id. at 6.

Cunningham filed the Motion within a reasonable time. The Oswald Order disclosed the new evidence on October 27, 2017, see Oswald Order, and Cunningham brought the Motion on January 3, 2018, see Mot. This is a span of just over two months, and includes the Thanksgiving and Christmas holidays. The court in Ashford gave "great weight" to the "interest in finality" because the time for appeal in that case had passed. See Ashford, 657 F.2d at 1055. Here, Cunningham has already appealed, and that appeal

4

is still pending. The interest in finality is thus not nearly as strong as it was in Ashford. As for the "reason for the delay" and "the practical ability of the litigant to learn earlier of the grounds relied on," see id., Cunningham could not have discovered either the contents of the BDO resignation letter (apart from the description of that letter in the November 30, 2015 Form 8-K) or the additional details about the Deloitte audit until the Court disclosed them in the Oswald Order. Finally, although Defendants complain that they are prejudiced because the appeal has already been briefed and "argument is scheduled to proceed on March 13, 2018—a mere two business days following the March 9, 2018 hearing date on this Motion," Opp'n at 7, this Order vacates the March 9, 2018 motion hearing. Nor has the briefing on this Motion interfered with the briefing in the Ninth Circuit, which was completed in October. See Reply at 4. Given the facts of this case, the Motion is timely.

### C. Merits

To prevail on a Rule 60(b) motion, a movant must show that "the evidence (1) existed at the time of the trial, (2) could not have been discovered through due diligence, and (3) was 'of such magnitude that production of it earlier would have been likely to change the disposition of the case.'" Jones, 921 F.2d at 878 (quoting Coastal Transfer Co. v. Toyota Motor Sales, U.S.A., 833 F.2d 208, 211–12 (9th Cir. 1987)). Defendants do not dispute that Cunningham has met the first two requirements, but argue that he does not meet the third. See Mot. at 7–14. The Court found that the SAC failed to adequately allege both scienter and loss causation as to the executive compensation misrepresentations. See Order Granting Motions to Dismiss at 36. Accordingly, for Cunningham to prevail, the new evidence would have to change the disposition of the case as to both scienter and loss causation. It does not.

#### 1. Scienter

The SAC's theory was that Defendants made the alleged executive compensation misrepresentations "with scienter because Hart and Nelson were aware that Hart was improperly charging the Company for personal expenses," and "given Defendants' . . . focus on expenses, including executive compensation expenses, and Nelson's extensive

5

financial background, Defendants knew that the misrepresentations and omissions regarding Hart's improper expenses would translate into false executive compensation reporting." SAC ¶ 100. The Court's Order included a lengthy discussion of the seven factors that Cunningham claimed supported scienter: (a) the Defendants' direct involvement in and knowledge of the alleged fraud, and Hart's and Nelson's roles as hands-on senior managers, (b) the corroborating accounts of the Ruggiero complaint and CW1, (c) BDO's "noisy" resignation, (d) Identiv's restatement of Hart's compensation figures, (e) the SOX certifications, (f) that the actions of Hart and Nelson allegedly violated Identiv's code of ethics, and (g) Hart's and Nelson's "resulting loss of their corporate positions." See Order Granting Motions to Dismiss at 19–29. The Court concluded that "[w]hile it might well be absurd to suggest that Hart was unaware that he repeatedly sought improper reimbursements for personal items, or that Nelson was unaware that he repeatedly allowed such reimbursements, it is quite another thing to suggest that both were obviously aware of 'the manipulation of the Company's financial reporting to conceal [the] misappropriation.'" Id. at 19–20, 29. The Court explained that there were not "plausible allegations that Hart, who did not prepare his own expenses, and presumably did not prepare the Other Compensation lines of the relevant proxy statements, understood . . . that minor variances in the Other Compensation lines would mislead investors." Id. at 20. The Court emphasized that "[t]he scienter that the SAC is required to allege is an intent to defraud investors—<u>not</u> an intent to get reimbursed for personal items, or an intent to reimburse someone else for personal items." Id. (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976) and other authorities).[2]

The two new pieces of evidence the Motion relies on do not change that analysis.

### a. BDO's Resignation

The first piece of new evidence at issue is the portion of the Oswald Order in which

---

[2] The Court also noted that it had rejected the scienter allegations in the FAC because the FAC "had failed to allege particularized facts showing strong scienter as to the executive compensation statements that was 'at least as compelling as any opposing inferences.'" Id. at 18 (citing Order re FAC at 5 re "sloppy management").

6

the Court discussed BDO's resignation letter. While Cunningham did not have access to the BDO resignation letter in drafting the SAC, the SAC certainly emphasized the significance of BDO's resignation, relying on Identiv's discussion of BDO's resignation in the November 30, 2015 Form 8-K. See SAC ¶¶ 88, 135; Order Granting Motions to Dismiss at 5–6, McGrath Decl. Ex. 14 (dkt. 57-2). The Form 8-K disclosed, among other things, that BDO had "resigned, effective immediately," and that BDO was "unwilling to be associated with the consolidated financial statements prepared by management for any of the fiscal periods within 2015." See McGrath Decl. Ex. 14 at 100 of 156. It went on to say that "the Board formed a Special Committee to investigate the allegations contained in a complaint," and that BDO "disagrees with the scope and remediation of the special investigation that was undertaken by the Special Committee of the Board." Id. Further, the Form stated that BDO had "informed the Board of two material weaknesses," one involving entity level controls, "including a determination by BDO that 'with respect to the results of the special investigation undertaken by the Special Committee during 2015, the Company's senior management leadership and operating style and the Board's oversight did not result in an open flow of information and communication and did not support an environment where accountability is valued.'" Id.

The Court stated in the Order in this case that it did "not see any plausible reading of the [Form 8-K] as confirming that there was an Entity Level Controls Weakness in 2013 or 2014, or even confirming as true the allegations in the Ruggiero complaint." Order Granting Motions to Dismiss at 11. The Court explained that "BDO's objection was to the Special Committee investigation in 2015," and that "BDO's problems with Identiv's leadership were tied to the 'results of the special investigation,' not to any independent assessment BDO had undertaken of 2013 or 2014 conduct." Id.; see also id. at 26 ("Because the BDO resignation was tied to the Special Committee's 2015 investigation of the Ruggiero complaint, the BDO resignation did not reflect a finding by BDO that Defendants made false statements in 2013 and 2014 about . . . Hart's compensation. Accordingly, it is not a basis for finding scienter.").

7

Cunningham asserts that Identiv was "circumspect and provided little information concerning the circumstances of BDO's resignation" in the Form 8-K. Mot. at 7. He argues that the new evidence "reveals the true reasons why BDO abruptly resigned." Id. The evidence he points to is one long paragraph from the Oswald Order, which reads:

> Identiv's independent auditor, BDO, requested on multiple occasions that the Board investigate further, and resigned on November 23, 2015, essentially because the Board refused. Id. ¶ 78. BDO's resignation letter to the Board states that after it became aware of Hart's "improper expenses, including relating to the entertainment of the US Marshals Service," "in accordance with the requirements of Section 10A [of the Securities Exchange Act of 1934,] . . . BDO has sought to determine whether it is likely that an illegal act has occurred; and if so, the possible effect of each illegal act on the financial statements of the Company." Id. Despite "multiple requests by BDO," the Special Committee refused to seek any legal advice from independent counsel regarding whether an illegal act had occurred, and halted the investigation "before Independent Counsel completed its planned investigative procedures." Id. BDO determined that "the Company ha[d] not taken timely and appropriate remedial actions because of, at a minimum, the limitations on the scope of the Independent Investigation, the limited advice provided by the Independent Counsel, and the limited actions taken regarding the on-going role and involvement of Mr. Hart with the Company." Id. BDO advised that it was "unwilling to be associated with the consolidated financial statements prepared by management for the quarterly and annual financial reporting periods for the fiscal year ending December 31, 2015," and resigned effective immediately.

Oswald Order at 7–8. Cunningham argues that this new evidence demonstrates that BDO's resignation "was indeed a 'strong, corrective measure' intended by the auditor to distance itself from wrongdoing and potential illegality by Defendant relating to Hart's improper expense reimbursement practices in 2013 and 2014, and the Company's response thereto," "directly [tying] the circumstances of BDO's noisy resignation with the allegations raised in the SAC." Mot. at 10.

Defendants argue that the new evidence is "cumulative," and they cite to authority holding that merely cumulative evidence is insufficient to form the basis for relief under Rule 60(b). See Opp'n at 10 n.4 (citing Arnett Facial Reconstr. Courses v. Patterson Dental Supply, Inc., No. 11-06929 CBM (Ex), 2013 WL 12246259, at *4 (C.D. Cal. April

8

8, 2013)); see also In re Fort Defiance Housing Corp., No. 10-1918-PHX-JAT, 2011 WL 1578504, at *6 (D. Ariz. April 27, 2011) (same). Some of the new evidence appears cumulative, providing context to what the Form 8-K already disclosed about BDO's dissatisfaction with the Special Committee's investigation. For example, the new evidence clarifies that BDO's disagreement with "the scope and remediation" of the investigation, and with the Board's supervision of the investigation, relates in part to BDO's thwarted requests for further investigation. See McGrath Decl. Ex. 14 at 100 of 156; Oswald Order at 7–8. But not all of the new evidence strikes the Court as merely cumulative. While there is still no evidence that BDO conducted an "independent assessment . . . of 2013 or 2014 conduct," or of the myriad allegations in the Ruggiero complaint, see Order Granting Motions to Dismiss at 11, there is now evidence that by November of 2015, BDO had "became aware of Hart's 'improper expenses,'" thus motivating BDO's push for further investigation. See Oswald Order at 7–8. That is new.

However, while the non-cumulative new evidence supports the allegation that some of Hart's expenses were improper, see id., the Court did not find that Cunningham failed to plead scienter because Hart's expenses were proper. Rather, the Court found that "[t]he scienter that the SAC is required to allege is an intent to defraud investors—not an intent to get reimbursed for personal items, or an intent to reimburse someone else for personal items." Order Granting Motions to Dismiss at 29. The new evidence still does not address the relevant intent. That BDO resigned in November of 2015 because it believed that some of Hart's expenses were improper and that the Special Committee and the Board were not adequately investigating the Ruggiero complaint does not mean that Defendants had a contemporaneous intent to defraud investors when they made the challenged executive compensation statements in the three proxy statements in 2013 and 2014.[3] See id. at 20 (collecting cases).

---

[3] The new evidence also does not change the fact that BDO never revised is previous audits, and repeatedly consented to its audit report of Identiv's 2014 financial statements being incorporated by reference in Identiv's SEC filings. See Opp'n at 10.

9

### b. Amount of Improper Expenses

The second piece of new evidence at issue is the revelation in the Oswald Order that "'Deloitte concluded that $518,601.36 of the charges it reviewed were non-business personal expenses, expenses that violated Company policy and could not be supported as business expenses, or possible business expenses that were incurred in violation of Company policy.'" Mot. at 10–11 (quoting Oswald Order at 6). Cunningham argues that "[t]he sheer magnitude of Hart's improper expense charges revealed in the Oswald Order suggests Hart intentionally misappropriated significant amounts of corporate funds, and directly undercuts the opposing inferences adopted by the Court." Id. at 11.

The Court's Order in this case addressed the amount of money involved in the alleged fraud. In addition to discussing the seven factors that Cunningham alleged support a finding of scienter, the Court noted that "a few additional factors weigh against finding scienter." Order Granting Motions to Dismiss at 22. The Court noted that neither Nelson nor Hart had sold any stock, that Defendants had voluntarily disclosed a different material weakness in internal controls, and that "the amount of money Hart received for his allegedly improper personal expenses was relatively small." Id. The SAC had alleged, based on the December 18, 2015 amended 2014 Annual Report (Form 10-K/A), that the amount of money Identiv had allegedly wrongly reimbursed to Hart between 2013 and 2014 was about $111,000. See id. at 6 (citing to McGrath Decl. Ex. 15; SAC ¶ 91). The Court reasoned, "It makes little sense for Defendants to engage in securities fraud by making misrepresentations about $111,000 over the course of two years, when Hart made over $3.75 million and Identiv earned more than $155 million in net revenue over those same two years." Id. at 22.

For the purposes of this Motion, the Court accepts Cunningham's argument that the Deloitte number is the more accurate amount of improper reimbursements. $518,601.36 represents about 14 percent of Hart's $3.75 million earnings, while $111,000 represents about 3 percent. The Court's point is clearly weaker in light of the new amount. But even removing the point entirely from the Court's analysis of scienter—relying on the seven

10

factors Cunningham pointed to and two, rather than three, additional factors[4]—the Court's conclusion as to scienter is unchanged. There are too many other holdings in the Court's scienter analysis that Cunningham's Motion fails to address. See Order Granting Motions to Dismiss at 17–29. Nor does the Court accept Cunningham's suggestion that the new amount of improper reimbursements affirmatively establishes scienter. See Mot. at 11. The new evidence simply does not give rise to a "strong inference" that Defendants acted with an intent to defraud investors, rather than an intent to see Hart reimbursed for (now $518,601.36 worth of ) personal items. See Order Granting Motions to Dismiss at 19 ("While it might well be absurd to suggest that Hart was unaware that he repeatedly sought improper reimbursements for personal items, or that Nelson was unaware that he repeatedly allowed such reimbursements, it is quite another thing to suggest that both were obviously aware of 'the manipulation of the Company's financial reporting to conceal [the] misappropriation.'"), 20 (citing Ernst & Ernst and other authorities).

### c. Conclusion as to Scienter

Even with the two new pieces of evidence, Cunningham has failed to establish an inference of scienter that a reasonable person would deem "at least as compelling as an opposing inferences one could draw." See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). The Court is not inclined to alter its holding on scienter.

### 2. Loss Causation

The SAC pled loss causation based on market revelation of the fraud. See, e.g., SAC ¶ 125 ("The price of those securities declined significantly when information disclosed to the market for the first time corrected those material misrepresentations and omissions."); id. ¶ 126 ("The truth regarding . . . CEO misconduct was partially revealed, and/or the concealed risks materialized . . ."); id. ¶ 127 ("decline in the value of Identiv securities when the truth was revealed"); id. ¶ 136 ("BDO, through Identiv's disclosure in

---

[4] Cunningham argues in his reply brief that the new number makes it "unlikely that the Court would persist in finding that the amount of Hart's improper expense reimbursements weighed against an inference of scienter," see Reply at 7, and the Court concedes this point.

11

the November 23, 2015 8-K, confirmed that Hart was engaged in . . . wrongdoing . . ."); id. ¶ 138 ("Investors interpreted Identiv's and BDO's statements surrounding BDO's resignation as confirmation"); id. ¶ 139 ("what was obvious to market observers").

The Court's Order discussed the five occasions upon which, the SAC alleged, Defendants' fraud was revealed to the market. See Order Granting Motions to Dismiss at 29–36. One of those occasions was November 30, 2015—the date of the Form 8-K announcing BDO's resignation. See SAC ¶¶ 126, 135. The Court held that the Form 8-K "did not reveal any fraud or even the outcome of the Special Committee's investigation," and that "the stock drop might well have reflected the market's concerns about the two material weaknesses in Identiv's 2015 internal controls that the disclosure actually did identify." See Order Granting Motions to Dismiss at 34. It went on to explain that, even if the Form 8-K sent "a message to the market about the Ruggiero complaint . . . it [did] not reveal fraud but only the risk of fraud," "at most" amounting to "'a potential future disclosure of fraudulent conduct.'" Id. at 35 (quoting Loos v. Immersion Corp., 762 F.3d 880, 889–90 (9th Cir. 2014)). Such a revelation is plainly inadequate. See Loos, 762 F.3d at 890 ("This type of speculation cannot form the basis of a viable loss causation theory."). Summing up all of the SAC's loss causation allegations, the Court held that "Cunningham failed to adequately plead 'that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity.'" See Order Granting Motions to Dismiss at 36 (quoting Loos, 762 F.3d at 887).

Cunningham now argues that the new evidence about BDO's resignation,[5] as well as supplemental authority, would alter the Court's loss causation ruling. See Mot. at 11–12; Reply at 8–9; Notice (dkt. 87). It would not.

### a. Impact of New Evidence

Cunningham argues that the new evidence about BDO's resignation "strongly supports the inference" that "[t]he market understood BDO's resignation . . . as a partial

---

[5] Cunningham does not argue that the new evidence about the amount of improper expenses has any bearing on loss causation.

12

disclosure" of fraud in connection with Hart's improper expenses. Mot. at 12. That argument is fatally flawed. The language from the Oswald Order does shed light on BDO's reasons for resigning. However, language disclosed for the first time in October 2017 sheds no new light on what the market understood in late 2015—the market did not have access to that language in late 2015. See Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1062 (9th Cir. 2008), as amended (Aug. 26, 2008) (requiring allegation that defendant's share price fell significantly once truth became known). Cunningham cannot argue both that the information disclosed in October 2017 was unknowable until October 2017, see Mot. at 8, and that it somehow impacts what the market knew nearly two years earlier.

The Court also rejects Cunningham's contention that "[a]t minimum, the new evidence . . . should afford [him] the opportunity to amend the complaint and further explain the market's understanding of BDO's resignation." See id. at 12. The SAC already alleged that in November 2015, when the market read the Form 8-K and learned that BDO was resigning, the market understood that the Form 8-K was revealing that Hart had engaged in fraud in connection with his executive compensation statements. See, e.g., SAC ¶¶ 136, 138. The Court rejected that reading of the Form 8-K. See Order Granting Motions to Dismiss at 34–35. New allegations expanding upon BDO's motivations in light of this new 2017 language would not materially improve the existing allegations: the Form 8-K says what it says.[6]

### b. Supplemental Authority

Finally, after the close of briefing on this Motion, Cunningham submitted a Notice

---

[6] Cunningham reminds the Court in his reply brief that "at the pleading stage, Plaintiff need only allege facts giving rise to a plausible inference of loss causation." Reply at 8–9 (citing In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008); Lloyd v. CVB Fin. Corp., 811 F.3d 1200 (9th Cir. 2016)). Indeed, "[a] plaintiff does not, of course, need to prove loss causation in order to avoid dismissal; but plaintiff must properly allege it." See Metzler, Inc., 540 F.3d at 1062; see also id. at 1064–65 (rejecting loss causation allegations and noting that "while the court assumes that the facts in a complaint are true, it is not required to indulge unwarranted inferences in order to save a complaint from dismissal."). The new evidence does not help Cunningham clear this hurdle.

13

of Supplemental Authority in Support of Plaintiff's Motion for Relief Pursuant to Fed. R. Civ. P. 60(b), attaching the Ninth Circuit's recent decision in Mineworkers' Pension Scheme et al. v. First Solar Inc. et al., No. 15-17282, slip op. (9th Cir. Jan. 31, 2018) (per curiam). See Notice (dkt. 87). The Mineworkers' Pension Scheme case held that "[t]o prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss," and that "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." Mineworkers' Pension Scheme, slip op. at 6–7.

The pending Motion is not a motion for reconsideration under Civil Local Rule 7-9,[7] but a Rule 60(b) motion, which means that Cunningham cannot relitigate the Court's initial holding as to loss causation but must demonstrate that the new evidence he points to would change the disposition of the case. Mineworkers' Pension Scheme explained that "[w]hen plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory." Id. at 7. As discussed above, the SAC pled a theory of loss causation based on market revelation of the fraud. See, e.g., SAC ¶ 125 ("The price of those securities declined significantly when information disclosed to the market for the first time corrected those material misrepresentations and omissions."). The Court held that Cunningham had failed to adequately plead the market revelation theory. Order Granting Motions to Dismiss at 34–35. The Court's analysis was consistent with, and is unchanged by, Mineworkers' Pension Scheme.

### c. **Conclusion as to Loss Causation**

Language from the Court's October 2017 Oswald Order has no meaningful impact on the Court's analysis of what the market understood of the November 30, 2015 Form 8-

---

[7] A motion for reconsideration arguing that there has been a "material difference in fact or law" from what the Court considered, or the emergence of "new material facts of change of law" after the Court's Order, or a "manifest failure . . . to consider material facts or dispositive legal arguments," would be untimely. See Civil L.R. 7-9(a) (providing that such a motion must be filed "[b]efore the entry of a judgment adjudicating all of the claims. . . ."). A motion for reconsideration also requires leave of the Court. Id.

14

K. Nor does the supplemental authority change the Court's understanding of the law. The Court is not inclined to alter its holding on loss causation.

IV. **CONCLUSION**

The Motion is not procedurally improper or untimely, but because the new evidence it relies on would not change the disposition of the case, the Court is not inclined to entertain or grant it.

**IT IS SO ORDERED.**

Dated: February 9, 2018



CHARLES R. BREYER
United States District Judge